# EXHIBIT B

# ANTITRUST LAW DEVELOPMENTS

court has rejected the relevance of a change in policy outright,[76] and at least one court has upheld monopoly power allegations based on evidence of switching costs even where there was no change in policy. In *Collins v. International Dairy Queen*,[77] the court found monopoly power in a market confined to soft-serve ice cream franchises because evidence of "excessive costs and potential losses associated with purchasing another franchise" effectively locked franchisees into their relationship with Dairy Queen.[78] Other courts have looked at the ability of customers to forecast accurately the total cost of the contract (i.e., life cycle pricing), concluding that the requisite monopoly power may be shown where such costs cannot be completely known and forecast accurately.[79]

## C. Acquiring, Enhancing, or Maintaining Monopoly Power through Exclusionary Conduct

### *1. The Exclusionary Conduct Requirement*

Possession of monopoly power does not alone violate Section 2. The offense of monopolization has a second element: "the willful acquisition or maintenance of [monopoly] power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."[80] As the Supreme Court explained in *Verizon Communications v. Law Offices of Curtis V. Trinko, LLP*:[81]

> The mere possession of monopoly power, and the concomitant charging of monopoly prices, is not only not unlawful; it is an important element of the free-market system. The opportunity to charge monopoly prices—at least for a short period—is what attracts "business acumen" in the first place; it induces risk taking that produces innovation and economic growth. To safeguard the incentive to innovate, the

defendant has not changed its policy after locking-in some of its customers, and the defendant has been otherwise forthcoming about its pricing structure and service policies."); *accord* Digital Equip. Corp. v. Uniq Digital Techs., 73 F.3d 756, 763 (7th Cir. 1996); Lee v. Life Ins. Co., 23 F.3d 14, 19-20 (1st Cir. 1994); ID Sec. Sys. Can. v. Checkpoint Sys., 249 F. Supp. 2d 622, 642 (E.D. Pa. 2003); Universal Avionics Sys. Corp. v. Rockwell Int'l Corp., 184 F. Supp. 2d 947, 956 (D. Ariz. 2001), *aff'd*, 52 F. App'x 897 (9th Cir. 2002).

76. *See* Red Lion Med. Safety v. Ohmeda, Inc., 63 F. Supp. 2d 1218, 1230 (E.D. Cal. 1999) (refusing to follow *PSI Repair*, *Digital Equipment*, and *Lee* because "*Kodak I* does not hold that an aftermarket claim is contingent on a change in a manufacturer's part or service policy").
77. 939 F. Supp. 875 (M.D. Ga. 1996).
78. *Id.* at 883.
79. *See, e.g.*, Xerox Corp. v. Media Scis. Int'l, 660 F. Supp. 2d 535, 547-550 (S.D.N.Y. 2009) (granting plaintiff's motion for summary judgment on defendant's counterclaims of monopolization in replacement color printer ink sticks because defendant was unable to create triable issues of fact as to whether consumers were "locked-in" to using Xerox color printers due to the high costs of acquiring the "lifecycle price" of the equipment); *ID Sec. Sys.*, 249 F. Supp. 2d at 642 ("market imperfections" such as high information costs and high switching costs "could create a less responsive connection" between foremarket and aftermarket); *Universal Avionics*, 184 F. Supp. 2d at 954, 955 ("in very limited circumstances it is possible for 'switching costs,' 'information costs,' and a 'lock in' to create a potential for aftermarket power in the derivative aftermarkets" for manufacturer's own equipment; as to information costs, "[a] substantial number of . . . customers must be too ignorant of 'lifecycle' prices to protect themselves by judicious interbrand comparisons or by contract before they become locked in").
80. United States v. Grinnell Corp., 384 U.S. 563, 570-71 (1966).
81. 540 U.S. 398 (2004).

possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive *conduct.*[82]

This requirement of some form of "anticompetitive conduct"—also called "exclusionary conduct," "deliberateness," or "willfulness"—has long been a part of Section 2 jurisprudence. Defining the contours of this element, however, has been one of the most vexing questions in antitrust law.

Courts suggested in older decisions that the willfulness element could be satisfied if a monopoly was the probable result of the defendant's conduct, as opposed to a situation in which the monopoly was "thrust upon" the defendant.[83] A leading opinion espousing this rationale was Judge Learned Hand's 1945 decision in *United States v. Aluminum Co. of America* (*Alcoa*).[84] However, these cases offered little guidance how to separate lawful from unlawful conduct.

More recent decisions generally have abandoned the view that any conduct conferring monopoly power on a firm or enhancing a monopolist's market position at the expense of a competitor necessarily satisfies the second element of monopolization. Courts instead have attempted to identify and categorize conduct that is "exclusionary" and to distinguish it from conduct that cannot support a Section 2 claim.[85] In *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,[86] for example, the Supreme Court explained that "[t]he question whether [the defendant's] conduct may properly be characterized as exclusionary cannot be answered by simply considering its effect on [the plaintiff]," but must consider its effect on competition and "whether it has impaired competition in an unnecessarily restrictive way."[87] The D.C. Circuit in *United States v. Microsoft Corp.*[88] echoed this point,

82. *Id.* at 407; *see also* Arroyo-Melecio v. Puerto Rican Am. Ins. Co., 398 F.3d 56, 69 (1st Cir. 2005) (alleged monopolist could lawfully "increase its profits through using cheap parts without charging cheaper prices" because, absent anticompetitive conduct, "a monopolist is entitled to exploit a monopoly in order to maximize its profits"); Berkey Photo v. Eastman Kodak Co., 603 F.2d 263, 274 n.12 (2d Cir. 1979) ("Nor is a lawful monopolist ordinarily precluded from charging as high a price for its product as the market will accept. True, this is a use of economic power . . . . But high prices, far from damaging competition, invite new competitors into the monopolized market.") (citations omitted).

83. United States v. Aluminum Co. of Am. (*Alcoa*), 148 F.2d 416, 429 (2d Cir. 1945); *see also* United States v. Paramount Pictures, 334 U.S. 131, 173 (1948) ("the requisite 'purpose or intent' is present if monopoly results as a necessary consequence of what was done"); United States v. Griffith, 334 U.S. 100, 106 (1948) (restraint or monopolization as "necessary and direct result" of conduct); Am. Tobacco Co. v. United States, 328 U.S. 781, 786-87 (1946) ("thrust upon" exception not available where conspiracy is shown).

84. 148 F.2d at 429 ("It does not follow because 'Alcoa' had such a monopoly, that it 'monopolized' the ingot market: it may not have achieved monopoly; monopoly may have been thrust upon it."); *id.* at 429-30 ("[P]ersons may unwittingly find themselves in possession of a monopoly, automatically so to say: that is, without having intended either to put an end to existing competition, or to prevent competition from arising when none had existed; they may become monopolists by force of accident.").

85. Goldwasser v. Ameritech Corp., 222 F.3d 390, 397 (7th Cir. 2000).

86. 472 U.S. 585 (1985).

87. *Id.* at 605. In a footnote, the Court also cited Areeda and Turner's definition of exclusionary conduct: "'[E]xclusionary' comprehends at the most behavior that not only (1) tends to impair the opportunities of rivals, but also (2) either does not further competition on the merits or does so in an unnecessarily restrictive way." *Id.* at 605 n.32 (quoting 3 PHILLIP AREEDA & DONALD F. TURNER, ANTITRUST LAW ¶ 626b, at 78 (1978)); *see also* M & M Med. Supplies & Serv. v. Pleasant Valley Hosp., 981 F.2d 160, 166 (4th Cir. 1992) (en banc) (quoting *Aspen*).

88. 253 F.3d 34 (D.C. Cir. 2001).

stating that an anticompetitive act must "harm the competitive *process* and thereby harm consumers. . . . In contrast, harm to one or more *competitors* will not suffice."[89] The Third Circuit made the same point in *United States v. Dentsply International*[90] observing that "there must be proof that competition, and not merely competitors, has been harmed."[91]

Today, courts agree that only actual "anticompetitive" behavior may satisfy the exclusionary conduct element of monopolization. They also agree that not all aggressive business conduct should be reflexively condemned as anticompetitive, stressing that distinguishing between procompetitive and anticompetitive can be difficult since both can have the same apparent effect of forcing rivals out of the market.[92] As the Supreme Court noted in *Copperweld Corp. v. Independence Tube Corp.*,[93] "it is sometimes difficult to distinguish robust competition from conduct with long-run anticompetitive effects."[94] The D.C. Circuit in *Microsoft* echoed this sentiment: "[w]hether any particular act of a monopolist is exclusionary, rather than merely a form of vigorous competition, can be difficult to discern."[95] Courts have not been able to agree, however, on any general standards to determine "anticompetitive" conduct beyond the highly abstract *Grinnell* language, which has been criticized as unhelpful. As the *Microsoft* court explained, "the challenge for an

89. *Id.* at 58; *see also* Morris Commc'ns Corp. v. PGA Tour, 364 F.3d 1288, 1294 (11th Cir. 2004).
90. 399 F.3d 181 (3d Cir. 2005).
91. *Id.* at 187.
92. *See, e.g.*, Endsley v. City of Chicago, 230 F.3d 276, 283-84 (7th Cir. 2000) (price increase by monopolist is not act of monopolization); Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1062 (8th Cir. 2000) ("[plaintiffs] have not shown that Brunswick's superior market share was achieved or maintained 'by means other than competition on the merits'") (citation omitted); Stearns Airport Equip. Co. v. FMC Corp., 170 F.3d 518, 522 (5th Cir. 1999) ("Exclusionary conduct under section 2 is the creation or maintenance of monopoly by means other than the competition on the merits embodied in the *Grinnell* standard."); Technical Res. Serv. v. Dornier Med. Sys., 134 F.3d 1458, 1466 (11th Cir. 1998) (rejecting § 2 liability if defendant has legitimate business justification for conduct); Multistate Legal Studies v. Harcourt Brace Jovanovich, 63 F.3d 1540, 1550 (10th Cir. 1995) ("A defendant may avoid liability by showing a legitimate business justification for the conduct."); Data Gen. Corp. v. Grumman Sys. Support Corp., 36 F.3d 1147, 1182 (1st Cir. 1994) ("[E]xclusionary conduct does not include behavior which poses no unreasonable threat to consumer welfare but is merely a manifestation of healthy competition, an absence of competition, or a natural monopoly."); Abcor Corp. v. AM Int'l, 916 F.2d 924, 927 (4th Cir. 1990) ("A desire to increase market share or even to drive a competitor out of business through vigorous competition on the merits is not sufficient."); United States v. Syufy Enters., 903 F.2d 659, 669 (9th Cir. 1990) ("an efficient, vigorous, aggressive competitor is not the villain antitrust laws are aimed at eliminating"); Ocean State Physicians Health Plan v. Blue Cross & Blue Shield, 883 F.2d 1101, 1110 (1st Cir. 1989) ("Section 2 does not prohibit vigorous competition on the part of a monopoly"). *But cf.* LePage's Inc. v. 3M Co., 324 F.3d 141, 147-48 (3d Cir. 2003) (citing United States v. Aluminum Co. of Am., 148 F.2d 416, 430 (2d Cir. 1945) (condemning expansion of output that had effect of foreclosing competitive entry); Del. & Hudson Ry. v. Consol. Rail Corp., 902 F.2d 174, 178 (2d Cir. 1990) ("fact that profit maximization is a goal of the [challenged] policy provides support for an argument that the policy is a legitimate practice, but does not shield the policy from judicial scrutiny").
93. 467 U.S. 752 (1984).
94. *Id.* at 767-68. *But see* Am. Needle, Inc. v. NFL, 130 S. Ct. 2201, 2209 (2010) (quoting *Copperweld*, 467 U.S. at 768) (reaffirming that "Congress [has] 'treated concerted behavior more strictly than unilateral behavior,'" and reiterating that "unlike independent action, '[c]oncerted activity inherently is fraught with anticompetitive risk' insofar as it 'deprives the market of independent centers of decisionmaking that competition assumes and demands'").
95. 253 F.3d at 58.

antitrust court lies in stating a general rule for distinguishing between exclusionary acts, which reduce social welfare, and competitive acts, which increase it."[96]

Courts have been more successful in developing workable standards for certain specific types of conduct. Thus, for example, there exists a reasonably precise set of rules in cases involving a challenge to a monopolist's low prices (i.e., "predatory pricing"). It is difficult to make meaningful generalizations about the conduct element when moving away from common business conduct. However, a few considerations touch on multiple categories of conduct and appear frequently in courts' analyses.

The first factor often appearing in opinions is the intent of the defendant. A number of court decisions have interpreted the willfulness element of monopolization to require some element of intent.[97] In *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,[98] the Supreme Court explained that "evidence of intent is . . . relevant to the question whether the challenged conduct is fairly characterized as 'exclusionary' or 'anticompetitive' . . . or 'predatory.'"[99] Other modern cases have stressed that general intent to defeat one's competitors and to obtain dominant or monopoly status is not sufficient to satisfy the second element of a monopolization claim absent predatory conduct.[100] Nor is intent relevant where the conduct is authorized by

96. *Id.*

97. This interpretation apparently stems from *Alcoa*'s discussion of the requirements for monopolization under § 2, where Judge Hand stated: "In order to fall within § 2, the monopolist must have both the power to monopolize, and the intent to monopolize. To read the passage as demanding any 'specific' intent makes nonsense of it, for no monopolist monopolizes unconscious of what he is doing." United States v. Aluminum Co. of Am., 148 F.2d 416, 432 (2d Cir. 1945). Thus, courts have considered proof of a defendant's intent to restrain competition or monopolize the market, although it was not always clear for what purpose. *See, e.g.*, Times-Picayune Publ'g Co. v. United States, 345 U.S. 594, 626 (1953) ("the completed offense of monopolization under § 2 demands only a general intent to do the act"); *see also* U.S. Football League v. NFL, 842 F.2d 1335, 1359 (2d Cir. 1988) ("Evidence of intent and effect helps the trier of fact to evaluate the actual effect of challenged business practices in light of the intent of those who resort to such practices."); E.I. duPont de Nemours & Co., 96 F.T.C. 653, 727 (1980) ("It is simply unrealistic to divorce conduct from intent."). A plaintiff alleging an attempt to monopolize—as opposed to monopolization—must prove the defendant's specific intent to monopolize. *See, e.g.*, Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 602 (1985); *Alcoa*, 148 F.2d at 431-32.

98. 472 U.S. 585 (1985).

99. *Id.* at 602.

100. *See, e.g.*, Endsley v. City of Chicago, 230 F.3d 276, 283 (7th Cir. 2000) (while monopoly power is not unlawful without element of predatory intent, "[b]y intent we do not mean intent to obtain a monopoly or to capture an ongoing increase in market share. This of course is the aim of every business endeavor."); Int'l Travel Arrangers v. NWA, Inc., 991 F.2d 1389, 1394-96 (8th Cir. 1993) (reasoning that evidence of statements by defendants to lower prices and send a signal to competition to stay out of the market, without offering evidence of additional predatory conduct, is not enough for a plaintiff to show predation); Ocean State Physicians Health Plan v. Blue Cross & Blue Shield, 883 F.2d 1101, 1113 (1st Cir. 1989) ("the desire to crush a competitor, standing alone, is insufficient to make out a violation of the antitrust laws"); A.A. Poultry Farms v. Rose Acre Farms, 881 F.2d 1396, 1398, 1402 (7th Cir. 1989) (defendant's statement that "[w]e are going to run you out of the egg business" was not probative because "intent is not a basis of liability (or a ground for inferring the existence of such a basis) in a predatory pricing case under the Sherman Act"); Olympia Equip. Leasing Co. v. W. Union Tel. Co., 797 F.2d 370, 379 (7th Cir. 1986) ("if conduct is not objectively anticompetitive the fact that it was motivated by hostility to competitors . . . is irrelevant"); Ball Mem'l Hosp. v. Mut. Hosp. Ins., 784 F.2d 1325, 1338-39 (7th Cir. 1986) ("'[I]ntent to harm rivals' is not a useful standard in antitrust.").

law.[101] Rather, consistent with *Aspen*'s focus on whether the defendant "attempt[ed] to exclude rivals on some basis other than efficiency,"[102] the focus of recent cases has been on the propriety of the monopolist's conduct, not its subjective desire to win the competitive battle. The D.C. Circuit in *Microsoft* took the approach that "[e]vidence of the intent behind the conduct of a monopolist is relevant only to the extent it helps us understand the likely effect of the monopolist's conduct."[103]

The second important factor appearing in decisions is the *justification* of the defendant for its conduct. Courts often determine whether conduct is to be condemned in part based on a defendant's proffered business justification, together with its significance or magnitude, its relation to the specific conduct in question, and the availability of alternative courses of action with less competitively restrictive results to achieve the same goals.[104]

A third important factor is the *effect* of the conduct and the sufficiency of the evidence that it has *caused* or is likely to cause monopoly power to be acquired, enhanced, or maintained.[105] Effect may be assessed on an *aggregate* basis, as distinguished from examining the impact of its discrete component parts. Even where no single act of an accused monopolist is found to be an act of monopolization, some courts have held that a group of such acts, in the aggregate, can constitute a violation.[106] The D.C. Circuit in *Microsoft* articulated one possible

---

101. *See, e.g.*, Prof'l Real Estate Investors v. Columbia Pictures Indus., 508 U.S. 49, 56-60 (1993) (filing of meritorious lawsuit cannot serve as foundation for antitrust liability regardless of defendant's motive because conduct is immunized by the First Amendment); United States v. Rock Royal Coop., 307 U.S. 533, 542-43, 560 (1939) (defendants' activity authorized by milk cooperative statute did not violate the antitrust laws even "[i]f ulterior motives of corporate aggrandizement stimulated their activities"); *In re* Indep. Serv. Orgs. Antitrust Litig., 203 F.3d 1322, 1327-28 (Fed. Cir. 2000) ("We therefore will not inquire into his subjective motivation for exerting his statutory rights, even though his refusal to sell or license his patented invention may have an anticompetitive effect, so long as that anticompetitive effect is not illegally extended beyond the statutory grant.").

102. 472 U.S. at 605.

103. United States v. Microsoft Corp., 253 F.3d 34, 59 (D.C. Cir. 2001).

104. *See, e.g.*, United States v. Dentsply Int'l, 399 F.3d 181, 196 (3d Cir. 2005) ("[E]ven if a company exerts monopoly power, it may defend its practices by establishing a business justification."); Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1062-63(8th Cir. 2000); Multistate Legal Studies v. Harcourt Brace Jovanovich, 63 F.3d 1540, 1550 (10th Cir. 1995) (conduct unlawful if "more restrictive than reasonably necessary" for "competition on the merits"). Thus, where the proffered legitimate justifications are found to be "pretextual," the conduct may be found to be exclusionary. *See, e.g.*, Eastman Kodak Co. v. Image Technical Servs., 504 U.S. 451, 484 (1992).

105. *See, e.g.*, *Dentsply*, 399 F.3d at 196; Morris Commc'ns Corp. v. PGA Tour, 364 F.3d 1288, 1295 (11th Cir. 2004); *Microsoft*, 253 F.3d at 58-59 ("the plaintiff, on whom the burden of proof of course rests . . . must demonstrate that the monopolist's conduct indeed has the requisite anticompetitive effect"); *cf.* A.I.B. Express v. FedEx Corp., 358 F. Supp. 2d 239, 241 (S.D.N.Y. 2004) (dismissing monopolization claim because "the anticompetitive conduct alleged by AIB is not relevant to the market FedEx is accused of monopolizing").

106. *See* Cont'l Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 698-99 (1962) ("plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after the scrutiny of each"); LePage's Inc. v. 3M Co., 324 F.3d 141, 152-54 (3d Cir. 2003); City of Groton v. Conn. Light & Power Co., 662 F.2d 921, 929 (2d Cir. 1981) (citing Ne. Tel. Co. v. AT&T, 651 F.2d 76, 95 n.28 (2d Cir. 1981)) (the "proper inquiry is whether qualitatively, there is a 'synergistic effect'"); City of Mishawaka v. Am. Elec. Power Co., 616 F.2d 976, 986 (7th Cir. 1980) ("[W]e might agree with the [defendants] that no one aspect standing alone is illegal. It is the mix of the various ingredients of [the defendants'] behavior in a monopoly broth that produces the unsavory flavor."). *But see Microsoft*, 253 F.3d at 78 (declining to rule on plaintiff's "cumulative effect" argument but reversing liability finding

approach when it held that courts can infer causation from the fact that a defendant has engaged in anticompetitive conduct that "reasonably appear[s] capable of making a significant contribution to . . . maintaining monopoly power."[107] To require otherwise would reward the monopolist: "[t]o some degree, 'the defendant is made to suffer the uncertain consequences of its own undesirable conduct.'"[108]

Some courts, enforcement agencies, and commentators have suggested convergence on a single targeted test for identifying exclusionary conduct: "[c]onduct is 'exclusionary' or 'predatory' in antitrust jurisprudence if the conduct would not make economic sense for the defendant but for its elimination or softening of competition."[109] However, many courts continue to take into account other factors described in this chapter.[110]

The next sections cover six types of not uncommon business conduct that have been deemed exclusionary under Section 2: vertical restrictions limiting competitor access to customers or suppliers; denials of rivals' requests for access; product design and new product introduction; predatory pricing; misuses of government and standard-setting processes; and tortious conduct.

## 2. *Vertical Restrictions Limiting Competitor Access to Markets or Supplies*

Vertical restraints are not only potential violations of Section 1; they are also a very common form of conduct to which Section 2 has been applied.[111] Although not

based on "course of conduct" where only acts identified were "not in themselves unlawful"); Intergraph Corp. v. Intel Corp., 195 F.3d 1346, 1366-67 (Fed. Cir. 1999) (court must conduct an analysis as to the validity of each claim); MCI Commc'ns Corp. v. AT&T, 708 F.2d 1081, 1174-77 (7th Cir. 1983) (Wood, J., concurring in part and dissenting in part) (aggregation clouds issues of causation and damage calculation); *City of Groton*, 662 F.2d at 928-29 ("[W]e reject the notion that if there is a fraction of validity to each of the basic claims and the sum of the fractions is one or more, the plaintiffs have proved a violation of the section 1 or section 2 of the Sherman Act.").

107. 253 F.3d at 79 (citing 3 PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶ 650, at 69 (1996); Morgan v. Ponder, 892 F.2d 1355, 1363 (8th Cir. 1989)).

108. 253 F.3d at 79 (citing 3 PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶ 651c, at 78 (1996)).

109. Brief for the United States and the Federal Trade Commission as Amici Curiae Supporting Petitioner at 15, Verizon Commc'ns v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398 (2004) (No. 02-682) (on petition for certiorari); *see, e.g.*, Advanced Health-Care Servs. v. Radford Cmty. Hosp., 910 F.2d 139, 148 (4th Cir. 1990) ("[I]f a plaintiff shows that a defendant has harmed consumers and competition by making a short-term sacrifice in order to further its exclusive, anti-competitive objectives, it has shown predation by that defendant."). The D.C. Circuit applied a similar test in one case, but the context was limited to allegations of refusal to deal with (or "assist") a direct rival. *See* Covad Commc'ns Co. v. Bell Atl. Corp., 398 F.3d 666, 676 (D.C. Cir. 2005).

110. Rambus, Inc. v. FTC, 522 F.3d 456, 464-67 (D.C. Cir. 2008) (holding that "[d]eceptive conduct—like any other kind—must have an anticompetitive effect in order to form the basis of a monopolization claim," but, because the FTC "expressly left open the possibility that [the standard-setting organization] would have standardized Rambus's technologies *even if Rambus had disclosed its intellectual property*. . . . Rambus's alleged deception cannot be said to have had an effect on competition in violation of the antitrust laws . . .") (emphasis in original), *cert. denied*, 129 S. Ct. 1318 (2009); *see also Microsoft*, 253 F.3d at 59 ("the plaintiff must demonstrate that the anticompetitive harm of the conduct outweighs the procompetitive benefit"); *Dentsply Int'l*, 399 F.3d at 189, 191-96 (applying similar regime of shifting burden of production).

111. As a general matter, conduct that would violate § 1 also will violate § 2 if it is engaged in by a monopolist. *See* United States v. Griffith, 334 U.S. 100, 106 (1948) (dealer restraint that violates

all Section 2 cases involving allegations of vertical restrictions fit into clear categories,[112] some of the most frequently used types of vertical restrictions are discussed in the sections that follow: (a) refusals to deal with "disloyal" customers or suppliers, (b) exclusive dealing, (c) tying, (d) loyalty discounts, (e) bundled pricing, and (f) most favored nation and most favored customer clauses.

a. REFUSALS TO DEAL WITH DISLOYAL CUSTOMERS OR SUPPLIERS

One of the oldest categories of vertical restraints that has been found to give rise to Section 2 liability involves refusals to deal or other reprisals taken against "disloyal" customers or suppliers, i.e., customers or suppliers that also do business with a competitor of the defendant. In *Lorain Journal Co. v. United States*,[113] the defendant published the only daily newspaper serving the local market. To prevent competition from a newly established local radio station, the newspaper adopted a plan under which it refused to accept local advertisements from any business that advertised, or that it believed was about to advertise, on the radio station. Because some merchants viewed newspaper advertising as essential to their business, they dropped plans to advertise on the radio station as a result of the newspaper's policy. The Supreme Court concluded that "[t]he publisher's attempt to regain its monopoly of interstate commerce by forcing advertisers to boycott a competing radio station violated § 2."[114]

In *United States v. Dentsply International*,[115] the Third Circuit reversed a district court's decision and held that the dominant manufacturer of artificial teeth in the United States violated Section 2 of the Sherman Act by prohibiting its independent distributors from carrying competing brands of teeth.[116] The court explained that the "test is not total foreclosure, but whether the challenged practices bar a substantial number of rivals or severely restrict the market's ambit."[117] The court held that "[t]he

§ 1 also violates § 2 if used to acquire or maintain monopoly power). Furthermore, in some cases, conduct that does not violate § 1 may nonetheless be sufficient to establish the offense of monopolization under § 2 of the Sherman Act. *See, e.g.*, *LePage's*, 324 F.3d at 144, 157 (holding that 3M violated § 2 even though jury found that same conduct did not violate § 1 of Sherman Act or § 3 of Clayton Act); *Microsoft*, 253 F.3d at 70 (discussing district court's conclusion that plaintiffs failed to show that agreements in question foreclosed enough of market to prevail under § 1, but that same conduct violated § 2).

112. *See, e.g.*, Telecor Commc'ns v. Sw. Bell Tel. Co., 305 F.3d 1124, 1145 (10th Cir. 2002) (affirming § 2 judgment against defendant telephone company that tried to enter into long-term contracts containing onerous early termination provisions with all pay phone sites).

113. 342 U.S. 143 (1951).

114. *Id.* at 152. The defendant did not offer a credible explanation for its conduct other than its desire to eliminate competition. *See id.* at 154 n.8. For a case involving similar facts, see *Kansas City Star Co. v. United States*, 240 F.2d 643 (8th Cir. 1957) (affirming § 2 convictions of executives of large daily newspaper for refusing to take advertisements from, and making reprisals against other firms that also advertised in small competing newspapers); *see also* Gen. Indus. Corp. v. Hartz Mountain Corp., 810 F.2d 795, 808 (8th Cir. 1987) (manufacturer's termination of longtime supplier who began selling a competitor's products violated § 2); Adolph Coors Co. v. FTC, 497 F.2d 1178, 1187 (10th Cir. 1974) (practice of threatening to terminate distributors who did not stop selling all competitors' products violated FTC Act).

115. 399 F.3d 181 (3d Cir. 2005).

116. *Id.* at 185. The conduct at issue was not contractual exclusive dealing, but rather a unilateral policy that Dentsply would terminate distributors that dealt in competitors' products. The dealers could continue to carry brands carried as of Dentsply's adoption of the policy in 1993. *Id.*

117. *Id.* at 191.

proper inquiry is not whether direct sales enable a competitor to 'survive' but rather whether direct selling 'poses a real threat' to defendant's monopoly."[118] Even though distributors did not sign written exclusive contracts with Dentsply and the arrangements were terminable at will, the court determined that, despite "the legal ease with which the relationship can be terminated," dealers "have a strong economic incentive to continue carrying Dentsply's teeth."[119] Therefore, "the rivals simply could not provide dealers with a comparable economic incentive to switch."[120] Finally, the court found that there was no plausible procompetitive justification for Dentsply's loyalty policy.[121]

In *United States v. Microsoft Corp.*,[122] the D.C. Circuit held that Microsoft's threats of reprisals against customers and suppliers violated Section 2 because they served to entrench Microsoft's operating system monopoly.[123] Microsoft had threatened to stop developing the Macintosh version of Microsoft's Office software suite unless Apple stopped distributing Netscape's rival Internet browser with its computers and exclusively used Microsoft's Internet Explorer. The court held that this insistence on an exclusive arrangement had a substantial effect on the distribution of browsers and had no procompetitive justification.[124] Microsoft had also made similar threats to Intel. The D.C. Circuit held that Microsoft offered no procompetitive justification for pressuring Intel not to cooperate with Microsoft's competitors and that many of Microsoft's vertical arrangements violated Section 2 by impeding rivals' ability to distribute and sell their products.[125]

Other cases deal with other forms of disloyalty by customers, such as the initiation of litigation against their supplier. In *Intergraph Corp. v. Intel Corp.*,[126] Intergraph obtained a preliminary injunction against Intel when Intel sought to stop providing technical assistance and prerelease access to Intel's new products to Intergraph in retaliation for Intergraph suing Intel for patent infringement. Intergraph was both a supplier and customer of Intel, but not a competitor.[127] The Federal Circuit reversed, agreeing with Intel that "the antitrust laws do not require it to give preferred treatment to a customer that is suing it,"[128] and rejecting Intergraph's Section 2 claims because "onerous actions do not in themselves constitute antitrust

118. *Id.* at 193; *see also id.* at 196 ("The mere existence of other avenues of distribution is insufficient without an assessment of their overall significance to the market.").

119. *Id.* at 194. The court stated that the many cases holding that short-term exclusive contracts did not violate the antitrust laws were "distinguishable," but it did not elaborate on the difference between those cases and the case at hand. *Id.* at 194 n.2.

120. *Id.* at 195.

121. *Id.* at 197 ("The record amply supports the District Court's conclusion that Dentsply's alleged justification was pretextual and did not excuse its exclusionary practices.").

122. 253 F.3d 34 (D.C. Cir. 2001).

123. Microsoft's practice of not dealing with firms that did business with its competitors was the subject of an earlier consent decree. That decree barred Microsoft from entering license agreements with computer manufacturers for certain products that lasted more than one year, from imposing penalties on manufacturers that elected not to renew a license agreement and from entering license agreements conditioned upon the manufacturer not licensing, purchasing, or distributing any non-Microsoft product. *See* United States v. Microsoft Corp., 1995 U.S. Dist. LEXIS 20533, at *6-8 (D.D.C. 1995) (consent decree).

124. *Microsoft*, 253 F.3d at 73-74.

125. *Id.* at 77-78.

126. 195 F.3d 1346 (Fed. Cir. 1999).

127. *Id.* at 1354.

128. *Id.* at 1358.

violations" and because Intel's refusal to deal with a customer did not harm competition.[129] Other cases have reached the same result.[130]

### b. EXCLUSIVE DEALING

As discussed in Chapter 1, exclusive dealing arrangements require a buyer to purchase products or services for a period of time exclusively or predominantly from one supplier.[131] While allegations of exclusive dealing may provide the basis for liability under Section 2 of the Sherman Act, exclusive dealing by a monopolist or alleged monopolist is not necessarily unlawful.[132] Exclusive dealing can be procompetitive, even when employed by firms with large market shares.[133] For that reason, exclusivity arrangements by monopolists or alleged monopolists have been upheld by courts where there was no significant adverse effect on competition or where the arrangements were supported by sufficient business justification.[134] The determination of liability for exclusive dealing under Section 2 often can be similar to the analysis under Section 1.[135]

The extent to which exclusive dealing jurisprudence under Section 2 differs from exclusive dealing claims in other contexts is not precisely clear. The Supreme Court

---

129. *Id.* at 1358, 1364. *But see* Intel Corp., 128 F.T.C. 213 (1999) (consent order discussing harm to competition caused by Intel's conduct towards Intergraph).

130. *See* Dart Drug v. Parke, Davis & Co., 344 F.2d 173, 186 n.6 (D.C. Cir. 1965) (it was not unlawful to refuse to deal with customer because it instigated Department of Justice antitrust investigation); High Tech Commc'ns v. Panasonic Co., 1995 U.S. Dist. LEXIS 1903, at *6-8 (E.D. La. 1995) (distributor terminated after it filed antitrust suit failed to state claim because termination would not enhance supplier's monopoly power). *But see* Bergen Drug v. Parke, Davis & Co., 307 F.2d 725, 726-27 (3d Cir. 1962) (requiring continued supply during pendency of litigation where termination would enhance supplier's monopoly power and where court believed termination was attempt to intimidate potential witnesses).

131. *See* Chapter 1.D.2.b.

132. *See, e.g.*, Fraser v. Major League Soccer, 284 F.3d 47, 61 (1st Cir. 2002) (exclusive dealing arrangement between league and its governing body was not inherently unlawful; showing of relevant market was required to prevail on § 2 exclusive dealing claim); Advo, Inc. v. Phila. Newspapers, 51 F.3d 1191, 1204 (3d Cir. 1995) (two-year exclusive contracts were insufficiently restrictive to violate § 2); Barry Wright Corp. v. ITT Grinnell Corp., 724 F.2d 227, 237 (1st Cir. 1983) (contract to purchase a large volume from defendant did not violate § 2).

133. *See, e.g.*, Tri-State Rubbish v. Waste Mgmt., 998 F.2d 1073, 1080 (1st Cir. 1993) ("Exclusive dealing contracts may also benefit customers and are unlawful only upon a particularized showing of unreasonableness."); Barr Labs. v. Abbott Labs., 978 F.2d 98, 111 (3d Cir. 1992) (exclusive distribution arrangements enhanced "business goodwill" and provided "high volume, low transaction cost outlets for Abbott's manufacturing capacity"); Ryko Mfg. Co. v. Eden Servs., 823 F.2d 1215, 1235 n.17 (8th Cir. 1987) (exclusive dealing "encourages the manufacturer's investment in marketing activity, and thus encourages interbrand competition").

134. *See* CDC Techs. v. IDEXX Labs., 186 F.3d 74, 80-81 (2d Cir. 1999) (upholding exclusive dealing arrangements by firm with 80% market share); Interface Group v. Mass. Port Auth., 816 F.2d 9, 11 (1st Cir. 1987) ("courts have explicitly permitted even private firms with effective monopoly control of a transportation facility to maintain exclusive dealing arrangements with even a single supplier"; citing cases); *Barry Wright Corp.*, 724 F.2d at 237 (requirements contract justified on ground that it allowed seller to lower costs through better production planning).

135. *See, e.g.*, Geneva Pharms. Tech. Corp. v. Barr Labs., 386 F.3d 485, 502, 508 (2d Cir. 2004) (reversing summary judgment for defendants on both § 1 and § 2 exclusive dealing claims); Omega Envtl. v. Gilbarco, Inc., 127 F.3d 1157, 1167 n.13 (9th Cir. 1997) (conclusion that exclusive dealing practices did not violate Clayton Act disposed of plaintiff's contention that conduct violated Sherman Act §§ 1 and 2); Ticketmaster Corp. v. Tickets.com, 127 F. App'x 346, 348 (9th Cir. 2005) (same foreclosure analysis applied to § 1 and § 2 claims).

has never expressly addressed the standards that apply to Section 2 exclusive dealing claims. In *Tampa Electric Co. v. Nashville Coal Co.*,[136] the Court held that an exclusive dealing arrangement would violate the Clayton Act if the "competition foreclosed by the contract . . . constitute[s] a substantial share of the relevant market."[137] Turning to the Sherman Act claims, the Court opined without discussion that it "need not discuss the respondents' further contention that the contract also violates § 1 and § 2 of the Sherman Act, for if it does not fall within the broader proscription of § 3 of the Clayton Act it follows that it is not forbidden by those of the former."[138]

A number of courts, relying on *Tampa Electric*, have held that exclusive dealing does not violate Section 2 where it does not violate Section 1 of the Sherman Act or Section 3 of the Clayton Act given the greater market power showing required in cases under Section 2.[139] However, other courts have emphasized that a monopolist may be held to a different standard than another firm engaging in exclusive dealing.[140] This position also finds support in the Supreme Court's opinion in *Tampa Electric*, where the Court held that the "relative strength of the parties" is one factor to consider in determining whether there is substantial foreclosure.[141]

Following this principle, a number of courts have held that conduct that would be legal for a nondominant firm can be deemed unlawful exclusionary conduct when performed by a monopolist or a dominant firm. In *United States v. United Shoe Machinery Corp.*,[142] the court held that the defendant violated Section 2 by offering certain shoe manufacturing equipment only pursuant to ten-year leases that discouraged customers from switching to the defendant's competitors. Among other things, the court found that the long-term leases impeded competitor access to customers more than outright sales because a customer who purchased the machinery

136. 365 U.S. 320 (1961).
137. *Id.* at 327-28.
138. *Id.* at 335.
139. *See* Imaging Ctr. v. W. Md. Health Sys., 158 F. App'x 413, 421 & n.6 (4th Cir. 2005) (same business justifications precluded liability for exclusive dealing under both § 1 and § 2); Williams v. I.B. Fischer Nev., 999 F.2d 445, 448 (9th Cir. 1993) ("As the no-switching agreement is not anticompetitive and thus does not establish a section 1 claim, it cannot form the basis of a section 2 claim."); Barr Labs. v. Abbott Labs., 978 F.2d 98, 110 (3d Cir. 1992) ("if the global contracts do not infringe upon the stiffer standards of anti-competitiveness under the Clayton Act, they will also be lawful under the less restrictive provisions of the Sherman Act"); Bepco, Inc. v. Allied-Signal, Inc., 106 F. Supp. 2d 814, 831 (M.D.N.C. 2000) (plaintiff's claims of exclusive dealing could not form the basis for § 2 complaint where the conduct in question was lawful under Clayton Act § 3). However, as in *Tampa Electric*, these decisions usually do not expressly analyze the issues faced under § 2. In *Barr Laboratories*, for example, the Third Circuit's statement quoted above was made in the context of § 1, not § 2, and the court separately found that the defendant did not have market power. 978 F.2d at 113-14. In *Williams*, the court rejected § 1 liability because there was no agreement as a matter of law for § 1 purposes. The court did not separately analyze the § 2 claim other than to say that it was "brief and opaque." 999 F.2d at 448.
140. *See* U.S. Healthcare v. Healthsource, 986 F.2d 589, 597-98 (1st Cir. 1993) (exclusive dealing "can be wrongful in the context of section 2 only where it has or threatens to have a significant exclusionary impact. But a lesser showing of likely effect *might* be required if the actor were a monopolist or one within striking distance."); 3M Co. v. Appleton Papers, 35 F. Supp. 2d 1138, 1145 (D. Minn. 1999) (rejecting defendant's position that § 2 exclusive dealing analysis should be "collapsed into the [§ 1] analytical framework" because, among other things, there was no finding of market power in *Tampa Electric*).
141. 365 U.S. at 329.
142. 110 F. Supp. 295 (D. Mass. 1953), *aff'd per curiam*, 347 U.S. 521 (1954).

could sell it in the secondary market and then turn to another supplier, whereas a customer subject to a long-term lease had no practical way of switching to a competitor during the term of the lease. The court based its opinion in part on lease provisions that, in effect, imposed substantial penalties upon customers who switched during the term of the lease.[143] The court found that a leasing arrangement, which was not unlawful in itself, was exclusionary conduct because it perpetuated United Shoe's market power in an anticompetitive manner.[144]

The leading modern case discussing the differences between exclusive dealing under Section 1 and Section 2 is the D.C. Circuit's *Microsoft* opinion, which expressly addressed the quantum of foreclosure necessary to find liability under Section 2.[145] In *Microsoft*, the United States challenged exclusive dealing under Section 1 and Section 2. The trial court held that the United States did not prove a Section 1 violation, and the United States did not appeal that finding. However, the trial court held that the identical conduct constituted a violation of Section 2.[146] Addressing the question of whether this same conduct could violate Section 2, the D.C. Circuit held that the "basic prudential concerns relevant to §§ 1 and 2 are admittedly the same . . . [but] we agree with plaintiffs that a monopolist's use of exclusive contracts, in certain circumstances, may give rise to a § 2 violation even though the contracts foreclose less than the roughly 40% or 50% share usually required in order to establish a § 1 violation."[147] The court determined that some of Microsoft's exclusive dealing practices violated Section 2.[148]

Subsequently, in *LePage's Inc. v. 3M Co.*,[149] the Third Circuit similarly held that exclusive dealing conduct could violate Section 2 even though a jury had concluded that the same conduct did not violate Section 1 of the Sherman Act or Section 3 of the Clayton Act (and the plaintiff did not appeal those verdicts).[150] Although the plaintiff had not proven any specific percentage of foreclosure in the relevant

---

143. *Id.* at 344-45.

144. *Accord* Eastman Kodak Co. v. Image Technical Servs., 504 U.S. 451, 488 (1992) (Scalia, J., dissenting) ("Where a defendant maintains substantial market power, his activities are examined through a special lens: Behavior that might otherwise not be of concern to the antitrust laws—or that might even be viewed as procompetitive—can take on exclusionary connotations when practiced by a monopolist.").

145. United States v. Microsoft Corp., 253 F.3d 34 (D.C. Cir. 2001).

146. *See id.* at 70.

147. *Id.*

148. *Id.* at 70-73 (exclusives with Internet access providers (IAPs) were unlawful because they "constitute one of the two major channels by which browsers can be distributed" and Microsoft's exclusive deals with 14 of the 15 largest IAPs had a "significant effect in preserving [Microsoft's] monopoly"; "first wave agreements" with independent software vendors were unlawful even though these vendors constituted a "relatively small channel for browser distribution" because Microsoft already had "largely foreclosed the two primary channels to its rivals"). A subsequent decision suggested limiting *Microsoft* to claims involving monopolization (not attempts to monopolize). *See* R.J. Reynolds Tobacco Co. v. Philip Morris Inc., 199 F. Supp. 2d 362, 395 (M.D.N.C. 2002) ("Plaintiffs cite the *Microsoft* case in arguing that their Section 2 claims can survive even if their Section 1 claim does not. The *Microsoft* court did identify a small window through which a Section 2 claim could pass, surviving the failure of a Section 1 claim based on the same conduct; however, the *Microsoft* window is open only to claims against monopolists, and even then in limited circumstances involving exclusive contracts."), *aff'd*, 67 F. App'x 810 (4th Cir. 2003).

149. 324 F.3d 141 (3d Cir. 2003) (en banc).

150. *Id.* at 157.

market,[151] the court stated that the exclusive dealing conduct should be considered in the context of all of the other conduct at issue.[152]

In *Dentsply*, the district court held that, "based on the court's finding that Dentsply is not in violation of § 3 of the Clayton Act, Dentsply is not in violation of § 2 of the Sherman Act either."[153] On appeal, however, the Third Circuit again rejected the argument that exclusive dealing conduct cannot violate Section 2 if it does not violate Sherman Act Section 1 or Clayton Act Section 3.[154] The court held that, by entering into a series of short-term exclusive dealing agreements with dealers, Dentsply had unlawfully maintained its monopoly power in the market for artificial teeth.[155]

Relying on Section 5 of the FTC Act, the FTC recently challenged conduct of Intel Corporation in furtherance of alleged monopolization of the market for central processing units (CPUs) used in personal computers. Under a consent decree, Intel is enjoined from conditioning payment of large rebates and other benefits to computer manufacturers on condition that they purchase CPUs exclusively from Intel.[156]

Foreclosure of a substantial share of the market has been dispositive in many exclusive dealing cases. For example, in *B&H Medical v. ABP Administration, Inc.*,[157] the Sixth Circuit, in rejecting the plaintiff's exclusive dealing claim,[158] held that a "substantial share" of the relevant market must be foreclosed and that levels under 40 percent were unlikely to raise competitive issues.[159] Similarly, in *Digene Corp. v. Third Wave Technologies*,[160] the Federal Circuit held that Third Wave did not adequately allege that it was substantially foreclosed from the human papillomavirus test market after Digene entered into certain contracts with customers that included penalties for early termination and failure to purchase minimum amounts.[161] The court reasoned that these contracts were not exclusionary because they did not prohibit customers from buying tests from Third Wave, which was already competing in the market and simply "lost that competition."[162]

---

151. *Id.* at 158-59 (noting "*Microsoft* opinion does not specify what percentage of the browser market Microsoft locked up").
152. *Id.* at 159.
153. United States v. Dentsply Int'l, 277 F. Supp. 2d 387, 451 (D. Del. 2003), *rev'd*, 399 F.3d 181 (3d Cir. 2005). The court did not address the opposite conclusion reached by the Third Circuit in *LePage's*.
154. 399 F.3d at 197.
155. *Id.*
156. *See* In the Matter of Intel Corp., Analysis of Proposed Consent Order to Aid Public Comment, at 9, No. 9341 (Aug. 4, 2010), *available at* http://www.ftc.gov/os/adjpro/d9341/100804intelanal.pdf.
157. 526 F.3d 257 (6th Cir. 2008).
158. *Id.* at 267.
159. *Id.* at 266 (quoting Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 328-29 (1961)).
160. 323 F. App'x 902 (Fed. Cir. 2009).
161. *Id.* at 910-11.
162. *Id. See also* Church & Dwight Co. v. Mayer Labs., 2011 U.S. Dist. LEXIS 35969, at *46-48 (N.D. Cal. 2011) (finding that, while numerous factors ultimately inform substantial foreclosure analysis, counterclaim survived motion to dismiss when its "extensive allegations establish[ed] anticompetitive conduct and the foreclosure of competition in a substantial share" of relevant market); E.I. du Pont de Nemours & Co. v. Kolon Indus., 683 F. Supp. 2d 401, 425 (E.D. Va. 2009) (counterdefendant's foreclosure of 43% of the market through exclusive dealing arrangements was sufficient to plead an exclusive dealing claim), *rev'd on other grounds*, 637 F.3d 435 (4th Cir. 2011).

What constitutes "substantial foreclosure" remains hotly contested. In September 2008, the DOJ issued a report[163] on single-firm conduct under Section 2 of the Sherman Act advocating an exclusive dealing safe harbor for conduct foreclosing less than 30 percent of a market and the application of a disproportionality test, under which exclusive dealing would be condemned only when "(1) it has no procompetitive benefits, or (2) if there are procompetitive benefits, the exclusivity arrangement produces harms that are substantially disproportionate to those benefits."[164] Both of these provisions were promptly criticized by three FTC Commissioners[165] in a public statement. Subsequently, the DOJ on May 11, 2009, withdrew its report and ceased following its recommendations.[166] The DOJ now contends that it will focus on the impact exclusionary conduct has on consumers by "aggressively pursuing cases where monopolists try to use their dominance in the marketplace to stifle competition and harm consumers."[167]

The absence of coercion was deemed significant by the Third Circuit in its analysis of a claim against an alleged monopolist for exclusive dealing. Without regard to the extent of market foreclosure, the court held in *Race Tires America, Inc. v. Hoosier Racing Tire Corp.*[168] that failure by the plaintiff tire manufacturer, STA, to demonstrate that its competitor, Hoosier, had coerced sports car racing sanctioning bodies to enter into exclusive supply contracts was fatal to its Section 2 claim. Because both STA and Hoosier competed head to head for the opportunity to enter into exclusive supply contracts and because sanctioning bodies made their own equipment rules and "freely entered into exclusive contracts with the respective suppliers,"[169] there was no evidence that Hoosier had "coerced or otherwise unduly interfered with the decision-making process of the various sanctioning bodies."[170]

### c. TYING

As discussed in more detail in Chapter 1, a tying arrangement is an agreement by a firm to sell one product (the "tying product"), but only on the condition that the buyer also purchases another product (the "tied product").[171] Tying arrangements are more frequently challenged under Section 1 of the Sherman Act, but unlawful tying also can constitute exclusionary conduct under Section 2.[172]

---

163. U.S. DEP'T OF JUSTICE, COMPETITION AND MONOPOLY: SINGLE-FIRM CONDUCT UNDER SECTION 2 OF THE SHERMAN ACT (2008), *available at* http://www.justice.gov/atr/public/reports/236681.pdf.
164. *Id.* at 140-41.
165. Statement of Commissioners Harbour, Leibowitz, and Rosch on the issuance of the Section 2 Report by the Department of Justice (September 2008), *available at* http://www.ftc.gov/os/2008/09/080908section2stmt.pdf.
166. *See* DOJ Press Release, Justice Department Withdraws Report on Antitrust Monopoly Law (May 11, 2009), *available at* http://www.justice.gov/atr/public/press_releases/ 2009/245710.pdf.
167. *Id.*
168. 614 F.3d 57 (3d Cir. 2010).
169. *Id.* at 78.
170. *Id.*
171. *See* Chapter 1.D.2.a.
172. *See, e.g.*, United States v. Microsoft Corp., 253 F.3d 34 (D.C. Cir. 2001) (tying conduct violated § 2; remanded for determination of whether same conduct violated § 1); Multistate Legal Studies v. Harcourt Brace Jovanovich, 63 F.3d 1540, 1550 (10th Cir. 1995) (finding triable issues surrounding § 1 tying claim and noting that "[i]llegal tie-ins and predatory pricing under section 1 may also qualify as anticompetitive conduct for section 2 purposes").

Although there are few cases that explicitly address the separate treatment of ties under Section 2, there are differences between tying analysis under Section 1 and Section 2. One distinction is that tying-like conduct that may not satisfy the traditional requirements for a tying claim under Section 1 may nonetheless violate Section 2. This could be true, for example, where the plaintiff cannot satisfy the separate product or agreement requirements for Section 1 purposes.[173] Furthermore, Section 2 analysis requires proof of actual or probable monopolization of the tied or tying product market. Section 1, in contrast, requires no such proof.[174]

In Section 1 tying cases, the focus is on harm to competition in the tied product market. Under Section 2, the plaintiff might show that the defendant used a tie to maintain its monopoly power in the tying product market[175] or that the defendant is using the tie to attempt to monopolize the tied product market. A tie can raise entry barriers by effectively requiring new firms to enter both markets simultaneously.[176]

### d. LOYALTY DISCOUNTS

Some Section 2 claims involve loyalty discounts and other incentives provided by a seller to encourage the purchase of its goods and services. Such conduct can take many possible forms, including market share discounts, rebates, and other payments to encourage purchases from the seller. For this reason, it is difficult to generalize, and the analysis in any case tends to be fact-specific.

As a threshold matter, there is nothing inherently suspect in a monopolist offering attractive pricing or other incentives to encourage repeat business from loyal customers. In fact, such conduct is more often than not beneficial to consumers.[177] Thus, simple volume discounts—whether designed to reward loyal customers or simply to encourage larger purchases—have been upheld.[178] In many of the cases

173. *See, e.g.*, *Multistate Legal Studies*, 63 F.3d at 1548, 1551 (linking of two products by giving away one of them for free could violate § 2 even though coercion element was missing for § 1 purposes); Image Technical Servs. v. Eastman Kodak Co., 125 F.3d 1195, 1201, 1217 n.10 (9th Cir. 1996) (same conduct alleged as basis for § 1 tying and § 2 monopolization claim; affirming jury verdict for plaintiffs on § 2 claim even though plaintiffs dropped § 1 tying claim, apparently for lack of evidence of agreement); Tele Atlas N.V. v. NAVTEQ Corp., 2008 U.S. Dist. LEXIS 111866, at *74-76 (N.D. Cal. 2008) (denying defendant summary judgment on § 2 tying claim even though court found insufficient evidence of market power in the tying market to support a § 1 claim); *cf.* C.R. Bard, Inc. v. M3 Sys., 157 F.3d 1340, 1382-83 (Fed. Cir. 1998) (defendant redesigned its biopsy gun so that it would not accept disposable needles made by rivals; without any discussion of § 1 tying requirements, court held this tying-like conduct violated § 2 if undertaken for predatory purposes). *But see* Zschaler v. Claneil Enters., 958 F. Supp. 929, 943-44 (D. Vt. 1997) (granting summary judgment for defendant on § 2 tying claims for failure to show two separate products or coercion).

174. *See, e.g.*, *Microsoft*, 253 F.3d at 85; Ortho Diagnostic Sys. v. Abbott Labs., 920 F. Supp. 455, 472 & n.26 (S.D.N.Y. 1996) (tying conduct may violate § 2 if defendant has market power in either tying or tied product market); Chapter 1.D.2.a.

175. *See Microsoft*, 253 F.3d at 95-96 (discussing distinction between tying evidence used to support monopoly maintenance claim and analysis of same evidence in context of § 1 tying claim).

176. *See id.* at 56, 62, 65-66.

177. *See, e.g.*, Virgin Atl. Airways v. British Airways, 257 F.3d 256, 265 (2d Cir. 2001) ("These kinds of agreements allow firms to reward their most loyal customers. Rewarding customer loyalty promotes competition on the merits.").

178. *See, e.g.*, W. Parcel Express v. UPS, 190 F.3d 974, 976 (9th Cir. 1999) (volume discounts "are legal under antitrust law"); Advo, Inc. v. Phila. Newspapers, 51 F.3d 1191, 1203 (3d Cir. 1995) (volume discounts "offend no antitrust principles"); *cf.* LePage's Inc. v. 3M Co., 324 F.3d 141, 154

where the challenged conduct is some type of discounting practice, the court's analysis may turn in whole or substantial part on whether the prices that result satisfy the standards for predatory pricing.[179] Assuming the court determines that the predatory pricing analysis of *Brooke Group v. Brown & Williamson Tobacco Corp.*[180] does apply, the loyalty pricing scheme violates Section 2 only if the plaintiff demonstrates that (1) the loyalty program caused prices to drop below the appropriate measure of the defendant's costs, and (2) there is a dangerous probability that the defendant will recoup its losses from the predatory pricing.[181]

Courts also have analyzed loyalty discounts under an exclusive dealing rubric. Discounts that are expressly contingent on exclusivity are often treated as the legal equivalent of exclusive dealing contracts.[182] Courts are split on whether to apply exclusive dealing analysis where the discounts do not require exclusivity but only provide financial inducements to distributors to purchase most or all of their needs from the defendant. This is sometimes called "de facto exclusive dealing."[183]

---

(3d Cir. 2003) (distinguishing "concededly legal" volume discounts). Some courts have distinguished volume discounts on single products from so-called "bundled discounts" on multiple products. Bundled discounts are discussed in the following section.

179. For example, in *United States v. AMR Corp.*, 140 F. Supp. 2d 1141, 1193 (D. Kan. 2001), *aff'd*, 335 F.3d 1109 (10th Cir. 2003), American Airlines instituted a "massive incentive program" for travel agents in certain markets and offered free upgrades to corporate customers and frequent fliers. Applying the predatory pricing rules developed in *Brooke Group v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 222-24 (1993), the court determined that this conduct (and the other conduct at issue) did not violate § 2. 335 F.3d at 1194 (finding that the government's argument that *Brooke Group* should not apply to its "predatory capacity" claim was a "fundamentally flawed attempt to circumvent the high standards for proof of a predatory pricing claim by semantic sleight of hand"); *see also* N.W.S. Mich., Inc. v. Gen. Wine & Liquor Co., 58 F. App'x 127, 129-30 (6th Cir. 2003) (claim about defendant's rebate and discount program was a claim about defendant's pricing; competitor has no standing to bring a pricing claim absent an allegation of predatory pricing); *Virgin Atl. Airways*, 257 F.3d at 266-72 (determining legality of incentive program by applying predatory pricing standards). However, as discussed in the following section, bundled rebates are usually treated differently.

Other courts have refused to apply a predatory pricing analysis to complaints about discounting under § 2. *See LePage's*, 324 F.3d at 151-52 (court agreed with plaintiffs that claim did not need to satisfy the *Brooke Group* test since there was no claim for predatory pricing); Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1062 (8th Cir. 2000) (defendant argued that its market share discounts were per se lawful because plaintiff did not try to prove below-cost pricing; court disagreed and engaged in full analysis of legality of discounts); *cf. Ortho Diagnostic Sys.*, 920 F. Supp. at 468 n.16 ("The parties have expended a good deal of energy in debating whether [the plaintiff's] claim is properly characterized as one of predatory pricing.").

180. 509 U.S. 209, 222-24 (1993); *see* part C.5 of this chapter for a discussion of predatory pricing.

181. 509 U.S. at 222-24.

182. *See* Allied Orthopedic Appliances v. Tyco Health Care Group LP, 592 F.3d 991, 1002 (9th Cir. 2009) (holding that defendant's discount agreements did not contractually obligate or otherwise force customers to purchase its products rather than competitors); *LePage's*, 324 F.3d at 158-59 (discussing 3M's discounts expressly requiring exclusivity); Natchitoches Parish Hosp. Serv. Dist. v. Tyco Int'l, Ltd., 2009 U.S. Dist. LEXIS 108858, at *19-21 (D. Mass. 2009) (plaintiff provided sufficient evidence of exclusionary loyalty discount agreements to withstand summary judgment); *cf.* United States v. Microsoft Corp., 253 F.3d 34, 68-70 (D.C. Cir. 2001) (analyzing arrangements under which Microsoft provided various incentives such as technical support in return for some form of exclusive distribution of Microsoft's products as traditional exclusive dealing).

183. *See LePage's*, 324 F.3d at 158-59 (small exclusive contracts coupled with rebates and discounts "designed to induce [customers] to award business to 3M to the exclusion of LePage's" amounted to unlawful exclusive dealing under § 2); *Concord Boat*, 207 F.3d at 1063 (market share discounts were not exclusive dealing contracts because they did not require that the customer purchase all of

Courts also have judged the legality of the loyalty programs under Section 2 using "generic" Section 2 principles rather than the more clearly defined standards applicable specifically to predatory pricing or exclusive dealing.[184] In such cases, there may be a variety of different discounts, rebates, and other incentive programs at issue. Although it is difficult to generalize, particularly given the relatively small number of published opinions, factors that courts have taken into account in determining liability include whether buyers were effectively coerced by the incentive programs into buying mostly or exclusively from the defendant and whether competitors can practicably match the loyalty discounts offered by the defendant.[185] The defendant's procompetitive justifications for its conduct are another important consideration.[186]

---

its engines from Brunswick); R.J. Reynolds Tobacco Co. v. Philip Morris Inc., 199 F. Supp. 2d 362, 394-95 (M.D.N.C. 2002) (analyzing Philip Morris' Retail Leaders program, under which Philip Morris provided financial incentives to distributors to feature Philip Morris products prominently at in-store displays, using guidelines applicable to traditional exclusive dealing and holding that the program did not violate § 1 or § 2 because there was no substantial foreclosure), *aff'd*, 67 F. App'x 810 (4th Cir. 2003) ("plaintiffs did not show that Retail Leaders substantially forecloses competition in the relevant market"); *cf.* W. Parcel Express v. UPS, 190 F.3d 974, 976 (9th Cir. 1999) (volume discounts are not the equivalent of exclusive dealing and "are legal under antitrust law"); Coca-Cola Co. v. Harmar Bottling Co., 218 S.W.3d 671, 688 (Tex. 2006) (interpreting federal law not to prohibit a loyalty program offered by a firm with a 75%-80% market share where there was "no evidence of substantial foreclosure or anti-competitive effect").

184. *See LePage's*, 324 F.3d at 152; *Concord Boat*, 207 F.3d at 1062 (finding that defendant's market share discounts were competition on the merits and were justified on the ground that defendant "was trying to sell its product"); Masimo Corp. v. Tyco Health Care Group, 2006 U.S. Dist. LEXIS 29977, at *13-19, *33 (C.D. Cal. 2006) (finding sufficient evidence to support § 1 and § 2 verdicts for plaintiff on market share discounts), *aff'd*, 350 F. App'x 95 (9th Cir. 2009); Avery Dennison Corp. v. ACCO Brands, 2000 U.S. Dist. LEXIS 3938, at *32 (C.D. Cal. 2000) (denying defendant's motion for summary judgment where defendant paid and budgeted millions of dollars to obtain exclusivity agreements, offered bundled rebates for customers who agreed to exclusivity, and paid millions of dollars in "trade promotions" to commercial customers, among other practices, to ensure that plaintiff's entry into the market for machinable labels would not be successful).

185. *Compare Concord Boat*, 207 F.3d at 1063 (rejecting plaintiffs' contention that defendant's market share discounts placed customers in "golden handcuffs" based on evidence that customers "were free to walk away from Brunswick's discounts at any time, and the evidence showed that they did so when Brunswick's competitors offered better discounts") *with* ZF Meritor LLC v. Eaton Corp., 769 F. Supp. 2d 684, 692 (D. Del. 2011) ("a reasonable jury ... could have concluded that compliance with the market penetration targets [in defendant's supply contract] was mandatory because no risk averse business would jeopardize its relationship with the largest manufacturer of transmissions in the market"). *See also* Virgin Atl. Airways v. British Airways, 257 F.3d 256, 270 (2d Cir. 2001) ("no evidence in the instant case is offered to show that British Airways' incentive agreements were coercive in relation to the transatlantic routes identified by Virgin"). As discussed below, courts have tended to find bundled discounts to be more coercive than other types of discount programs.

186. *LePage's*, 324 F.3d at 164 (rejecting 3M's proffered business justification as unsupported in the record and noting that "[t]he fact 3M acted to benefit its own economic interests is hardly a reason to overturn the jury's finding that it violated § 2 of the Sherman Act"); *Virgin Atl. Airways*, 257 F.3d at 265 (in the context of discussing the § 1 claim, noting that the "efficiency argument in favor of incentive agreements like those used by British Airways is obvious"); *Concord Boat*, 207 F.3d at 1062 ("Brunswick's business justification in this case is that it was trying to sell its product."); *cf.* United States v. AMR Corp., 140 F. Supp. 2d 1141, 1204-08 (D. Kan. 2001) (American Airlines' practices were justified on the ground that it was meeting competition), *aff'd on other grounds*, 335 F.3d 1109, 1120 n.15 (10th Cir. 2003) (declining to decide whether the

e. BUNDLED PRICING

Bundled pricing is a particular form of loyalty discount that has received considerable attention in recent years. Bundled discounts or rebates are similar to volume discounts, but they are awarded when customers make a sufficient number of purchases across multiple product lines, in contrast to traditional volume discounts calculated based on purchases of a single product (or product line). Some courts have expressed the concern that bundled rebates or discounts offered by large firms with diverse product lines may impair competition in circumstances where the bundled discount cannot be matched by smaller firms that compete with the large firm in only one product line. Bundled pricing is sometimes described as coercive in the sense that the rebates or discounts offered on a large bundle of products might be so large that it would be economically irrational for a customer to buy a single product from another seller and risk not earning the rebate on the entire bundle. Courts have tended to treat bundled pricing as distinct from other types of loyalty discounts.[187] They have taken a variety of approaches to assessing the legality of such discounts under Section 2.

In *SmithKline Corp. v. Eli Lilly & Co.*,[188] the Third Circuit affirmed a district court decision finding unlawful Lilly's discount on a bundle of three antibiotics—two of which were available only from Lilly. The court held the bundle unlawful because Lilly linked products on which it faced no competition with a competitive product. "The result was to sell all three products on a competitive basis in what otherwise would have been a competitive market for [the two recently introduced antibiotics]."[189] The court did not evaluate whether the bundle resulted in Lilly selling below cost if the entire discount were applied to the product where it faced competition, although the district court found that a competing firm that was as efficient as Lilly, but that sold only the competitive product, would not be able profitably to match Lilly's bundled price.[190]

The Third Circuit returned to the issue of bundled discounts in *LePage's Inc. v. 3M Co.*[191] The case involved bundles of 3M's popular Scotch brand tape with products from other 3M businesses. LePage's maintained that the bundled pricing impaired its ability to sell its tape products, including private label products, to retailers. The Third Circuit took the case en banc after a Third Circuit panel reversed

---

district court correctly extended the meeting competition defense from the Robinson-Patman Act to the § 2 context).

187. *See Concord Boat*, 207 F.3d at 1062 ("Because only one product, stern drive engines, is at issue here and there are no allegations of tying or bundling with another product, we do not find these [bundled rebate] cases persuasive."); Advo, Inc. v. Phila. Newspapers, 51 F.3d 1191, 1203 (3d Cir. 1995) ("PNI's discounts, based on the total amount of dollars spent by a customer, offend no antitrust principles. Such 'total quantity' discounts distinguish this case from *SmithKline Corp. v. Eli Lilly & Co.*, [575 F.2d 1056 (3d Cir. 1978)], where we found that discounts *tied to the purchase of specific items* might amount to unlawful leveraging of monopoly power.") (citation and footnote omitted; emphasis in original); *cf. Virgin Atl. Airways*, 257 F.3d at 270 (distinguishing *SmithKline* and *LePage's* on the ground that British Airways' loyalty discounts were not coercive).

188. 575 F.2d 1056 (3d Cir. 1978).

189. *Id.* at 1065.

190. *See* SmithKline Corp. v. Eli Lilly & Co., 427 F. Supp. 1089, 1108 (E.D. Pa. 1976) (taking Lilly's rebates in the aggregate "into consideration, SmithKline's profitability disappears, even if SmithKline were able to reduce its costs of goods to Lilly's levels"), *aff'd*, 575 F.2d 1056 (3d Cir. 1978).

191. 324 F.3d 141 (3d Cir. 2003) (en banc).

a jury verdict in LePage's favor on the Section 2 claim.[192] The en banc court rejected 3M's argument that its bundled pricing did not violate Section 2 because LePage's had made no attempt to prove that any of 3M's prices were below cost. Instead, the court held that predatory-pricing standards did not apply because LePage's did not allege predatory pricing.[193] Focusing first on the bundled rebates, the court compared the harm from bundling to tying, "whose foreclosure effects are similar."[194] According to the court, "[t]he principal anticompetitive effect of bundled rebates . . . is that when offered by a monopolist they may foreclose portions of the market to a potential competitor who does not manufacture an equally diverse group of products and who therefore cannot make a comparable offer."[195] In affirming the jury verdict, the court relied in particular on evidence that the rebates in some cases were "as much as half of LePage's entire prior tape sales to that customer."[196] The court also noted evidence from which the jury could have concluded that 3M intended to eliminate the private label tape segment and then raise prices.[197] The court rejected the argument that 3M's conduct was justified because the bundled rebates were designed to sell more 3M products. The court did not, however, articulate any specific standard for evaluation of when bundled rebates are unreasonably exclusionary.[198]

An earlier district court decision, *Ortho Diagnostic Systems v. Abbott Laboratories*,[199] applied a more specific test to the analysis of bundled discounts. The court held that a plaintiff challenging a monopolist's bundling of products on which it faces competition with products for which it is the only source "must allege and prove either that (a) the monopolist has priced below its average variable cost or (b) the plaintiff is at least as efficient a producer of the competitive product as the defendant, but that the defendant's pricing makes it unprofitable for the plaintiff to continue to produce."[200]

Other courts have criticized *LePage's*. In *Cascade Health Solutions v. PeaceHealth*,[201] the Ninth Circuit applied the *Brooke Group* below-cost pricing test to bundled discounts in a case involving the claim that the defendant hospital offered bundled discounts to commercial insurers of 35% to 40% of tertiary services if the insurance companies made the defendant their preferred hospital for all services—primary, secondary, and tertiary.[202] The court held "the exclusionary conduct element of a claim arising under § 2 of the Sherman Act cannot be satisfied by reference to bundled discounts unless the discounts result in prices that are below an appropriate

---

192. *Id.*
193. *Id.* at 151-52.
194. *Id.* at 155.
195. *Id.*; *cf.* Invacare Corp. v. Respironics, Inc., 2006 U.S. Dist. LEXIS 77312, at *36 (N.D. Ohio 2006) (distinguishing *LePage's* and *SmithKline* and rejecting bundling claim because plaintiff was able to offer the same bundle of products as defendant).
196. 324 F.3d at 155.
197. *Id.* at 163.
198. *Id.* at 164 ("The fact that 3M acted to benefit its own economic interests is hardly a reason to overturn the jury's finding that it violated § 2 of the Sherman Act.").
199. 920 F. Supp. 455 (S.D.N.Y. 1996).
200. *Id.* at 469. The court granted summary judgment to Abbott on the bundled pricing claim under § 2 because the evidence showed that the plaintiff could match the discount and still make a profit, albeit a smaller profit than before. *Id.* at 470.
201. 515 F.3d 883 (9th Cir. 2008).
202. *Id.* at 892, 903.

measure of the defendant's costs."[203] Notably, however, the court declined to adopt the second and third elements of the Antitrust Modernization Commission's (AMC) test,[204] stating that a recoupment requirement is inappropriate because there may be no losses to recoup in bundled pricing cases and proving antitrust harm is redundant because injury is already a required element of antitrust claims.[205]

Courts continue to grapple with the appropriate standards for evaluating Section 2 claims that involve allegations of bundled pricing.[206] For example, the Ninth Circuit in *John Doe 1 and John Doe 2 v. Abbott Laboratories*[207] dismissed the plaintiffs' bundling claim under the Supreme Court's recent *linkLine* decision, which directs courts, for price squeeze claims, to analyze pricing in each market independently.[208] In *John Doe*, the defendant sold its pharmaceutical product both as a standalone for use in combination with protease inhibitors (PIs) marketed by rival drug makers, and as a fixed-dose combination with its own PI.[209] The plaintiffs alleged that the defendant engaged in monopoly leveraging by raising the price of its standalone drug while maintaining the price of its fixed-dose combination.[210] The Ninth Circuit characterized the plaintiffs' claim as "the functional equivalent of the price squeeze" analyzed in *linkLine*.[211] On this basis, the court dismissed the claim because the

203. *Id.*
204. The AMC's recommended test for bundled discounts requires: "(1) after allocating all discounts and rebates attributable to the entire bundle of products to the competitive product, the defendant sold the competitive product below its incremental cost for the competitive product; (2) the defendant is likely to recoup these short-term losses; and (3) the bundled discount or rebate program has had or is likely to have an adverse effect on competition." ANTITRUST MODERNIZATION COMM'N, REPORT AND RECOMMENDATIONS TO THE PRESIDENT AND THE CONGRESS OF THE U.S. 12 (2007), *available at* http://govinfo.library.unt.edu/amc/report_recommendation/amc_final_report.pdf.
205. *PeaceHealth*, 515 F.3d at 910 n.21.
206. Other cases involving claims of bundled pricing include: Safeway Inc. v. Abbott Labs., 761 F. Supp. 2d 874, 891-92 (N.D. Cal. 2011) (finding that drug combining two protease inhibitors constitutes bundled product and denying motion for summary judgment as to bundling claim where defendant only challenged whether product qualified as bundle); Masimo Corp. v. Tyco Health Care Group, 2006 U.S. Dist. LEXIS 29977, at *36-37 (C.D. Cal. 2006) (granting defendant's motion for judgment as a matter of law on bundling claims where there was no proof that defendant did not face competition on at least one product in bundle; stating in dictum that bundling does not violate § 2 "absent evidence of predatory pricing or tying"), *aff'd*, 350 F. App'x 95 (9th Cir. 2009); J.B.D.L. Corp. v. Wyeth-Ayerst Labs., 2005 U.S. Dist. LEXIS 11676, at *47 (S.D. Ohio 2005) (granting summary judgment for the defendant and criticizing *LePage's* for "favor[ing] letting a jury sort it out, using the same imprecise, conflicting Section 2 standards transformed into jury instructions"); Ramallo Bros. Printing v. El Dia, Inc., 392 F. Supp. 2d 118, 137-38 (D.P.R. 2005) (granting summary judgment for defendant where plaintiff failed to show that it lost any sales as a result of defendant's bundled pricing); Avery Dennison Corp. v. ACCO Brands, 2000 U.S. Dist. LEXIS 3938, at *56 (C.D. Cal. 2000) (denying defendant's motion for summary judgment on § 2 claim involving allegations that defendant, among other things, offered bundled rebates on its full line of office products and paid an additional amount to customers who agreed to be exclusive); *see also* Kinetic Concepts v. Hillenbrand Indus., 262 F. Supp. 2d 722, 725 (W.D. Tex. 2003) (approving $250 million settlement after verdict in case involving claims of bundling and attempted monopolization).
207. 571 F.3d 930 (9th Cir. 2009).
208. *Id.* at 935 (citing Pac. Bell Tel. Co. v. linkLine Commc'ns, 555 U.S. 438 (2009)).
209. *Id.* at 932.
210. *Id.*
211. *Id.* at 935.

plaintiffs had failed to allege either predatory pricing in the market for the combination drug or a refusal to deal in the market for the standalone drug.[212]

The FTC applied the *PeaceHealth* test for bundled discounts in its consent decree with Intel Corporation. Under the decree, Intel is prohibited from bundling the sales of central processing units with chipsets when the effective selling price of either piece of the bundle is below Intel's cost.[213] In its analysis of the proposed consent decree, the Commission observed that the provision is "based on the standard articulated by the Ninth Circuit in *PeaceHealth*," but it explicitly reserved "the right to pursue independent claims against Intel or any alleged monopolist under Section 2 of the Sherman Act or Section 5 of the FTC Act based on a different legal standard such as (by way of example) the standard articulated by the *en banc* decision in the Third Circuit's *LePage's* case."[214]

### f. Most Favored Nation/Most Favored Customer Provisions

"Most favored nation" (MFN) or "most favored customer" (MFC) clauses guarantee a purchaser that it will receive terms at least as favorable as those provided to any other customer. Some courts have indicated that these provisions may be anticompetitive under some circumstances and provide the basis for a finding of liability under Section 2. MFN clauses may disadvantage competing buyers by creating an economic incentive for the seller to charge them higher prices than it otherwise would, so as to avoid the obligation to give the price break to customers with the MFN clause. However, as of this writing, no court has held that any particular MFN clause violates Section 2.

In *Ocean State Physicians Health Plan v. Blue Cross & Blue Shield*,[215] the First Circuit rejected a challenge to the use of MFN clauses by Blue Cross and Blue Shield, finding them reflective of "a bona fide policy to ensure that Blue Cross would not pay more than any competitor paid for the same services."[216] The court concluded that "insisting on a supplier's lowest price . . . as a matter of law is not exclusionary," assuming the price is not predatory.[217] Other courts, however, have raised the possibility that MFN clauses may be anticompetitive even where the prices are not predatory.[218]

---

212. *Id.*

213. Intel Corp., Decision and Order, § IV(A)(6), No. 9341 (F.T.C. Oct. 29, 2010), *available at* http://www.ftc.gov/os/adjpro/d9341/101102inteldo.pdf.

214. Analysis of Proposed Consent Order to Aid Public Comment, at 10, No. 9341 (F.T.C. Aug. 4, 2010) (footnote omitted; italics in original), *available at* http://www.ftc.gov/os/adjpro/d9341/100804intelanal.pdf. The Commission's complaint alleged violations of § 5 of the FTC Act only.

215. 883 F.2d 1101 (1st Cir. 1989).

216. *Id.* at 1110.

217. *Id.* at 1111; *see also* Blue Cross & Blue Shield United v. Marshfield Clinic, 65 F.3d 1406, 1415 (7th Cir. 1995) (rejecting challenge to MFN clause); Kitsap Physicians Serv. v. Wash. Dental Serv., 671 F. Supp. 1267, 1269 (W.D. Wash. 1987) (same). In *Marshfield Clinic*, the court's original opinion suggested that MFN clauses were never anticompetitive, but the opinion was amended on rehearing in response to briefs submitted on this issue by the DOJ and FTC. The amended opinion remarks: "Perhaps, as the Department of Justice believes, these clauses are misused to anticompetitive ends in some cases; but there is no evidence of that in this case." 65 F.3d at 1415.

218. *See* United States v. Delta Dental, 943 F. Supp. 172, 176 (D.R.I. 1996) (denying motion to dismiss a claim arising from a dental insurer's use of an MFN clause in contracts with participating dentists); Reazin v. Blue Cross & Blue Shield, 899 F.2d 951, 971 (10th Cir. 1990) (noting in

### 3. *Denials of Rivals' Requests for Access*

More than ninety years ago, the Supreme Court observed that "[i]n the absence of any purpose to create or maintain a monopoly, the [Sherman] act does not restrict the long-recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal."[219] Determining when a firm with monopoly power may lawfully refuse to deal with a rival has been "one of the most unsettled and vexatious [issues] in the antitrust field."[220]

#### a. DENIALS OF ACCESS

The Supreme Court has faced cases challenging a defendant's unilateral refusal to deal with rivals many times over the years. Cases in this line date back to the 1920s and continue through the Supreme Court's 2004 decision in *Verizon Communications v. Law Offices of Curtis V. Trinko, LLP*.[221]

In a 1927 case, *Eastman Kodak Co. v. Southern Photo Materials Co.*,[222] the issue arose in the context of Kodak's effort to integrate into the retail distribution of photographic supplies. A retailer sued Kodak after Kodak had refused to sell supplies at wholesale prices following the retailer's decision to refuse to sell its business to Kodak. The Supreme Court held that the unilateral refusal to deal violated Section 2 because Kodak's refusal to deal was "in pursuance of a purpose to monopolize."[223]

In 1985, the Supreme Court confronted a similar claim in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*[224] Defendant Ski Co. operated three of the four ski locations in Aspen, Colorado; plaintiff Highlands operated the remaining location. For many seasons, the parties had jointly offered an "all-Aspen" ski ticket that allowed skiers to use the lifts at all four locations. Ski Co., however, declined to continue with the joint marketing arrangement. Highlands attempted to market its own multi-area package but was thwarted by moves by Ski Co. designed to make such marketing "extremely difficult."[225]

---

dictum that "the jury reasonably could have concluded that [the MFN] clause contributed to Blue Cross' power over price"); Blue Cross & Blue Shield v. Bingaman, 1996 U.S. Dist. LEXIS 17091, at *11 (N.D. Ohio 1996) (in the context of a discovery dispute, observing that "MFN clauses could be illegal in certain circumstances").

219. United States v. Colgate & Co., 250 U.S. 300 (1919).

220. Byars v. Bluff City News Co., 609 F.2d 843, 846 (6th Cir. 1979).

221. 540 U.S. 398 (2004).

222. 273 U.S. 359 (1927).

223. *Id.* at 375; *see also* United States v. Terminal R.R. Ass'n, 224 U.S. 383, 410 (1912) (condemning under both § 1 and § 2 refusal to deal by competitors that jointly controlled the only bridge over the Mississippi River near St. Louis); Lorain Journal Co. v. United States, 342 U.S. 143, 154 (1951) (newspaper violated § 2 by refusing to accept advertisements from customers that advertised with radio stations in an effort to suppress competition for advertising).

224. 472 U.S. 585 (1985). The court of appeals had upheld the defendant's liability both generally and under the essential facilities test, *see* Aspen Highlands Skiing Corp. v. Aspen Skiing Co., 738 F.2d 1509 (10th Cir. 1984), but the Supreme Court found it unnecessary to address the essential facilities issue. 472 U.S. at 611 n.44.

225. *Id.* at 593-94. Ski Co. refused to sell Highlands any lift tickets at either discount or retail, refused to accept Highland vouchers for Ski Co. lift tickets even though the vouchers were guaranteed by

The Supreme Court acknowledged that "even a firm with monopoly power has no duty to engage in joint marketing with a competitor."[226] Nevertheless, the Court stated:

> The absence of an unqualified duty to cooperate does not mean that every time a firm declines to participate in a particular cooperative venture, that decision may not have evidentiary significance, or that it may not give rise to liability in certain circumstances. The absence of a duty to transact business with another firm is, in some respects, merely the counterpart of the independent businessman's cherished right to select his customers and his associates. The high value that we have placed on the right to refuse to deal with other firms does not mean that the right is unqualified.[227]

The Court characterized Ski Co.'s decision to terminate a long-standing joint marketing arrangement as "a decision by a monopolist to make an important change in the character of the market."[228] That, coupled with the defendant's gratuitous refusal even to accept cash-equivalent vouchers, and the jury's implicit conclusion that there were no valid business reasons for this conduct,[229] led the Court to hold that Ski Co.'s actions could properly be characterized as exclusionary.[230]

In *Trinko*, the Court analyzed a refusal to deal that arose in a different context, the period following enactment of the Telecommunications Act of 1996.[231] The Telecommunications Act of 1996 imposed a number of duties on incumbent local exchange carriers (such as Verizon) to deal with rival telecommunications providers.[232] A Verizon customer sued Verizon, claiming that Verizon had violated the Telecommunications Act and, thus Section 2 of the Sherman Act, by providing discriminatory access to its network. The district court dismissed the complaint, but the Second Circuit reinstated the antitrust claim. The Supreme Court reversed. The Court first concluded that the Act's antitrust savings clause precluded any argument that the Act created either antitrust immunity or any new antitrust claims, characterizing the issue as "whether the activity of which [the plaintiff] complains violates pre-existing antitrust standards."[233] The Court held that it did not.[234]

The Court observed that, under certain circumstances, a monopolist's refusal to cooperate with rivals can violate Section 2, but noted that "[w]e have been very cautious in recognizing such exceptions, because of the uncertain virtue of forced

---

funds at a local bank, and discontinued certain area passes. Ski Co. also embarked on an advertising campaign implying that it had the only ski mountains in that area.

226. *Id.* at 600.
227. *Id.* at 601 (footnote omitted).
228. *Id.* at 604.
229. *Id.* at 605. In addition, the Court stated that its conclusion was "strongly supported by Ski Co.'s failure to offer any efficiency justification whatever for its pattern of conduct." *Id.* at 608 (footnote omitted).
230. The Court concluded that "the evidence supports an inference that Ski Co. was not motivated by efficiency concerns and that it was willing to sacrifice short-run benefits and consumer goodwill in exchange for a perceived long-run impact on its smaller rival." *Id.* at 610-11 (footnote omitted).
231. Pub. L. No. 104-104, 110 Stat. 56 (1996).
232. *Id.* at 402 (citing Pub. L. No. 104-104, 110 Stat. 56 (1996)). For an in-depth discussion of the 1996 Telecommunications Act and the interplay between the Act and the antitrust laws, see Chapter 14.B.2.a.
233. 540 U.S. at 407. *Id.* at 406-07.
234. *Id.* at 407-10.

sharing and the difficulty of identifying and remedying anticompetitive conduct by a single firm."[235] Placing *Aspen* "at or near the outer boundary of Section 2 liability,"[236] the Court distinguished the facts in *Aspen* and concluded that Verizon's conduct did not fall within that boundary.[237] First, unlike the defendant in *Aspen*, Verizon had not voluntarily engaged in any course of dealing with its rivals and would not have done so absent statutory compulsion. More fundamentally, unlike the lift tickets in *Aspen*, the services that Verizon had allegedly refused to provide were not otherwise available to the public and were only provided "at considerable expense and effort."[238] Thus, the Court concluded, Verizon's alleged insufficient assistance in the provision of service to its rivals does not state a claim under the Court's refusal to deal precedents.[239]

The *Trinko* Court held that there was no basis for creating a new exception to the general proposition that even monopolists have no duty to aid competitors. In reaching this conclusion, the Court placed heavy emphasis on the presence of a regulatory regime expressly designed to deter and remedy anticompetitive conduct.[240]

Lower court decisions after *Trinko* have recognized that a monopolist does not have a duty to deal with its rivals absent unusual circumstances. For example, in *Morris Communications v. PGA Tour*,[241] the Eleventh Circuit affirmed the district court's rejection of an antitrust claim based on the PGA's requirement that media companies delay their publication of scores from PGA tournaments. The court held that the PGA's desire to prevent media organizations from free riding on its substantial efforts to compile live golf scores was a legitimate business justification.[242] It discounted the relevance of the PGA's prior willingness to provide

---

235. *Id.* at 408.
236. *Id.* at 409.
237. *Id.* at 410.
238. *Id.*
239. *Id.*
240. *Id.* at 411-16.
241. 364 F.3d 1288 (11th Cir. 2004).
242. *Id.* at 1295-96; *accord, e.g.*, Four Corners Nephrology Assocs. v. Mercy Med. Ctr., 582 F.3d 1216, 1225 (10th Cir. 2009) (no antitrust liability where hospital's decision to deny plaintiff access was based on a desire to avoid an unprofitable relationship); Christy Sports, LLC v. Deer Valley Resort Co., 555 F.3d 1188, 1197 (10th Cir. 2009) (no antitrust liability where plaintiff ski rental shop did not allege that defendant ski resort's enforcement of a restrictive covenant was motivated by anything other than a legitimate profit motive); Schor v. Abbott Labs., 457 F.3d 608, 610 (7th Cir. 2006) ("[A]ntitrust law does not require monopolists to cooperate with rivals by selling them products that would help the rivals to compete. . . . Cooperation is a problem in antitrust, not one of its obligations.") (citation omitted); Telecom Technical Servs. v. Rolm Co., 388 F.3d 820, 826-28 (11th Cir. 2004) (refusal to sell to intermediate seller is not anticompetitive where consumers can buy directly from alleged monopolist because "consumers are likely to benefit by not having to accept [third parties'] mark-up of [the defendant's] prices"); MetroNet Servs. Corp. v. Qwest Corp., 383 F.3d 1124, 1132 (9th Cir. 2004) (no antitrust liability where defendant terminated prior course of dealing because that prior course was unprofitable); LiveUniverse, Inc. v. MySpace, Inc., 304 F. App'x 554, 557 (9th Cir. 2008) (in affirming the dismissal of the charges, the court held that even assuming a voluntary course of dealing, the plaintiff had failed to allege actions that were "profitable to MySpace, such that MySpace's conduct was contrary to its short-term business interests"); Sunbeam Television Corp. v. Nielsen Media Research, 763 F. Supp. 2d 1341, 1350 (S.D. Fla. 2011) (granting defendant's motion for summary judgment where there was "no record evidence to suggest...both anticompetitive purpose and effect," nor a complete refusal to deal, with regard to defendant's requirement that data be returned upon expiration of subscription); N.Y. Mercantile Exch. v. Intercontinental Exch., 323 F. Supp. 2d 559, 571 (S.D.N.Y. 2004) (desire to prevent free riding is legitimate business justification for refusal to deal). *But see* Creative Copier

unrestricted access to golf scores in the past, holding that the "PGA has a right to control its property interest . . . regardless of its past practices."[243]

Some post-*Trinko* decisions have concluded that the Supreme Court's decision generally bars refusal-to-deal claims where there was no voluntary prior course of dealing or where the defendant's conduct increased its short-term profits.[244] Refusal-to-deal claims have been permitted to proceed, however, where the defendant has changed a prior course of dealing, acted contrary to its own short-term economic interest, or sought to monopolize an adjacent market.[245]

b. ESSENTIAL FACILITIES DOCTRINE

The "essential facilities" doctrine traces its origins to two Section 1 group boycott cases, *United States v. Terminal Railroad Ass'n*[246] and *Associated Press v. United States*.[247] In *Terminal Railroad*, the Court held that it was improper for railroads that jointly owned the only terminal in St. Louis that could feasibly accommodate traffic from the west to deny their competitors access to the terminal on reasonable terms because such access was essential to their ability to compete.[248] In *Associated Press*, the Supreme Court held that a news wire service violated Section 1 with a bylaw that

---

Servs. v. Xerox Corp., 344 F. Supp. 2d 858, 866 (D. Conn. 2004) (denying motion to dismiss because "nowhere in *Trinko* did the Court indicate that a complaint should be dismissed if it fails to recite the magic words 'no short-term profit'").

243. *Morris Commc'ns*, 364 F.3d at 1296 n.13; *see* Covad Commc'ns Co. v. Bell Atl. Corp., 398 F.3d 666, 673 (D.C. Cir. 2005) (affirming dismissal of claim where "Covad alleges neither that Bell Atlantic had at one time voluntarily dealt with Covad nor that it would ever have been in Bell Atlantic's interest to have done so").

244. *See, e.g.*, *Covad Commc'ns*, 398 F.3d at 673 (quoting *Trinko*, 540 U.S. at 409) ("An antitrust claim based upon the defendant's refusal to cooperate with its competitor can withstand a motion to dismiss only when it is alleged either that the defendant had previously 'engaged in a course of dealing with its rivals, or [that it] would ever have done so absent statutory compulsion.'"); ASAP Paging Inc. v. CenturyTel of San Marcos Inc., 137 F. App'x 694, 698-99 (5th Cir. 2005) (complaint alleging that defendant began charging higher rates to competitor failed to state a claim because conduct increased defendant's short-term profits); Covad Commc'ns Co. v. BellSouth Corp., 374 F.3d 1044, 1049 (11th Cir. 2004) ("*Trinko* now effectively makes the unilateral termination of a voluntary course of dealing a requirement for a valid refusal-to-deal claim under *Aspen*."); *N.Y. Mercantile Exch.*, 323 F. Supp. 2d at 571 (rejecting antitrust claim based on refusal to deal where there was no "history of cooperation" with the plaintiff and no evidence that the plaintiff was "flouting consumer demand and foregoing short-term profits by refusing to cooperate with [the plaintiff]").

245. *See, e.g.*, Am. Cent. E. Tex. Gas Co. v. Union Pac. Res. Group, 93 F. App'x 1, 8 (5th Cir. 2004) (distinguishing *Trinko* because "Duke refused to deal in the context of a prior course of dealing"); Safeway, Inc. v. Abbott Labs., 761 F. Supp. 2d 874, 894-95 (N.D.Cal. 2011) (denying summary judgment where plaintiff offered evidence that defendant "unilaterally terminated a voluntary course of dealing" by increasing the price of a product by 400% despite the fact that the price increase caused it to incur costs in the form of diminished rate of profit and drop in stock price); Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, 311 F. Supp. 2d 1048, 1106-07 (D. Colo. 2004) (denying summary judgment where defendant, a radio network that was also a concert promoter, changed prior practice of promoting concerts by competing promoters on its radio stations and refusal to accept paid advertising was not in defendant's "best commercial interests").

246. 224 U.S. 383 (1912).

247. 326 U.S. 1 (1945).

248. 244 U.S. at 411-12.

permitted member newspapers to veto membership by competing newspapers.[249] As the Supreme Court noted in *Trinko*,[250] however, the Court has never recognized (nor rejected) the essential facilities doctrine in connection with a monopolist's *unilateral* refusal to deal with a rival. The *Trinko* Court likewise remained silent on the issue.[251] Some courts have continued to apply the essential facilities doctrine after the *Trinko* decision.[252]

The leading case applying the essential facilities doctrine is *MCI Communications v. AT&T*[253] MCI argued that AT&T had improperly refused to let it connect its long-distance telephone lines with AT&T's nationwide local telephone network. MCI claimed that it could not compete with AT&T in the long-distance business without this interconnection. The Seventh Circuit, relying on *Otter Tail Power Co. v. United States*,[254] applied the essential facilities doctrine and held that MCI had proven "that it was technically and economically feasible for AT&T to have provided the requested interconnections, and that AT&T's refusal to do so constituted an act of monopolization."[255] The court stated:

> A monopolist's refusal to deal under these circumstances is governed by the so-called essential facilities doctrine. Such a refusal may be unlawful because a monopolist's control of an essential facility (sometimes called a "bottleneck") can extend monopoly power from one stage of production to another, and from one market into another. Thus, the antitrust laws have imposed on firms controlling an essential facility the obligation to make the facility available on nondiscriminatory terms.[256]

In a formulation that has been substantially adopted or cited with approval by many other courts,[257] *MCI* identified four elements necessary to establish liability under the essential facilities doctrine:

---

249. 326 U.S. at 19.
250. 540 U.S. 398 (2004).
251. *Id.* at 410-11.
252. *See, e.g.*, MetroNet Servs. Corp. v. Qwest Corp., 383 F.3d 1124, 1129-30 (9th Cir. 2004) (recognizing doctrine but finding it inapplicable on facts); Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, 311 F. Supp. 2d 1048, 1113 (D. Colo. 2004) (applying essential facilities analysis and distinguishing *Trinko* because refusal to engage in commercially beneficial conduct could reasonably support a jury's verdict that the defendant radio network that also promoted rock concerts had "sacrifice[d] short-term gains in the hopes of destroying other promoters and reaping long-term monopolistic profits").
253. 708 F.2d 1081, 1132 (7th Cir. 1983).
254. 410 U.S. 366 (1973) (upholding liability of wholesale supplier of electricity that refused to supply power to power system that competed with it for retail customers where other power system had no other source of supply). In *Otter Tail*, the Supreme Court did not indicate whether it was applying an intent test or the essential facilities doctrine, both of which appeared to have been applied by the lower court.
255. 708 F.2d at 1133.
256. *Id.* at 1132 (citations omitted).
257. *See, e.g.*, City of Anaheim v. S. Cal. Edison Co., 955 F.2d 1373, 1380 (9th Cir. 1992); City of Chanute v. Williams Natural Gas Co., 955 F.2d 641, 647 (10th Cir. 1992); City of Malden v. Union Elec. Co., 887 F.2d 157, 160 (8th Cir. 1989); Ferguson v. Greater Pocatello Chamber of Commerce, 848 F.2d 976, 983 (9th Cir. 1988); Interface Group v. Mass. Port Auth., 816 F.2d 9, 12 (1st Cir. 1987); Aspen Highlands Skiing Corp. v. Aspen Skiing Co., 738 F.2d 1509, 1520 (10th Cir. 1984), *aff'd on other grounds*, 472 U.S. 585 (1985); Del. Health Care v. MCD Holding Co., 893 F. Supp. 1279, 1287 (D. Del. 1995); *see also* Hecht v. Pro-Football, Inc., 570 F.2d 982, 992-93 (D.C. Cir. 1977) (pre-*MCI* decision).

> (1) control of the essential facility by a monopolist; (2) a competitor's inability practically or reasonably to duplicate the essential facility; (3) the denial of the use of the facility to a competitor; and (4) the feasibility of providing the facility.[258]

The first element focuses on control by a monopolist[259] of an essential facility.[260] Generally, a facility is essential if it is vital to competitive viability because competitors cannot compete effectively in the relevant market without access to it.[261] In *Aspen Highlands Skiing Corp. v. Aspen Skiing Co.*,[262] the Tenth Circuit held that a ski resort would not be competitively viable unless it could offer its patrons access to larger neighboring resorts, and it thus held access to those resorts to be an essential facility.[263] In contrast, in *McKenzie v. Mercy Hospital*,[264] the Tenth Circuit held that access to a hospital's facilities was not essential to a doctor's competitive viability. The court noted that the doctor could treat the majority of his patients in his clinic or office.[265]

---

258. 708 F.2d at 1132-33. One court has observed that satisfaction of the doctrine's four elements eliminates the need to prove specific intent to monopolize in an attempted monopolization case. *In re* Air Passenger Computer Reservations Sys. Antitrust Litig., 694 F. Supp. 1443, 1456 (C.D. Cal. 1988), *aff'd sub nom.* Alaska Airlines v. United Airlines, 948 F.2d 536 (9th Cir. 1991). *But cf.* Kramer v. Pollock-Krasner Found., 890 F. Supp. 250, 257 (S.D.N.Y. 1995) ("The 'essential facilities' doctrine is not an independent cause of action, but rather a type of monopolization claim."); Viacom Int'l v. Time Inc., 785 F. Supp. 371, 376 n.12 (S.D.N.Y. 1992) ("[T]he doctrine is more properly characterized as a label that may aid in the analysis of a monopoly claim, not a statement of a separate violation of law. It follows that the essential facilities argument relieves Plaintiffs here of no burden they would otherwise bear . . . .") (citation omitted).
259. The facility must be subject to the monopolist's control. U.S. Football League v. NFL, 842 F.2d 1335, 1368-69 (2d Cir. 1988); *MCI*, 708 F.2d at 1132; *cf.* N. Am. Soccer League v. NFL, 465 F. Supp. 665, 676 n.20 (S.D.N.Y. 1979) (recognizing that court must consider whether defendant has monopoly power in market that includes existing facility).
260. *But see* CTC Commc'ns Corp. v. Bell Atl. Corp., 77 F. Supp. 2d 124, 127 (D. Me. 1999) (plaintiff alleged a refusal to deal through denial of plaintiff's ability to resell various of the defendant's telecommunications and related services; court noted that where a previously regulated monopoly is required by statute to participate in the development of competition for its services, it is not necessary that plaintiff either allege or prove that each of the services involved in its specific claims is an essential facility).
261. *See, e.g.*, *City of Anaheim*, 955 F.2d at 1380 n.5; Alaska Airlines v. United Airlines, 948 F.2d 536, 544-45 (9th Cir. 1991) (facility is essential "only if control of the facility carries with it the power to eliminate competition in the downstream market"); TCA Bldg. Co. v. Nw. Res. Co., 873 F. Supp. 29, 39 (S.D. Tex. 1995) ("An essential facility need not be indispensable, but its denial must impose a severe handicap on potential market entrants."); Advanced Health-Care Servs. v. Giles Mem'l Hosp., 846 F. Supp. 488, 497 (W.D. Va. 1994) ("Plaintiff must show that this denial inflicted a 'severe handicap' that threatened to eliminate competition in the [relevant] market.") (citation omitted); Colonial Penn Group v. Am. Ass'n of Retired Persons, 698 F. Supp. 69, 73 (E.D. Pa. 1988).
262. 738 F.2d 1509 (10th Cir. 1984), *aff'd on other grounds*, 472 U.S. 585, 611 n.44 (1985).
263. *Id.* at 1520-21.
264. 854 F.2d 365 (10th Cir. 1988).
265. *Id.* at 370; *see also* Paladin Assocs. v. Mont. Power Co., 328 F.3d 1145, 1162-63 (9th Cir. 2003) (rejecting claim that gas pipeline and storage facility were an essential facility because downstream gas customers obtained gas from sources other than the defendant's system); Blue Cross & Blue Shield United v. Marshfield Clinic, 65 F.3d 1406, 1413 (7th Cir. 1995) (access to defendant clinic not essential because it controls less than 50% of any relevant market); Ill. *ex rel.* Burris v. Panhandle E. Pipe Line Co., 935 F.2d 1469 (7th Cir. 1991) (access to defendant's pipeline not essential because competitors could interconnect with other pipelines and construct new pipelines); Flip Side Prods. v. Jam Prods., 843 F.2d 1024, 1034 (7th Cir. 1988) (availability of alternate arenas for rock concerts foreclosed finding of essential facility); JamSports & Entm't v. Paradama Prods.,

In *Fishman v. Estate of Wirtz*,[266] the Seventh Circuit addressed the second element of the essential facilities doctrine: a competitor's inability practically or reasonably to duplicate the essential facility. Fishman and Wirtz each led an investor group seeking to acquire the Chicago Bulls NBA franchise. Fishman had an agreement to buy the Bulls contingent on obtaining a stadium lease. Wirtz, however, controlled Chicago Stadium and refused to offer Fishman a lease. After affirming the district court's finding that the stadium was "essential,"[267] the court addressed the defendants' contention that Fishman could have built a new stadium; the defendants pointed to a stadium that had, in fact, been built shortly after the events of the case. The court nevertheless held that Chicago Stadium "was not duplicable without an expenditure that would have been unreasonable in light of the size of the transaction such duplication would have facilitated."[268] The court explained that the point of the essential facilities doctrine is that potential market entrants should not be required to enter two markets simultaneously.[269] The mere fact that other parties did, in fact, build a new arena did not justify requiring Fishman to do the same if he wanted to compete.

It is insufficient, however, for a plaintiff to allege that access to one facility is simply more economical than other alternatives.[270] Moreover, a defendant's offer to provide an alternative facility on a reasonable basis may defeat an essential facilities claim. For example, in *Laurel Sand & Gravel, Inc. v. CSX Transportation*,[271] the Fourth Circuit held that it would be unreasonable to require the plaintiff to lay a duplicative railroad track next to that of the defendant.[272] The court stated, however, that the defendant's offer to provide railroad service over an alternative route might

---

336 F. Supp. 2d 824, 839 (N.D. Ill. 2004) (11 stadiums not essential for promotion of motorcycle racing because "a facility is not essential even if it is widely preferred by consumers and producers in the market, as long as there is an alternative (albeit inferior) venue").

266. 807 F.2d 520 (7th Cir. 1986).

267. *Id.* at 539-40. The stadium was unique in terms of its seating capacity and physical plant quality. Moreover, it could charge much higher prices than could other arenas without losing business. *Id.* at 539. Indeed, the trial court had found that ownership of the stadium conferred monopoly power in the market for "indoor sports arenas suitable for professional indoor team sports in Chicago."

268. *Id.* at 540. There had been testimony that building a new arena would cost $19 million, whereas the price of the Bulls franchise was approximately $3.3 million. *Id.* at 525, 540. *But see* Pittsburgh Cnty. Rural Water Dist. No. 7 v. City of McAlester, 346 F.3d 1260, 1287 (10th Cir. 2003) (finding no essential facility where, among other things, plaintiff admitted that it could "duplicate the facility owned by McAlester by constructing its own [water] collection and treatment facility by as early as April 2004"); Ferguson v. Greater Pocatello Chamber of Commerce, 848 F.2d 976, 983 (9th Cir. 1988) (minidome was not essential facility due in part to absence of evidence that competitor could not feasibly construct alternate facility).

269. *Fishman*, 807 F.2d at 540.

270. *See, e.g.*, Midwest Gas Servs. v. Ind. Gas Co., 317 F.3d 703, 714 (7th Cir. 2003) (rejecting claim that natural gas pipeline was essential facility because it was the shortest route to serve customers because "the most economical route is not an essential facility when other routes are available"); City of Chanute v. Williams Natural Gas Co., 955 F.2d 641, 648-49 (10th Cir. 1992) (no "severe handicap" when defendant terminated a temporary program of transporting natural gas purchased from third parties); Alaska Airlines v. United Airlines, 948 F.2d 536, 544-46 (9th Cir. 1991) (rejecting essential facility claim because denial of access would only impose financial burden on excluded competitors, not "eliminate" them); Twin Labs. v. Weider Health & Fitness, 900 F.2d 566, 570 (2d Cir. 1990) ("As the word 'essential' indicates, a plaintiff must show more than inconvenience, or some economic loss; he must show that an alternative to the facility is not feasible.").

271. 924 F.2d 539 (4th Cir. 1991).

272. *Id.* at 544-45.

be viewed as a viable alternative as long as the service was offered on a reasonable basis.[273]

The third element of an essential facilities claim is denial of access to the facility. Proof of flat, unqualified rejection of access is not required. In *Laurel Sand & Gravel*, the Fourth Circuit held that an unreasonable change in the services provided or the rates charged may amount to denial of access to a facility.[274] The court analyzed "the rate's reasonableness in the context of competition, rather than from plaintiff's perspective," thus making it clear that a reasonable rate need not be below cost.[275]

On the other hand, the essential facilities doctrine does not apply when the plaintiff does not allege either literal or constructive denial through the imposition of unreasonable terms.[276] Some courts have rejected the plaintiff's constructive denial of access claims when the focus of the claim has been the preferred manner of access.[277] For example, in *Cyber Promotions v. America Online, Inc.*,[278] the district court held that America Online's mechanism that allowed its subscribers to block junk e-mail was not a denial of access, required for antitrust liability under the essential facilities doctrine.[279] Rather, the plaintiff was only being "denied access to AOL's system in the manner which it prefers," namely, that America Online's customers should be able to view Cyber's e-mail without having to take affirmative steps to view the e-mail.[280] In *Anserphone, Inc. v. BellAtlantic*,[281] the district court similarly granted summary judgment in favor of the defendants, concluding that defendants' provision of poor quality service was insufficient to prove antitrust liability under a constructive denial theory.[282] And courts after *Trinko*[283] have found no denial of an essential facility "[w]here a state or federal agency is authorized to compel access to a competitor's infrastructure, as under [the Telecommunications Act], because in that situation there is no true unavailability of access."[284]

---

273. *Id.*
274. *Id.*
275. *Id.*; *see also* Ideal Dairy Farms v. John Labatt, Ltd., 90 F.3d 737, 748 (3d Cir. 1996) (where plaintiff is actually making use of an essential facility, a § 2 claim may not be based on the mere fact that defendant is charging plaintiff more than it is entitled to charge under the terms of a contract); *City of Chanute*, 955 F.2d at 648; Ill. Bell Tel. Co. v. Haines & Co., 905 F.2d 1081, 1087-88 (7th Cir. 1990) (licensing essential facility to one firm on special terms did not support claim by that firm's competitor, at least where the competitor did not attempt to negotiate similar special terms), *vacated on other grounds*, 499 U.S. 944 (1991); Del. & Hudson Ry. v. Consol. Rail Corp., 902 F.2d 174, 179-80 (2d Cir. 1990).
276. *See, e.g.*, *Laurel Sand & Gravel*, 924 F.2d at 544-45; Cnty. of Stanislaus v. Pac. Gas & Elec. Co., 1995 U.S. Dist. LEXIS 21411, at *63 (E.D. Cal. 1995) (dismissing complaint for failure to allege that access was requested or that such a request would have been futile), *aff'd*, 114 F.3d 858 (9th Cir. 1997).
277. *See, e.g.*, Paladin Assocs. v. Mont. Power Co., 97 F. Supp. 2d 1013, 1038 (D. Mont. 2000) (holding no denial of access when plaintiff complained of lack of preferential access to the defendant's storage facility superior to the rights of other shippers), *aff'd*, 328 F.3d 1145 (9th Cir. 2003).
278. 948 F. Supp. 456 (E.D. Pa. 1996).
279. *Id.* at 460.
280. *Id.*
281. 955 F. Supp. 418 (W.D. Pa. 1996).
282. *Id.* at 428-29.
283. 540 U.S. 398, 411 (2004).
284. Covad Commc'ns Co. v. BellSouth Corp., 374 F.3d 1044, 1050 (11th Cir. 2004); *accord Trinko*, 540 U.S. at 411 (because "the indispensable requirement for invoking the doctrine is the

The fourth element of an essential facilities claim is the establishment of the feasibility of the monopolist's providing access to the facility. Feasibility is a question of fact, and courts have reached conflicting conclusions in similar circumstances. In *MCI*,[285] the Seventh Circuit upheld the jury's finding that interconnection with AT&T's telephone network was feasible. In contrast, in *Southern Pacific Communications v. AT&T*,[286] the court held that AT&T did not unreasonably restrict Southern Pacific's access to its telephone network. Recognizing that denial of access or restrictive interconnection practices "may be justified on the basis of AT&T's duties as an enterprise regulated under a 'public interest' standard," the court held that this regulatory justification defense would apply only if AT&T's "basis for its interconnection decision is reasonable and if AT&T actually made its decision at the time in good faith on that basis rather than solely on the basis of competitive considerations."[287] A legitimate business reason for denying access is a defense.[288]

c. REFUSALS TO LICENSE INTELLECTUAL PROPERTY

Courts generally have found no Section 2 violation when a firm that has achieved an advantageous or monopoly position in a market by virtue of a valid and legitimately acquired patent or copyright or through know-how, refuses to license or disclose the technology to competitors.[289] In *E.I. duPont de Nemours & Co.*,[290] the FTC held that, in the absence of wrongdoing by duPont in the acquisition of know-how allowing it to produce titanium dioxide more cheaply than its competitors, there was no Section 2 violation in duPont's refusal to license the technologies. The

---

unavailability of access to the 'essential facilities'. . . . [t]he 1996 Act's extensive provision for access makes it unnecessary to impose a judicial doctrine of forced access"); Am. Channel, LLC v. Time Warner Cable, 2007 U.S. Dist. LEXIS 3484, at *35-36 (D. Minn. 2007) (dismissing claim based upon alleged refusal to carry plaintiff cable network's programming; essential facilities doctrine is inapplicable to denial of access to câble systems because FCC has power to regulate access); MetroNet Servs. Corp. v. Qwest Corp., 383 F.3d 1124, 1129 (9th Cir. 2004); Z-Tel Commc'ns v. SBC Commc'ns, 331 F. Supp. 2d 513 (E.D. Tex. 2004); N.Y. Mercantile Exch. v. Intercontinental Exch., 323 F. Supp. 2d 559, 569 (S.D.N.Y. 2004).

285. 708 F.2d 1081, 1133 (7th Cir. 1983).

286. 740 F.2d 980 (D.C. Cir. 1984).

287. *Id.* at 1009; *see also* Ill. *ex rel.* Burris v. Panhandle E. Pipe Line Co., 935 F.2d 1469, 1483 (7th Cir. 1991) (concern about its liability under take-or-pay contracts justified defendant's refusal to transport competitors' gas through its pipeline); Laurel Sand & Gravel, Inc. v. CSX Transp., 924 F.2d 539, 545 (4th Cir. 1991) (defendant "articulated a number of legitimate business reasons for refusing trackage rights, including altering its relationship to 'feeder' lines, upon which it relies for profitable traffic"); *cf. Trinko*, 540 U.S. at 410 (existence of regulatory scheme that required sharing of facility is irrelevant to determining legality of refusal to deal).

288. City of Anaheim v. S. Cal. Edison Co., 955 F.2d 1373, 1379 (9th Cir. 1992); *see also* City of Vernon v. S. Cal. Edison Co., 955 F.2d 1361, 1366-68 (9th Cir. 1992) (affirming summary judgment for defendant on certain claims because of legitimate justifications for denying access, but remanding for trial as to one claim because of fact question regarding justifications).

289. *See, e.g.*, Cal. Computer Prods. v. IBM, 613 F.2d 727, 744 (9th Cir. 1979); Berkey Photo v. Eastman Kodak Co., 603 F.2d 263, 283-84 (2d Cir. 1979); ILC Peripherals Leasing Corp. v. IBM, 458 F. Supp. 423, 436-37 (N.D. Cal. 1978), *aff'd sub nom.* Memorex Corp. v. IBM, 636 F.2d 1188 (9th Cir. 1980); E.I. duPont de Nemours & Co., 96 F.T.C. 653 (1980).

290. 96 F.T.C. 653 (1980).

FTC stated that "imposition of a duty to license might serve to chill the very kind of innovative process that led to duPont's cost advantage."[291]

There is currently a conflict between the Federal Circuit and the Ninth Circuit on whether a firm's refusal to license patented or copyrighted technology violates Section 2 if the intent and effect in so refusing is to create or preserve a monopoly in a relevant market. The Ninth Circuit, in *Image Technical Services v. Eastman Kodak Co.*,[292] held that, although an intellectual property owner is entitled to a presumption that a refusal to deal is motivated by a desire to protect intellectual property rights, that presumption can be rebutted by evidence of pretext.[293] By contrast, the Federal Circuit, in *In re Independent Service Organizations Antitrust Litigation*,[294] held that, as long as the patentee merely exercises its right "to refuse to sell or license in markets within the scope of the statutory patent grant," the refusal to deal could not violate the Sherman Act,[295] and more generally stated that, "[i]n the absence of any indication of illegal tying, fraud on the Patent and Trademark Office, or sham litigation, the patent holder may enforce the statutory right to exclude others from making, using, or selling the claimed invention free from liability under the antitrust laws."[296]

Analysis of the legality of the refusal to license an acquired patent or other intellectual property right typically depends on the legality of the acquisition. Where an improper acquisition of patents has conferred monopoly power on the acquirer, courts have held that a refusal to license contributes to the acquisition or maintenance of monopoly power.[297] Conversely, a monopolist generally does not face liability for refusing to license a patent that it acquired lawfully.[298]

---

291. *Id.* at 748.
292. 125 F.3d 1195 (9th Cir. 1996).
293. *Id.* at 1220; *see also* Data Gen. Corp. v. Grumman Sys. Support Corp., 36 F.3d 1147, 1187 (1st Cir. 1994) (a unilateral refusal to license a copyright, unlike a unilateral refusal to license a patent, may constitute exclusionary conduct, but "an author's desire to exclude others from use of its copyrighted work is a presumptively valid business justification for any immediate harm to consumers"); Apple Inc. v. Psystar Corp., 2009 U.S. Dist. LEXIS 14370, at *14 (N.D. Cal. 2009) (dismissing counterclaim where defendant failed to explain how refusal to license a copyright "constitutes harm to competition or a violation of the spirit of the antitrust laws"); *but see* Apple iPod iTunes Antitrust Litig., 2011 U.S. Dist. LEXIS 77155, at *20 (N.D. Cal. 2011) (rejecting claim based on refusal to license and distinguishing *Kodak* because it involved a change in course of dealing).
294. 203 F.3d 1322 (Fed. Cir. 2000).
295. *Id.* at 1327. The Federal Circuit upheld the district court's grant of summary judgment dismissing the claim of the plaintiff, an independent service organization, that Xerox's long-standing policy of not selling unique parts for certain copier products to competitors unless they were also end-users of the copiers constituted an unlawful refusal to deal. Xerox held valid copyrights and patents on the parts in question, and plaintiff's central contention was that Xerox's refusal to deal was an impermissible effort to expand Xerox's power from one antitrust market (parts) into another (service). *Id.* at 1326.
296. *Id.* at 1327; *see also* Schor v. Abbott Labs., 457 F.3d 608, 613 (7th Cir. 2006) (rejecting *Image Technical Services*); Océ N. Am., Inc. v. MCS Servs., 795 F. Supp. 2d 337, 344 (D. Md. 2011) (dismissing claim where plaintiff alleged that decision to enforce intellectual property rights was pretext for anticompetitive behavior but provided no factual support for allegation).
297. *See* Kobe, Inc. v. Dempsey Pump Co., 198 F.2d 416 (10th Cir. 1952); United States v. Besser Mfg. Co., 96 F. Supp. 304, 310-11 (E.D. Mich. 1951), *aff'd*, 343 U.S. 444 (1952). In *Walker Process Equipment v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 176 (1965), the Supreme Court held that the unlawful acquisition of a patent right could violate § 2, but the Court did not address the legality of a refusal to license the unlawfully acquired patent. *See generally* Chapter 12.F.1.
298. *See* SCM Corp. v. Xerox Corp., 645 F.2d 1195, 1209 (2d Cir. 1981).

## *4. Product Design and Product Introduction*

The antitrust laws embody a strong policy favoring innovative activity.[299] As a result, courts have cautioned that antitrust enforcement must be careful not to "chill" or "stifle" innovation.[300] Under certain limited circumstances, however, conduct associated with the introduction or promotion of new products can violate Section 2.

### a. PRODUCT DESIGN

Although the introduction of new products by a company with monopoly power may make it difficult for smaller firms to compete, product introductions are predatory in only very limited circumstances. Generally, "any firm, even a monopolist, may bring its products to market whenever and however it chooses."[301] Where competitors' products must interface with the monopolist's product, the monopolist's introduction of a new product that makes that interconnection more difficult or expensive might violate Section 2.[302] A monopolist need not, however, ordinarily take special steps to mitigate the adverse impact upon its competitors

---

299. *See, e.g.*, Verizon Commc'ns v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 407 (2004) (Sherman Act interpreted in a way to "safeguard the incentive to innovate"); United States v. Microsoft Corp., 147 F.3d 935, 948 (D.C. Cir. 1998) ("any dampening of technological innovation would be at cross-purposes with antitrust law"); Data Gen. Corp. v. Grumman Sys. Support Corp., 36 F.3d 1147, 1182 (1st Cir. 1994) (describing goals of antitrust as "lower prices, better products, and more efficient production methods"); Berkey Photo v. Eastman Kodak Co., 603 F.2d 263, 282 (2d Cir. 1979); *In re* IBM Peripheral EDP Devices Antitrust Litig., 481 F. Supp. 965, 1003 (N.D. Cal. 1979) ("Truly new and innovative products are to be encouraged, and are an important part of the competitive process."), *aff'd sub nom.* Transamerica Computer Co. v. IBM, 698 F.2d 1377 (9th Cir. 1983); U.S. DEP'T OF JUSTICE & FEDERAL TRADE COMM'N, ANTITRUST ENFORCEMENT AND INTELLECTUAL PROPERTY RIGHTS: PROMOTING INNOVATION AND COMPETITION 1 (2007) ("[I]ntellectual property laws and antitrust laws share the same fundamental goals of enhancing consumer welfare and promoting innovation.").

300. *Berkey Photo*, 603 F.2d at 282-83; *see also* Schering-Plough Corp. v. FTC, 402 F.3d 1056, 1066 (11th Cir. 2005) (stating that "'[w]hat is required here is an analysis of the extent to which antitrust liability might undermine the encouragement of innovation'") (quoting Valley Drug Co. v. Geneva Pharms. Corp., 344 F.3d 1294, 1312 (11th Cir. 2003)).

301. *Berkey Photo*, 603 F.2d at 286; *see also* Cal. Computer Prods. v. IBM, 613 F.2d 727, 744 (9th Cir. 1979) (monopolist has "right to redesign its products to make them more attractive to buyers whether by reason of lower manufacturing cost and price or improved performance"); Arminak & Assocs. v. Saint-Gobain Calmar, Inc., 789 F. Supp. 2d 1201, 1208 (C.D. Cal. 2011) (redesigning product to reduce manufacturing cost and price was procompetitive). The Second Circuit pointed out, however, that the introduction of new products would not immunize additional conduct otherwise unlawful: "This is not to say . . . that new product introductions are ipso facto immune . . . and we do not agree with Kodak's argument that they are; in all such cases, however, it is not the product introduction itself, but some associated conduct, that supplies the violation." *Berkey Photo*, 603 F.2d at 286 n.30 (citing Sargent-Welch Scientific Co. v. Ventron Corp., 567 F.2d 701 (7th Cir. 1977)); *see also* Multistate Legal Studies v. Harcourt Brace Jovanovich, 63 F.3d 1540, 1551 (10th Cir. 1995) ("Both the purpose and results of a product change, including customers' reception of the change, are relevant to whether a claimed product improvement is pro- or anti-competitive.").

302. *See* Ne. Tel. Co. v. AT&T, 651 F.2d 76, 94 (2d Cir. 1981) (implying that choosing unreasonably restrictive alternative violates § 2); ILC Peripherals Leasing Corp. v. IBM, 458 F. Supp. 423, 440-41, 444 (N.D. Cal. 1978) (new computer interface did not violate § 2 "[w]here the approach chosen was at least as justifiable as the alternative"), *aff'd sub nom.* Memorex Corp. v. IBM, 636 F.2d 1188 (9th Cir. 1980).

caused by the introduction of a new product if that product improves performance,[303] lowers price,[304] or achieves significant consumer acceptance by noncoercive means.[305]

Several cases have addressed the legality of a manufacturer's integration or modification of a product to render incompatible a competitor's components. Such integration has been consistently held lawful where it improves performance or reduces cost, regardless of the resultant incompatibility with formerly interchangeable competitive component parts.[306] In *In re IBM Peripheral EDP Devices Antitrust Litigation*,[307] the district court upheld an interface change despite finding that it was adopted principally to preclude competition. The court concluded that it was a superior design, that its effect on competition was negligible, and that a contrary finding "would amount to punishment for intent alone."[308]

When faced with claims that a new product or a design change is not really an improvement, and that the favorable treatment the antitrust laws generally accord innovations is thus not warranted, courts have been reluctant to substitute their judgment regarding the merits of the innovation for that of either the innovator or the market. As the Second Circuit explained in *Berkey Photo v. Eastman Kodak Co.*:[309]

> In this context therefore, the question of product quality has little meaning. A product that commends itself to many users because superior in certain respects may be rendered unsatisfactory to others by flaws they considered fatal. . . . If a monopolist's products gain acceptance in the market, therefore, it is of no importance that a judge or jury may later regard them as inferior, so long as that success was not based on any form of coercion.[310]

---

303. *Cal. Computer Prods.*, 613 F.2d at 744; Telex Corp. v. IBM, 510 F.2d 894, 927 (10th Cir. 1975); Apple iPod iTunes Antitrust Litig., 2011 U.S. Dist. LEXIS 77155, at *16-17 (N.D. Cal. 2011) ("Because iTunes 4.7 was a genuine improvement, the Court may not balance the benefits or worth of iTunes 4.7 against its anticompetitive effects."); *ILC Peripherals Leasing*, 458 F. Supp. at 438-39, 443-44.

304. *Cal. Computer Prods.*, 613 F.2d at 744; *ILC Peripherals Leasing*, 458 F. Supp. at 438, 443-44.

305. *Berkey Photo*, 603 F.2d at 287; *see also* Response of Carolina, Inc. v. Leasco Response, Inc., 537 F.2d 1307, 1326-31 (5th Cir. 1976); Walgreen Co. v. AstraZeneca Pharms. 534 F. Supp. 2d 146, 151-52 (D.D.C. 2008) (introduction of new drug to compete with already-established drugs added to consumers' choices and was noncoercive). *But see* Abbott Labs. v. Teva Pharms. USA, 432 F. Supp. 2d 408, 422 (D. Del. 2006) (where introduction of new drug formulation and simultaneous withdrawal of prior formulation denied consumers choice, fact that new product is an improvement is not dispositive and court must balance procompetitive and anticompetitive effects).

306. *See, e.g.*, Allied Orthopedic Appliances v. Tyco Health Care Group, LP, 592 F.3d 991, 998-1002 (9th Cir. 2010); HDC Med. v. Minntech Corp., 474 F.3d 543, 550 (8th Cir. 2007); Transamerica Computer Co. v. IBM, 698 F.2d 1377, 1382-83 (9th Cir. 1983); *Memorex*, 636 F.2d at 1188; *Cal. Computer Prods.*, 613 F.2d at 744; Medtronic Minimed, Inc. v. Smiths Med. MD, 371 F. Supp. 2d 578, 587 (D. Del. 2005) (rejecting antitrust claim based upon change from a standard interface to a proprietary patented interface where the defendant's "driving motivation . . . was to serve the customers who purchased its pumps"); Telex Corp. v. IBM, 367 F. Supp. 258, 342 (N.D. Okla. 1973), *rev'd on other grounds*, 510 F.2d 894 (10th Cir. 1975).

307. 481 F. Supp. 965 (N.D. Cal. 1979), *aff'd sub nom.* Transamerica Computer Co. v. IBM, 698 F.2d 1377 (9th Cir. 1983).

308. *Id.* at 1005.

309. 603 F.2d 263 (2d Cir. 1979).

310. *Id.* at 286-87; *see also* Ne. Tel. Co. v. AT&T, 651 F.2d 76, 94-96 (2d Cir. 1981) (*Berkey Photo* test applied to design change wholly lacking in technical merit intended to frustrate rivals); *Cal. Computer Prods.*, 613 F.2d at 744 (rejecting charge that IBM's design changes were

But where the evidence indicates that the change was grounded in anticompetitive motives that leave serious doubt about whether it was an improvement, a court might conclude that a purported innovation was predatory.[311] In *C.R. Bard, Inc. v. M3 Systems*,[312] for instance, the Federal Circuit affirmed a jury verdict that the antitrust defendant (Bard) introduced a modified version of its product to monopolize the market for a complementary product. Bard produced a biopsy needle firing device or "gun," which would inject a biopsy needle assembly into body tissue to take a tissue sample. Prior to the modifications, the Bard biopsy gun was compatible with competitors' replacement biopsy needles. After the modifications, however, the gun was no longer compatible with those needles. To show that the modification amounted to exclusionary conduct, the plaintiff "was required to prove that Bard made a change in its [biopsy] gun for predatory reasons, i.e., for the purpose of injuring competitors in the replacement needle market rather than for improving the operation of the gun."[313] Because there was evidence that the modifications "had no effect on gun or needle performance," that competitors' replacement needle presented no safety issue, and that the "real reasons for modifying the gun were to raise the cost of entry to potential makers of replacement needles," the court upheld the jury verdict of monopolization.[314]

In contrast, in *United States v. Microsoft Corp.*,[315] the D.C. Circuit held that Microsoft's development of its own version of the Java Virtual Machine that was incompatible with its rivals, but allowed Windows applications to run more swiftly, was not predatory.[316] Nor was Microsoft's development of a software package that allowed Internet access providers to create a distinctive identity for their service because that allowed them to customize portions of Microsoft's Web browser.[317]

---

"technological manipulation" and did not provide improved performance, and holding "[t]he reasonableness of IBM's conduct in this regard did not present a jury issue"); ILC Peripherals Leasing Corp. v. IBM, 458 F. Supp. 423, 439-41 (N.D. Cal. 1978) (quoting *Response of Carolina*, 537 F.2d at 1330) ("Where there is a difference of opinion as to the advantages of two alternatives which can both be defended from an engineering standpoint, the court will not allow itself to be enmeshed 'in a technical inquiry into the justifiability of product innovations.'").

311. *See, e.g.*, Xerox Corp. v. Media Scis. Int'l, 511 F. Supp. 2d 372, 387-89 (S.D.N.Y. 2007) (court or jury may have to weigh alleged anticompetitive purpose against evidence of product improvement or business justifications); Caldera, Inc. v. Microsoft Corp., 72 F. Supp. 2d 1295, 1310-14 (D. Utah 1999) (explaining that plaintiff need not prove that change was completely devoid of technical merit and denying motion for summary judgment because nonmovant had submitted sufficient evidence that incompatibilities built into new product were part of an anticompetitive scheme as evidenced by defendant's internal documents); *In re IBM Peripheral EDP Devices Antitrust Litig.*, 481 F. Supp. at 1002-03 (court would find frequent interface changes that precluded competitors from connecting with IBM equipment predatory if they "had no purpose and effect other than the preclusion of . . . competition"; "[i]f the design choice is unreasonably restrictive of competition, the monopolist's conduct violates the Sherman Act") (footnote omitted).
312. 157 F.3d 1340 (Fed. Cir. 1998).
313. *Id.* at 1382.
314. *Id. But see* Medtronic Minimed, Inc. v. Smiths Med. MD, 371 F. Supp. 2d 578, 588 (D. Del. 2005) (interpreting *C.R. Bard* to apply only where there is unlawful use of a patent that covers the interface); *cf. In re* Microsoft Corp. Antitrust Litig., 333 F.3d 517, 522-24 (4th Cir. 2003) (describing district court findings that defendant engaged in exclusionary conduct by, among other things, creating incompatibilities in product, but reversing preliminary injunction because of failure to prove irreparable harm).
315. 253 F.3d 34 (D.C. Cir. 2001).
316. *Id.* at 75.
317. *Id.* at 68.

However, the court held that, when Microsoft deceived developers of Java-based applications into believing that Microsoft's Java development tools were compatible with rival applications, that conduct was exclusionary.[318]

Where a product change does not involve technical issues, the courts are less hesitant to condemn a change. In *Multistate Legal Studies v. Harcourt Brace Jovanovich*,[319] the plaintiff alleged that the defendants attempted to monopolize the market for supplemental bar review workshops by bundling their workshop with their popular full bar review course. The defendants argued that the courses were bundled to create an improved product, but the Tenth Circuit reversed summary judgment for the defendants and remanded for trial. The court acknowledged the "difficulties and dangers" of second-guessing a claim that a product change is an improvement, but it observed that "[w]here . . . the claimed product improvement takes the form of a marketing change, rather than some complex technological integrations of previously separate functions, our degree of deference to product designers is reduced."[320]

b. FAILURE TO PREDISCLOSE TO COMPETITOR

A monopolist is generally not required to notify its competitors that it intends to introduce a new product into the market or to provide its competitors with technical information about the new product. In *Berkey Photo*, the plaintiff contended that Kodak's monopoly of the camera market effectively meant that only film that was compatible with Kodak cameras would be available. It argued that Kodak was obligated to predisclose to competing camera manufacturers the specifications of its new camera to enable them to modify their cameras to be compatible with the new film when the new camera was introduced. The Second Circuit disagreed:

> Kodak did not have a duty to predisclose information about the 110 system to competing camera manufacturers. . . . [A] firm may normally keep its innovations secret from its rivals as long as it wishes, forcing them to catch up on the strength of their own efforts after the new product is introduced. It is the possibility of success in the marketplace, attributable to superior performance, that provides the incentives on which the proper functioning of our competitive economy rests. If a firm that has engaged in the risks and expenses of research and development were required in all circumstances to share with its rivals the benefits of those endeavors, this incentive would very likely be vitiated.[321]

The same result has been reached in cases involving the computer industry where changes in the interface between peripheral and central processing units may directly cause the obsolescence of competitive peripheral equipment.[322]

318. *Id.* at 76-77.
319. 63 F.3d 1540 (10th Cir. 1995).
320. *Id.* at 1551 n.10.
321. 603 F.2d 263, 281 (2d Cir. 1979) (citation omitted); *accord* GAF Corp. v. Eastman Kodak Co., 519 F. Supp. 1203, 1228 (S.D.N.Y. 1981) ("only in the rarest cases will a monopolist's failure to disclose technical information concerning its new product support a claim for treble damages under § 2").
322. *See, e.g.*, Cal. Computer Prods. v. IBM, 613 F.2d 727, 744 (9th Cir. 1979) ("IBM, assuming it was a monopolist, had the right to redesign its products to make them more attractive to buyers—whether by reason of lower manufacturing cost and price or improved performance. It was under

It also has been held that a monopolist is entitled to enjoy the "lead time" achieved when a new product is not predisclosed and thus sells in the marketplace for some period with virtually no competition.[323] Such lead time has been cited as one of the primary incentives to innovation, which should not be "chilled."[324] Thus, the Second Circuit in *Berkey Photo* observed that "enforced predisclosure would cause undesirable consequences beyond merely encouraging the sluggishness the Sherman Act was designed to prevent."[325]

c. PREANNOUNCEMENT TO MARKET

Courts are split on whether preannouncement of a new product substantially before it would be commercially available in an effort to exclude a competitor can violate Section 2. In *Covad Communications Co. v. Bell Atlantic Corp.*,[326] the D.C. Circuit dismissed the plaintiff's claim that Bell Atlantic attempted to monopolize a market for DSL broadband service by falsely claiming that its DSL service was available in various areas before it actually was, holding that there is no harm to competition where a customer can readily determine that the new product is not available:

> When a company falsely claims or implies its own service is available and the falsity of that claim is necessarily dispelled whenever a consumer tries to obtain the service, there can be no plausible harm to competition; upon discovering the service is not available, the consumer may choose freely whether to purchase the service from another source or to wait for the offeror to make good on its offer. Although the consumer will have incurred an unnecessary transaction cost—which may generate bad will toward the firm by which it was misled—that is not a harm to the competitive process.[327]

Other courts have rejected monopolization claims where the preannouncement was not knowingly false.[328]

---

no duty to help CalComp or other peripheral equipment manufacturers survive or expand. IBM need not have provided its rivals with disk products to examine and copy . . . nor have constricted its product development so as to facilitate sales of rival products. The reasonableness of IBM's conduct in this regard did not present a jury issue.") (citation omitted); ILC Peripherals Leasing Corp. v. IBM, 458 F. Supp. 423, 443 (N.D. Cal. 1978) ("IBM was not required . . . to facilitate attachment of Memorex products."), *aff'd sub nom.* Memorex Corp. v. IBM, 636 F.2d 1188 (9th Cir. 1980).

323. *Berkey Photo*, 603 F.2d at 279-83; *see also ILC Peripherals Leasing*, 458 F. Supp. at 437. *But see* Caldera, Inc. v. Microsoft Corp., 72 F. Supp. 2d 1295, 1317-18 (D. Utah 1999) (recognizing right to lead time but distinguishing *Berkey Photo* and denying summary judgment because failure to predisclose was only one act in overall scheme to monopolize).
324. *Berkey Photo*, 603 F.2d at 282; *see also ILC Peripherals Leasing*, 458 F. Supp. at 437.
325. 603 F.2d at 282.
326. 398 F.3d 666 (D.C. Cir. 2005).
327. *Id.* at 675.
328. *See* MCI Commc'ns Corp. v. AT&T, 708 F.2d 1081, 1128-29 (7th Cir. 1983) (rejecting claim that preannouncement of new prices combined with delay in implementation improperly discouraged customers from switching to MCI where there was no evidence that the announcement was "knowingly false or misleading" and noting that in the case of preannounced prices, "[u]nnecessarily restrictive rules are likely to inhibit the flow of valuable information to the market"); S. Pac. Commc'ns Co. v. AT&T, 556 F. Supp. 825, 965-66 (D.D.C. 1983) (rejecting preannouncement claim as to same tariff), *aff'd*, 740 F.2d 980 (D.C. Cir. 1984);

### 5. *Predatory and Exploitative Pricing*

The Supreme Court has defined predatory pricing as "pricing below an appropriate measure of cost for the purpose of eliminating competitors in the short run and reducing competition in the long run."[329] According to the Court, it is vital to distinguish between procompetitive price cutting and anticompetitive predatory pricing because "cutting prices in order to increase business often is the very essence of competition. Thus, mistaken inferences in cases such as this one are especially costly, because they chill the very conduct the antitrust laws are designed to protect."[330]

In *Brooke Group v. Brown & Williamson Tobacco Corp.*,[331] the Supreme Court explained the requirements for proving that pricing is predatory:

> First, a plaintiff seeking to establish competitive injury resulting from a rival's low prices must prove that the prices complained of are below an appropriate measure of its rival's costs. . . . The second prerequisite to holding a competitor liable under the antitrust laws for charging low prices is a demonstration that the competitor had a reasonable prospect [in a primary line Robinson-Patman case], or, under § 2 of the Sherman Act, a dangerous probability, of recouping its investment in below-cost prices. . . . Recoupment is the ultimate object of an unlawful predatory pricing scheme; it is the means by which a predator profits from predation. Without it, predatory pricing produces lower aggregate prices in the market, and consumer welfare is enhanced. Although unsuccessful predatory pricing may encourage some inefficient substitution toward the product being sold at less than its cost, unsuccessful predation is in general a boon to consumers.[332]

Under *Brooke Group*, a plaintiff must establish these two elements—below-cost pricing and probable recoupment via supracompetitive prices—to prevail in a predatory pricing case. Mere aggressively low pricing will not serve as the basis for

---

AD/SAT v. Associated Press, 920 F. Supp. 1287, 1301 (S.D.N.Y. 1996) ("pre-announcement of a product or service constitutes predatory conduct only when the announcement is knowingly false"), *aff'd*, 181 F.3d 216, 231 (2d Cir. 1999); *ILC Peripherals Leasing*, 458 F. Supp. at 442 (six-month slippage in availability for delivery of new IBM product was not unlawful because such delays were common for complex computer products and there was no evidence "that when IBM announced NCP for delivery in March 1973, it did not honestly expect the product to be available at that time").

329. Cargill, Inc. v. Monfort of Colo., Inc., 479 U.S. 104, 117 (1986).

330. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 594 (1986) (citations omitted) (alteration in original); *see also* Brooke Grp. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 224 (1993) ("[t]hat below-cost pricing may impose painful losses on its target is of no moment to the antitrust laws if competition is not injured"); Atl. Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 337-38, 341 (1990) (cutting prices to get more business is the essence of competition; hence a competitor injured by low but nonpredatory price competition suffers no antitrust injury); *cf. Cargill*, 479 U.S. at 117-18 ("[Predatory pricing] is a practice that harms both competitors and competition. In contrast to price cutting aimed simply at increasing market share, predatory pricing has as its aim the elimination of competition. Predatory pricing is thus a practice inimical to the purposes of [the antitrust] laws, and one capable of inflicting antitrust injury.") (citation omitted).

331. 509 U.S. 209 (1993).

332. *Id.* at 222, 224.

a claim of predatory pricing.[333] Rather, a plaintiff must establish the *Brooke Group* elements.

Although *Brooke Group* itself was a Robinson-Patman Act case, the Supreme Court in *Brooke Group* stated that these elements apply equally to Section 2 cases.[334] Accordingly, courts analyzing monopolization claims based on predatory pricing under Section 2 apply the *Brooke Group* standards.[335]

a. PRICE-COST RELATIONSHIPS

As discussed, the first element of a predatory pricing claim is evidence that the defendant priced below an appropriate measure of its costs.[336] A threshold issue in performing this price-cost analysis is identifying the product or products whose prices and costs are to be analyzed.[337] Courts generally have held that the price-cost comparison should be made across entire product lines, rather than on a product-by-product basis.[338] However, a company can be guilty of predatory pricing with regard

---

333. *See, e.g.*, Wallace v. IBM, 467 F.3d 1104, 1107 (7th Cir. 2006) ("When monopoly does not ensue, low prices remain—and the goal of antitrust law is to use rivalry to keep prices low for consumers' benefit. Employing antitrust law to drive prices up would turn the Sherman Act on its head."); United States v. Microsoft Corp., 253 F.3d 34, 68 (D.C. Cir. 2001) ("The rare case of price predation aside, the antitrust laws do not condemn even a monopolist for offering its product at an attractive price, and we therefore have no warrant to condemn Microsoft for offering [its products] free of charge or even at a negative price."); Taylor Publ'g Co. v. Jostens, Inc., 216 F.3d 465, 476-79 (5th Cir. 2000) ("sham pricing"—luring customers with a low but not below-cost contract price, then trying to sell them upgrades at a higher margin—is not predatory or anticompetitive conduct); C.B. Trucking, Inc. v. Waste Mgmt., 137 F.3d 41, 44 (1st Cir. 1998) (granting summary judgment on predatory pricing claim when plaintiff claimed that defendant's prices were below plaintiff's, but did not show they were below defendant's costs); Abcor Corp. v. AM Int'l, 916 F.2d 924, 928 (4th Cir. 1990) (price cuts not anticompetitive where prices still exceeded costs); Monahan's Marine v. Boston Whaler, Inc., 866 F.2d 525, 527 (1st Cir. 1989) (above-cost prices not illegal even if low); D.E. Rogers Assocs. v. Gardner-Denver Co., 718 F.2d 1431, 1435 (6th Cir. 1983).

334. 509 U.S. at 222 ("whether the claim alleges predatory pricing under § 2 of the Sherman Act or primary-line price discrimination under the Robinson-Patman Act, two prerequisites to recovery remain the same"). See Chapter 5 for a discussion of claims under the Robinson-Patman Act.

335. *See, e.g.*, Pac. Bell Tel. Co. v. linkLine Commc'ns, 555 U.S. 438, 457 (2009) ("*Brooke Group* holds that low prices are only actionable under the Sherman Act when the prices are below cost and there is a dangerous probability that the predator will be able to recoup the profits it loses from the low prices."); *Matsushita*, 475 U.S. at 590 ("observations [regarding requirements for predatory pricing claim] apply even to predatory pricing by a *single firm* seeking monopoly power") (emphasis in original); United States v. AMR Corp., 335 F.3d 1109, 1115 n.5 (10th Cir. 2003) ("Although *Brooke Group* involved primary line discrimination under the Robinson-Patman Act, 15 U.S.C. § 13(a), the Supreme Court assured that the analysis applicable to predatory pricing claims under § 2 of the Sherman Act is identical."). *But see* LePage's Inc. v. 3M Co., 324 F.3d 141, 151 (3d Cir. 2003) ("nothing in [*Brooke Group*] suggests that its discussion of the issue is applicable to a monopolist with unconstrained market power").

336. *See Brooke Group*, 509 U.S. at 222.

337. Where a firm sells a product to an affiliate that resells it to an unaffiliated company, a question also arises as to which company's price and cost should be considered. In *Vollrath Co. v. Sammi Corp.*, 9 F.3d 1455, 1460-61 (9th Cir. 1993), the Ninth Circuit considered purported predatory pricing by vertically integrated corporations under common control. The court rejected the claim, finding that there was no evidence that either the last unit in the chain or the group of related companies as a whole had priced below its cost.

338. *See, e.g.*, Kentmaster Mfg. Co. v. Jarvis Prods. Corp., 146 F.3d 691, 694-95 (9th Cir. 1998) (if combined price of original equipment and foreseeably necessary spare parts was not predatory, a predatory pricing claim could not be based only on low-priced original equipment), *amended*, 164

to a limited number of important customers rather than across all sales.[339] The issue typically turns on whether the scope and duration of the allegedly predatory pricing is such that it is likely to drive competitors from the market so as to confer or maintain monopoly power.[340] Complications also may arise where the product is sold as part of a bundle or package.[341]

Once the relevant product or products have been identified, the controlling test for appraising whether a given price is "below cost" must be ascertained. While the Supreme Court held in *Brooke Group* that below-cost pricing is a necessary element of a predatory pricing claim, it has repeatedly declined to state what precise measure of "cost" is dispositive for this purpose.[342] In the absence of definitive guidance from the Supreme Court, there is conflicting case law in lower courts.

Although some early cases dealt vaguely with the concept of predatory pricing,[343] much of the modern analysis of this concept springs from a 1975 article by Professors Areeda and Turner.[344] The Areeda-Turner test proposes that prices below

---

F.3d 1243 (9th Cir. 1999); Int'l Travel Arrangers v. NWA, Inc., 991 F.2d 1389, 1395-96 (8th Cir. 1993) (to evaluate properly the pricing structure of airline tickets, it was necessary to consider all prices for the routes in question, not just the lowest priced seats); Stitt Spark Plug Co. v. Champion Spark Plug, 840 F.2d 1253, 1256 (5th Cir. 1988) (any meaningful comparison of price and cost must include both the original equipment market and replacement equipment market); Directory Sales Mgmt. Corp. v. Ohio Bell Tel. Co., 833 F.2d 606, 614 (6th Cir. 1987) (focus should be on "operations taken as a whole"); Bayou Bottling v. Dr. Pepper Co., 725 F.2d 300, 305 (5th Cir. 1984) (where full-line soft drink dealers sold variety of drinks in variety of sizes, determination of average variable cost must take into consideration full product line); *see also* Am. Academic Suppliers v. Beckley-Cardy, Inc., 922 F.2d 1317, 1320-21 (7th Cir. 1991) (in analyzing defendant's ability to recoup foregone profits, court noted that alleged predation "was on only a fraction of the total product line . . . so at most it would have driven [the plaintiff] from a portion of its business, leaving it free to reenter . . . as soon as [the defendant] raised prices").

339. *See, e.g.*, *Brooke Group*, 509 U.S. at 216 (addressing alleged predatory pricing of only generic cigarettes); Spirit Airlines v. Nw. Airlines, 431 F.3d 917, 933 (6th Cir. 2005) (reversing grant of summary judgment to defendant on predatory pricing claim limited to tickets for leisure travelers and excluding business and first class travelers); Marsann Co. v. Brammall, Inc., 788 F.2d 611, 612-14 & n.2 (9th Cir. 1986) (where claim was that defendant engaged in predatory pricing to gain particular customer, relevant product was sales to that customer); C.E. Servs. v. Control Data Corp., 759 F.2d 1241, 1247-48 (5th Cir. 1985) (predatory pricing solely to particular customers can support a monopolization claim where competitor would be harmed by such conduct). *But see* Invacare Corp. v. Respironics, Inc., 2006 U.S. Dist. LEXIS 77312, at *26 (N.D. Ohio 2006) (rejecting claim that defendant "could be liable for below-cost pricing to *some* customers" where both plaintiff and defendant sold to a broader group of customers).

340. *See, e.g.*, Taylor Publ'g Co. v. Jostens, Inc., 216 F.3d 465, 478-79 (5th Cir. 2000) (no possibility that conduct could drive competitor from market when it resulted in competitor losing no more than 0.4% of its business in any given year); Springfield Terminal Ry. Co. v. Canadian Pac. Ltd., 133 F.3d 103, 109-10 (1st Cir. 1997) (single instance of below-cost pricing insufficient); Morgan v. Ponder, 892 F.2d 1355, 1361-62 (8th Cir. 1989) (two isolated instances of below-cost pricing insufficient).

341. See part C.2.e of this chapter for a more detailed discussion of bundled pricing.

342. *See, e.g.*, *Brooke Group*, 509 U.S. at 222 n.1; Atl. Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 341 n.10 (1990); Cargill, Inc. v. Monfort of Colo., Inc., 479 U.S. 104, 117-18 n.12 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585 n.9 (1986).

343. *See, e.g.*, United States v. Am. Tobacco Co., 221 U.S. 106, 160, 182 (1911); Standard Oil Co. v. United States, 221 U.S. 1, 43 (1911); *cf.* Utah Pie Co. v. Cont'l Baking Co., 386 U.S. 685 (1967) (Robinson-Patman Act case).

344. Phillip Areeda & Donald F. Turner, *Predatory Pricing and Related Practices Under Section 2 of the Sherman Act*, 88 HARV. L. REV. 697 (1975).

reasonably anticipated marginal cost[345] be deemed predatory, while prices at or above reasonably anticipated marginal cost be deemed nonpredatory.[346] Because marginal cost is often difficult to measure, average variable cost[347] is supported as an acceptable proxy.[348]

To apply a test based on average variable cost (or any other type of incremental cost), it is necessary to determine what costs are variable (or incremental), as opposed to fixed.[349] Properly defined economic costs will often differ from costs as shown on the defendant's books, which are governed by accounting principles rather than economic rules.[350]

Although *Brooke Group* requires a cost-based test for predatory pricing, there remain considerable differences in the specific application of the test.[351] Furthermore, many of the decisions discussed below were decided before *Brooke Group* and its rule that a plaintiff must prove not only below-cost pricing, but also a dangerous probability of recoupment, to prevail on a predatory pricing claim. In reading the following discussion, it is important to keep in mind that the existence of below-cost pricing—regardless of the test used—does not alone form the basis for liability under Section 2.

***First Circuit.*** In *Tri-State Rubbish v. Waste Management*,[352] the First Circuit observed that pricing below variable cost is the "normal test of predation."[353] The

---

345. Marginal cost is the "increment to total cost that results from producing an additional increment of output." *Id.* at 700.

346. These presumptions are conclusive, except that prices below marginal cost are not deemed predatory in the rare case where such prices are at or above average total cost. *Id.* at 712.

347. *See id.* at 700.

348. *See id.* at 712 n.37, 716-18.

349. In general, whether a cost should be characterized as fixed or variable is a question for the finder of fact. *See* Spirit Airlines v. Nw. Airlines, 431 F.3d 917, 945 (6th Cir. 2005) (reversing grant of summary judgment because "a trier of fact could reasonably accept Spirit's experts' definition and calculation of Northwest's incremental costs to attract the leisure travel passengers on these routes as the appropriate measure of Northwest's average variable costs"); United States Philips Corp. v. Windmere Corp., 861 F.2d 695, 704 (Fed. Cir. 1988) (even uncontradicted expert testimony that "advertising expenses were variable rather than fixed costs" created a jury question); McGahee v. N. Propane Gas Co., 858 F.2d 1487, 1504 n.38 (11th Cir. 1988) ("determining what costs are variable[] is an issue of fact requiring expert testimony"); Kelco Disposal v. Browning-Ferris Indus., 845 F.2d 404, 408 (2d Cir. 1988) ("The characterization of legitimately disputed costs is a question of fact for the jury."), *aff'd on other grounds*, 492 U.S. 257 (1989).

350. *See, e.g.*, *McGahee*, 858 F.2d at 1495 n.16. *But cf.* D.E. Rogers Assocs. v. Gardner-Denver Co., 718 F.2d 1431, 1437-38 (6th Cir. 1983) (use of accountant's rather than economist's test of variable cost was satisfactory because it best reflected the "economic horizon" facing the defendant when it instituted the challenged pricing policy).

351. Brooke Grp. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 222-25 (1993). *Brooke Group* effectively overruled prior profit-maximization tests for predation. *See* Stearns Airport Equip. Co. v. FMC Corp., 170 F.3d 518, 533 n.14 (5th Cir. 1999) (theory of predation based upon the failure of the defendant to maximize profits "is no longer tenable in the wake of *Brooke Group*"). In *United States v. AMR Corp.*, 335 F.3d 1109, 1117-19 (10th Cir. 2003), the Tenth Circuit rejected what it characterized as various profit maximization tests proposed by the government. As the Tenth Circuit noted, "such a [profit] sacrifice test would necessarily involve a great deal of speculation and often result in injury to the consumer and a chilling of competition." *Id.* at 1118.

352. 998 F.2d 1073 (1st Cir. 1993).

353. *Id.* at 1080 ("A company that rationally prices its own product or service at or above its own costs does not violate the Sherman Act merely because its costs, and thus its prices, are lower than a rival's costs; and this is true even though its lower costs may be due to the generosity, or foolishness, of another supplier who has charged the company too little for an input.").

First Circuit has not identified cases in which prices above incremental cost might be predatory. Following *Brooke Group*, however, the First Circuit has observed that "even below-cost pricing is not automatically an antitrust violation if competition is not threatened."[354]

***Second Circuit.*** The Second Circuit has adopted the Areeda-Turner test.[355] In *Kelco Disposal v. Browning-Ferris Industries*,[356] the court held that "[p]rices that are below reasonably anticipated marginal cost, and its surrogate, reasonably anticipated average variable cost, are presumed predatory."[357] The *Kelco* court did not explicitly state that the presumption could not be overcome, but its reliance upon the Areeda-Turner test suggests that the presumption is generally conclusive. Earlier, in *Northeastern Telephone Co. v. AT&T*,[358] the Second Circuit noted that a defendant who prices below cost "still would be entitled to prove that its below-cost prices had an acceptable business justification."[359]

***Third Circuit.*** The Third Circuit has referred to the Areeda-Turner test with approval, but it has not formally adopted it nor any other price-cost test.[360]

***Fourth Circuit.*** The Fourth Circuit, likewise, has not specified the price-cost test it would apply. In *Liggett Group v. Brown & Williamson Tobacco Corp.*,[361] the court noted that the Supreme Court had held that pricing must be "below some appropriate measure of cost" to be predatory but had not specified the relevant cost standard.[362]

***Fifth Circuit.*** In *Stearns Airport Equipment Co. v. FMC Corp.*,[363] the Fifth Circuit held that, in light of the Supreme Court's decision in *Brooke Group*, a price is not predatory unless it is below average variable cost.[364]

***Sixth Circuit.*** In *D.E. Rogers Associates v. Gardner-Denver Co.*,[365] the Sixth Circuit adopted the Ninth Circuit's modification of the Areeda-Turner test set forth in

---

354. R.W. Int'l Corp. v. Welch Food, 13 F.3d 478, 488 (1st Cir. 1994). *But see* Picker Int'l v. Leavitt, 865 F. Supp. 951, 966 (D. Mass. 1994) (citing Barry Wright Corp. v. ITT Grinnell Corp., 724 F.2d 227 (1st Cir. 1983)) ("Predatory pricing is the pricing of a product below its average total cost.").

355. *See* Irvin Indus. v. Goodyear Aerospace Corp., 974 F.2d 241, 245 (2d Cir. 1992) ("we have adopted the test set forth by Phillip Areeda and Donald F. Turner in their seminal 1975 article: predatory pricing is presumed to occur when a seller prices below reasonably anticipated average variable cost").

356. 845 F.2d 404 (2d Cir. 1988), *aff'd on other grounds*, 492 U.S. 257 (1989).

357. *Id.* at 407.

358. 651 F.2d 76 (2d Cir. 1981).

359. *Id.* at 91 n.24.

360. *See, e.g.*, Advo, Inc. v. Phila. Newspapers, 51 F.3d 1191, 1198 (3d Cir. 1995) (finding that the plaintiff was unable to produce any direct evidence of pricing "below any relevant measure of cost").

361. 964 F.2d 335 (4th Cir. 1992), *aff'd sub nom.* Brooke Grp. v. Brown & Williamson Tobacco Corp., 509 U.S. 209 (1993).

362. *Id.* at 339 (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585 n.8 (1986)). Subsequently, however, in a decision antedating the Supreme Court decision in *Brooke Group*, and without any reference to the relation between price and cost, the court suggested that setting prices below those of one's competitors might indicate the type of "self-induced injury" necessary to prove predation. M & M Med. Supplies & Serv. v. Pleasant Valley Hosp., 981 F.2d 160, 167 (4th Cir. 1992) (en banc).

363. 170 F.3d 518 (5th Cir. 1999); *see also* Taylor Publ'g Co. v. Jostens, Inc., 216 F.3d 465, 478 n.6 (5th Cir. 2000).

364. *Stearns Airport Equipment*, 170 F.3d at 532.

365. 718 F.2d 1431, 1437 (6th Cir. 1983).

*William Inglis*.[366] In *Arthur S. Langenderfer, Inc. v. S.E. Johnson Co.*,[367] however, the Sixth Circuit refused to follow the Ninth Circuit's "extension" of the burden of proof principle in *Transamerica Computer Co. v. IBM*,[368] holding that some evidence of pricing below average total cost must be shown before Sherman Act liability could be premised on alleged predatory pricing.[369] In *Spirit Airlines v. Northwest Airlines*,[370] the Sixth Circuit reaffirmed *Langenderfer*, indicating that average variable cost was the appropriate proxy for short-run marginal cost under the Areeda-Turner test.[371]

***Seventh Circuit.*** In *MCI Communications v. AT&T*,[372] the Seventh Circuit embraced a cost-based standard,[373] although it noted that "some future case may admit more scope for 'other factors.'"[374] Noting that prior cases had "largely addressed the merits of short-run marginal cost (or its proxy, average variable cost) as compared with average total cost,"[375] the court considered—in light of a stipulation "that a form of average total cost would be used to determine predation"—whether fully distributed cost or long-run incremental cost is the most meaningful measure of average total cost.[376] The court rejected the use of fully distributed cost, which includes costs that are not causally related to the service or product in question, and held that average total cost is best measured, at least in the multiproduct context, by average long-run incremental cost.[377] The court then concluded that prices at or above long-run incremental cost should not provide a basis for an inference or presumption of predatory intent.[378]

***Eighth Circuit.*** The Eighth Circuit, in *Henry v. Chloride, Inc.*,[379] adopted a combination of the First and Ninth Circuit tests:

---

366. William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co., 668 F.2d 1014, 1035-36 (9th Cir. 1981) (prices above average variable cost but below average total cost may be predatory).
367. 729 F.2d 1050 (6th Cir. 1984).
368. 698 F.2d 1377, 1388 (9th Cir. 1983) (pricing *above* average total cost may be deemed predatory if plaintiff offers clear and convincing evidence of predatory intent).
369. *Arthur S. Langenderfer*, 729 F.2d at 1056.
370. 431 F.3d 917 (6th Cir. 2005).
371. *Id.* at 938; *see also id.* at 952-53 (jury could find predation even if price above average variable cost if it found, under the industry structure, defendant's pricing injured competition and would allow recoupment).
372. 708 F.2d 1081 (7th Cir. 1983).
373. *Id.* at 1115. The Court rejected the suggestion that choice of the appropriate cost-based standard for predation could be a factual question for the jury. *Id.* at 1111-12 (citing Chillicothe Sand & Gravel Co. v. Martin Marietta Corp., 615 F.2d 427 (7th Cir. 1980)). The court also rejected the use of a "subjective test based wholly upon intent." *MCI*, 708 F.2d at 1112. In *A.A. Poultry Farms v. Rose Acre Farms*, the Seventh Circuit subsequently rejected any focus on intent in the analysis of predatory pricing because doing so "invites juries to penalize hard competition." 881 F.2d 1396, 1402 (7th Cir. 1989).
374. 708 F.2d at 1123 n.59 (citation omitted).
375. *Id.* at 1119.
376. *Id.* at 1120 & n.55. Fully distributed cost reflects the allocation of all the costs of the business to its products; long-run incremental cost reflects all costs that, over a several year period, would not be incurred if the product in question were not offered. Thus, certain fixed costs of doing business are typically excluded from long-run incremental cost but included in fully distributed cost. Long-run incremental cost differs from average variable cost in that it includes some costs that do not vary in the short run but that do vary over a longer time period depending on whether a particular product is offered. *Id.* at 1115-16.
377. *Id.* at 1122.
378. *Id.* at 1123 & n.59.
379. 809 F.2d 1334 (8th Cir. 1987) (price discrimination case).

> We agree with *Barry Wright Corp.* that at some point, competitors should know for certain they are pricing legally, and that this point should be average total cost. In other words, prices above average total cost are legal *per se*. However, we also believe that "rigid adherence to a particular cost-based rule," *William Inglis & Sons Baking Co.*, can produce injustice, and therefore hold [average variable cost] to be a marker of rebuttable presumptions, with the plaintiff holding the burden above and the defendant below.[380]

***Ninth Circuit.*** In *William Inglis & Sons Baking Co. v. ITT Continental Baking Co.*,[381] the Ninth Circuit held that prices above average variable cost but below average total cost may be predatory:

> Although pricing below average total cost and above average variable cost is not inherently predatory, it does not follow, however, that such prices are never predatory. Predation exists when the justification of these prices is based, not on their effectiveness in minimizing losses, but on their tendency to eliminate rivals and create a market structure enabling the seller to recoup his losses. This is the ultimate standard, and not rigid adherence to a particular cost-based rule, that must govern our analysis of alleged predatory pricing.[382]

The court held that if the defendant's prices, although below average total cost, were above average variable cost, "the plaintiff bears the burden of showing defendant's pricing was predatory."[383] However, a plaintiff establishes a prima facie case of predatory pricing when it proves the defendant's prices were below average variable cost.[384] Once the plaintiff has established a prima facie case of predation, the burden shifts to the defendant "to prove that the prices were justified without regard to any anticipated destructive effect they might have on competitors."[385]

In *Transamerica Computer Co. v. IBM*,[386] the Ninth Circuit went a step further and held that even prices above average total cost may be deemed predatory upon clear and convincing evidence of predatory intent.[387]

---

380. *Id.* at 1346 (citation omitted); *accord* Int'l Travel Arrangers v. NWA, Inc., 991 F.2d 1389, 1394-96 (8th Cir. 1993) (airline's overall pricing structure, including high-priced seats, was above average total cost, hence per se legal, even though some seats were sold below cost); Morgan v. Ponder, 892 F.2d 1355, 1360 (8th Cir. 1989) ("average variable cost is a marker of rebuttable presumptions").
381. 668 F.2d 1014 (9th Cir. 1981).
382. *Id.* at 1035.
383. *Id.* at 1035-36.
384. *Id.* at 1036.
385. *Id.*; *see also* Transamerica Computer Co. v. IBM, 698 F.2d 1377, 1388 (9th Cir. 1983) ("cost categories should be used to allocate the burden of proof on the issue of predation").
386. 698 F.2d 1377 (9th Cir. 1983).
387. *Id.* at 1388; *see also* Marsann Co. v. Brammall, Inc., 788 F.2d 611, 614-15 (9th Cir. 1986) (prices may be predatory even if not shown to be not below either marginal or average variable cost); Drinkwine v. Federated Publ'ns, 780 F.2d 735, 739 (9th Cir. 1985) ("Absent evidence that [the defendant's] pricing was below its average total cost, [the plaintiff] must prove by clear and convincing evidence that its pricing policy unreasonably restricted competition."). *But cf.* Oahu Gas Serv. v. Pac. Res., 838 F.2d 360, 370-71 (9th Cir. 1988) (reversing denial of defendant's motion for judgment n.o.v. where prices were above average total cost and the net result of marketing scheme increased competition by inducing competitor plaintiff to lower its prices).

In *Vollrath Co. v. Sammi Corp.*,[388] the Ninth Circuit quoted the Supreme Court's statement in *Brooke Group* that for a price to be predatory it must be "below an appropriate measure of . . . costs."[389] It did not indicate, however, whether it viewed that statement as overruling *Transamerica*'s holding that above-cost prices can sometimes be predatory, depending on the defendant's intent.

***Tenth Circuit.*** In *Multistate Legal Studies v. Harcourt Brace Jovanovich*,[390] the Tenth Circuit held that, after *Brooke Group*, both marginal and average variable costs are "relevant" to the predatory pricing analysis, but observed that neither the Tenth Circuit nor the Supreme Court had "taken a position on which of various cost measures is the definitive one."[391] Subsequently, in *United States v. AMR Corp.*,[392] the Tenth Circuit again declined "to dictate a definitive cost measure for all cases," explaining that "there may be times when courts need the flexibility to examine both [average variable cost] as well as other proxies for marginal cost in order to evaluate an alleged predatory pricing scheme."[393]

In *AMR*, the government conceded that American Airlines did not price below its average variable cost,[394] but contended that "where there is a challenge to well-defined incremental conduct, and where incremental costs may be directly and confidently measured utilizing alternative proxies to [average variable cost], . . . the market-wide [average variable cost] test is inappropriate."[395] Although the government offered four alternative tests purporting to measure "the precise costs associated with the capacity additions at issue," the court considered and rejected each of these tests.[396] It found that two of the proposed tests did not properly measure incremental costs because they relied on fully allocated costs and included many fixed costs not affected by the airline capacity additions at issue.[397] The court rejected the third test proffered by the government because it actually measured short-run profit maximization rather than incremental costs.[398] The court found the fourth test also "fatally flawed" because it incorporated "arbitrarily allocated variable costs" rather than only the avoidable or incremental costs that the government purported to compare to incremental revenue.[399]

***Eleventh Circuit.*** In *McGahee v. Northern Propane Gas*,[400] the Eleventh Circuit ruled that the "test for predatory pricing must consider subjective evidence and should use average total cost as the cost above which no inference of predatory intent can be made."[401] Prices below average total cost but above average variable cost

---

388. 9 F.3d 1455 (9th Cir. 1993).
389. *Id.* at 1460 (quoting *Brooke Group*, 509 U.S. at 222).
390. 63 F.3d 1540 (10th Cir. 1995).
391. *Id.* at 1549 n.5.
392. 335 F.3d 1109 (10th Cir. 2003).
393. *Id.* at 1116. The court's analysis, however, implicitly rejected, in light of *Brooke Group*, its earlier conclusion that sales above an appropriate measure of cost "do not preclude a finding of predatory pricing if other factors are present indicating unreasonably anticompetitive behavior." Instructional Sys. Dev. v. Aetna Cas. & Sur. Co., 817 F.2d 639, 648 (10th Cir. 1987).
394. 335 F.3d at 1120.
395. *Id.* at 1116.
396. *Id.* at 1116-20.
397. *Id.* at 1117-18.
398. *Id.* at 1118 ("such a [profit] sacrifice test would necessarily involve a great deal of speculation and often result in injury to the consumer and a chilling of competition").
399. *Id.* at 1119-20.
400. 858 F.2d 1487 (11th Cir. 1988).
401. *Id.* at 1496 (footnote omitted).

create circumstantial evidence of predatory intent.[402] The Eleventh Circuit explained that the difference between its test and that of the Sixth and Ninth Circuits regarding prices below average total cost and above short run marginal cost "is one of semantics and not of substance."[403]

Finally, the Eleventh Circuit held that, "[i]f a defendant's prices were below short run marginal cost, then the circumstantial evidence is strong enough to create a rebuttable presumption of predatory intent."[404] To establish predatory intent as a matter of law, however, a plaintiff still must show not only that the defendant's prices were below short run marginal cost but also that "the other evidence, subjective or objective, is sufficiently probative of defendant's predatory intent."[405]

***District of Columbia Circuit.*** In *Southern Pacific Communications v. AT&T*,[406] the District of Columbia Circuit reviewed the Ninth Circuit's holdings in *William Inglis* and *Transamerica* and compared them with the Areeda-Turner test for predatory pricing.[407] Under the facts of the case, however, the District of Columbia Circuit found it unnecessary to decide which rule to adopt because the plaintiff had failed to demonstrate predatory pricing under any test.[408]

***Federal Trade Commission and Department of Justice.*** Before *Brooke Group*, the FTC had formulated its own cost-based test to distinguish presumptively lawful pricing from presumptively predatory pricing.[409] In dismissing charges that ITT attempted to monopolize several wholesale baking markets, the FTC held that:

> (1) Sales at prices that equal or exceed average variable cost should be strongly, often conclusively, presumed to be legal. . . . (2) Sales at prices below average variable cost for a significant period of time should be rebuttably presumed to be anticompetitive. . . . [and] (3) Sales at prices that equal or exceed average total cost should be conclusively presumed to be legitimate.[410]

In its 2008 report on single firm conduct,[411] the Department of Justice indicated that it would rely on an average avoidable cost standard. In 2009, it withdrew that guidance.[412]

402. *Id.* at 1503.
403. *Id.* at 1504 n.37.
404. *Id.* at 1504.
405. *Id.*
406. 740 F.2d 980 (D.C. Cir. 1984).
407. *Id.* at 1003-05.
408. *Id.* at 1006-07.
409. *See* ITT Corp., 104 F.T.C. 280 (1984).
410. *Id.* at 403-04 (emphasis omitted). The presumption that prices equaling or exceeding average variable cost are legal could be rebutted by a "strong showing that sales at such prices were not, absent the effect of the alleged predation, consistent with profit maximization or loss minimization." *Id.* at 403-04. The presumptive illegality of pricing below average variable cost for a significant period of time may be rebutted by showing "that the sales at issue (1) were of products that were obsolete, perishable, or otherwise subject to rapid value deterioration; (2) were at introductory prices designed to induce trial; or (3) were made to avoid losing goodwill, such as product loyalty, that it would be very costly to regain were the firm to shut down and then reopen later." *Id.* at 404.
411. U.S. DEP'T OF JUSTICE, COMPETITION AND MONOPOLY: SINGLE-FIRM CONDUCT UNDER SECTION 2 OF THE SHERMAN ACT 67 (2008).
412. *See* DOJ Press Release, Justice Department withdraws Report on Antitrust Monopoly Law (May 11, 2009), *available at* http://www.justice.gov/atr/public/press_releases /2009/245710.pdf. Three FTC Commissioners criticized the DOJ report and rejected average avoidable cost as the preferred

b. MARKET STRUCTURE AND RECOUPMENT

In *Brooke Group*,[413] the Supreme Court held that "[t]he second prerequisite to holding a competitor liable under the antitrust laws for charging low prices is a demonstration that the competitor had . . . a dangerous probability of recouping its investment in below-cost prices."[414] The reason for this requirement is that consumers benefit from below-cost prices and are injured only if they will eventually be forced to pay supracompetitive prices when monopoly power is achieved.[415] Moreover, a rational firm would only engage in predatory pricing if it anticipated that it would be able to recover its losses later through monopoly profits.[416]

To establish a predatory pricing claim, the plaintiff must show, first, that the below-cost pricing was capable of driving rivals from the market.[417] "This requires an understanding of the extent and duration of the alleged predation, the relative financial strength of the predator and its intended victim, and their respective incentives and will."[418] Second, the plaintiff must present evidence that the market is susceptible to sustained monopoly pricing following the victim's exit.[419] In the Court's words:

---

cost measure in predation cases. Statement of Commissioners Harbour, Leibowitz and Rosch on the Issuance of the Section 2 Report by the Department of Justice at 6 (Sept. 8, 2008), *available at* http://www.ftc.gov/os/2008/09/080908section2stmt.pdf. The Commissioners noted that the average avoidable cost standard might exclude a rival that could constrain monopoly power, such as when upfront costs are large but the costs of producing marginal units are de minimis. *Id.*

413. 509 U.S. 209 (1993).

414. *Id.* at 224.

415. *Id.* ("predatory pricing produces lower aggregate prices in the market, and consumer welfare is enhanced"); *see also* Wallace v. IBM, 467 F.3d 1104, 1107 (7th Cir. 2006) ("When monopoly does not ensue, low prices remain—and the goal of antitrust law is to use rivalry to keep prices low for consumers' benefit. Employing antitrust law to drive prices up would turn the Sherman Act on its head.").

416. *See Brooke Group*, 509 U.S. at 224; *see also* Stearns Airport Equip. Co. v. FMC Corp., 170 F.3d 518, 528 (5th Cir. 1999) ("[The recoupment] inquiry is really into the economic rationality of the challenged conduct. If there is no likelihood of recoupment, it would seem improbable that a scheme would be launched."). The Supreme Court's decision in *Brooke Group* reflects the view that predatory pricing is almost never a viable business strategy. Since *Brooke Group*, however, "[r]ecent scholarship has challenged the notion that predatory pricing schemes are implausible and irrational." *See* United States v. AMR Corp., 335 F.3d 1109, 1114-15 (10th Cir. 2003).

417. *Brooke Group*, 509 U.S. at 225; *Wallace*, 467 F.3d at 1107 (affirming dismissal of predatory pricing claim where plaintiff did not contend that defendants' conduct would lead to monopoly prices in the future); Taylor Publ'g Co. v. Jostens, Inc., 216 F.3d 465, 478 n.8 (5th Cir. 2000) (limited promotional pricing could not satisfy recoupment requirement because it "presented no risk of driving [the plaintiff] from the market"); *Stearns Airport Equip.*, 170 F.3d at 528 (first prong of recoupment requirement is that "claimant must demonstrate that the scheme could actually drive the competitor out of the market").

418. 509 U.S. at 225.

419. *Id.* at 225-26; *see also* Rebel Oil Co. v. Atl. Richfield Co., 51 F.3d 1421, 1438, 1441 (9th Cir. 1995) (in an attempted monopolization case, "ARCO's market share of 44% is sufficient as a matter of law to support a finding of market power, [only] if entry barriers are high and competitors are unable to expand their output in response to supracompetitive pricing"); Dial A Car, Inc. v. Transp., Inc., 82 F.3d 484, 487 (D.C. Cir. 1996) ("A plaintiff must show, first, that the defendant would be able to achieve a monopoly position in the relevant market . . . ."); Am. Academic Suppliers v. Beckley-Cardy, Inc., 922 F.2d 1317, 1320 (7th Cir. 1991) ("Firms found guilty of attempting to monopolize are typically, and in predatory pricing cases must always be, monopolists.").

> If market circumstances or deficiencies in proof would bar a reasonable jury from finding that the scheme alleged would likely result in sustained supracompetitive pricing, the plaintiff's case has failed. In certain situations—for example, where the market is highly diffuse and competitive, or where new entry is easy, or the defendant lacks adequate excess capacity to absorb the market shares of his rivals and cannot quickly create or purchase new capacity—summary disposition of the case is appropriate.[420]

The courts have to date rejected efforts to establish recoupment of predatory losses in one group of markets by demonstrating that the predation will facilitate the exercise of monopoly power in other markets. For example, in *Advo, Inc. v. Philadelphia Newspapers*,[421] the court rejected the argument that a monopolist who pursues predatory pricing will earn a reputation that will scare off potential entrants in other markets in which it competes so that it can charge monopoly prices long enough to recoup. According to the Third Circuit, this argument "sweeps too broadly" and would "bar summary judgment in every predatory pricing case."[422] A similar result was reached by the district court in *AMR*.[423]

Finally, given the difficulty of proving a dangerous probability of recoupment, in some cases a predatory pricing claim may be disposed of without ever reaching the issue of whether there was below-cost pricing. As the Seventh Circuit explained in *A.A. Poultry Farms v. Rose Acre Farms*:[424]

> It is much easier to determine from the structure of the market that recoupment is improbable than it is to find the cost a particular producer experiences in the short, middle, or long run (whichever proves pertinent). Market structure offers a way to cut the inquiry off at the pass, to avoid the imponderable questions that have made antitrust cases among the most drawn-out and expensive types of litigation. Only if market structure makes recoupment feasible need a court inquire into the relation between price and cost.[425]

---

420. 509 U.S. at 226; *see also* Bailey v. Allgas, Inc., 284 F.3d 1237, 1245-56 (11th Cir. 2002) (in Robinson-Patman Act case, affirming summary judgment for defendant because plaintiff did not show either market power within a properly defined relevant market or barriers to entry); *Taylor Publ'g*, 216 F.3d at 478 (no recoupment shown where below-cost pricing was minimal and therefore would not drive competitors out of the market); *Stearns Airport Equip.*, 170 F.3d at 528-31 (plaintiff failed to show either that the alleged predatory pricing would have eliminated competitors or that there were sufficient barriers to entry for defendant to recoup); *Dial A Car*, 82 F.3d at 488 (affirming dismissal of complaint where recoupment unlikely because there were other companies poised to take business away from any would-be monopolist and there were no barriers to entry); *Rebel Oil Co.*, 51 F.3d at 1443 (affirming summary judgment for defendant where it was undisputed that competitors could raise their output in response to defendant's price cuts); Advo, Inc. v. Phila. Newspapers, 51 F.3d 1191, 1200-02 (3d Cir. 1995) (ease of entry precludes liability for predatory pricing); Masco Contractor Servs. E. v. Beals, 279 F. Supp. 2d 699, 707 (E.D. Va. 2003) (dismissing defendant's § 2 counterclaim for failure to allege any barrier to entry in the relevant market that would allow plaintiff to recoup its investment in below-cost prices); United States v. AMR Corp., 140 F. Supp. 2d 1141, 1209-10 (D. Kan. 2001) (recoupment not possible where there was significant existing competition and insufficient barriers to entry), *aff'd*, 335 F.3d 1109 (10th Cir. 2003).
421. 51 F.3d 1191 (3d Cir. 1995).
422. *Id.* at 1202.
423. *AMR Corp.*, 140 F. Supp. 2d at 1213-15.
424. 881 F.2d 1396 (7th Cir. 1989).
425. *Id.* at 1401.

The court reasoned that, by making likelihood of recoupment the "initial hurdle," complex questions regarding cost and intent could be avoided.[426] The court concluded that, on the facts of the case, where the defendant's market share was about 2 percent and entry was easy, "no rational jury could have found that recoupment took place, could have taken place, or conceivably could take place in the future."[427].

c. MEETING COMPETITION DEFENSE

Price cutting has frequently been deemed not to be predatory under Section 2 of the Sherman Act where it is intended to or only meets competition.[428] However, it is uncertain whether a court would hold that a monopolist pricing below its average variable cost (or marginal cost) to match the prices of a smaller rival violates Section 2.

In *AMR*, the district court recognized a meeting competition defense predicated on the statutory defense to price discrimination claims under the Robinson-Patman Act[429] and granted summary judgment because American Airlines only matched, and never undercut, the fares of the new entrant.[430] On appeal, the Tenth Circuit affirmed

426. *Id.*

427. *Id.*; *cf.* Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 588-93 (1986) (discussing implausibility of recoupment); Cargill, Inc. v. Monfort of Colo., Inc., 479 U.S. 104, 119-21 & n.14 (1986) (same). For other cases where the court made its determination based on the recoupment prong alone, see Bailey v. Allgas, Inc., 284 F.3d 1237, 1244-45 (11th Cir. 2002) (in Robinson-Patman Act case, affirming grant of summary judgment based on recoupment analysis alone); Nat'l Parcel Servs. v. J.B. Hunt Logistics, 150 F.3d 970, 971 (8th Cir. 1998) (rejecting predatory pricing claim on basis of no dangerous probability of recoupment without examining price-cost relationship); Isr. Travel Advisory Serv. v. Isr. Identity Tours, 61 F.3d 1250, 1256 (7th Cir. 1995) (ease of entry precludes recoupment and predatory pricing); Am. Academic Suppliers v. Beckley-Cardy, Inc., 922 F.2d 1317, 1320-22 (7th Cir. 1991) (rejecting predatory pricing claim without evaluating price-cost relationship because ease of entry and defendant's small market share precluded recoupment); Ne. Tel. Co. v. AT&T, 651 F.2d 76, 89 (2d Cir. 1981) ("in industries in which entry is easy, predatory pricing will not pay"); AND Carting, LLC v. Finocchio Bros., 2010 U.S. Dist. LEXIS 89660, at *12-15 (D. Conn. 2010) (assuming pricing below average variable cost, and granting summary judgment based on lack of evidence that defendants could recoup any losses by charging supracompetitive prices).

428. *See, e.g.*, Richter Concrete Corp. v. Hilltop Concrete Corp., 691 F.2d 818, 826 (6th Cir. 1982) (noting that "[i]t is not anticompetitive for a company to reduce prices to meet lower prices already being charged by competitors," in a case where the defendant had a 44% market share and the parties stipulated that the defendant's prices were below average total costs but above average variable costs and where the court declined to decide whether to adopt the Areeda-Turner test because there was no evidence of any market effect from the low pricing and no evidence of intent to monopolize); D.E. Rogers Assocs. v. Gardner-Denver Co., 718 F.2d 1431, 1438 (6th Cir. 1983) (citing *Richter*); ILC Peripherals Leasing Corp. v. IBM, 458 F. Supp. 423, 433 (N.D. Cal. 1978) (where plaintiff conceded that there was no evidence of prices below average variable costs or marginal costs and where IBM's prices were mostly higher than plaintiffs', stating that "[t]o force a company to maintain non-competitive prices would be to turn the antitrust laws on their head"), *aff'd sub nom.* Memorex Corp. v. IBM, 636 F.2d 1188 (9th Cir. 1980).

429. 15 U.S.C. § 13(b).

430. United States v. AMR Corp., 140 F. Supp. 2d 1141, 1204-08 (D. Kans. 2001) (reviewing case law discussing the meeting competition defense in the Sherman Act context), *aff'd*, 335 F.3d 1109 (10th Cir. 2003).

the holding that American Airlines had not engaged in predatory pricing, but declined to rely on the meeting competition defense.[431] In the court's words:

> There may be strong arguments for application of the meeting competition defense in the Sherman Act context by analogy to the Robinson-Patman context. However, unlike in the Robinson-Patman Act, such a defense is not expressly provided for by the terms of the Sherman Act. The Supreme Court has never mentioned the possibility of such a defense under the Sherman Act. We therefore decline to rule that the "meeting competition" defense applies in the § 2 context.[432]

d. PROMOTIONAL DISCOUNTS

Pricing strategies may involve temporary or promotional discounts. Courts generally have indicated that price-cost tests should not be applied strictly to genuine promotional discounts.[433] The Seventh Circuit explained:

> [P]romotional discounts raise no antitrust problems . . . though often they are below incremental cost in a superficial sense. (Superficial because they may be above that cost when the promotional value of the discounts is added to the discounted price, as it should be to construct the full price with which to compare incremental cost.)[434]

A "promotional" price must be of limited duration, but there is no definitive rule separating the legitimate promotional period from the longer period necessary to qualify as predatory.[435]

e. PRICE SQUEEZES

Price squeezes occur most commonly in two situations: (1) a partially vertically integrated firm charges a rate for a finished product that is so low compared to the price it charges for the raw materials it sells to competitors that those competitors cannot match the prices that the firm charges for the finished product; and (2) a firm (usually a utility) sells in the wholesale and retail markets, and charges retail rates that are the same as or lower than the wholesale rates. In *Pacific Bell Telephone Co.*

---

431. 335 F.3d at 1120-21.

432. *Id.* at 1120 n.15. In another case addressing predation in the airline industry, a district court rejected the meeting competition defense. Spirit Airlines v. Nw. Airlines, 2003 U.S. Dist. LEXIS 26831, at *33-38 (E.D. Mich. 2003), *rev'd on other grounds*, 431 F.3d 917 (6th Cir. 2005).

433. *See, e.g.*, Taylor Publ'g Co. v. Jostens, Inc., 216 F.3d 465, 478 n.8 (5th Cir. 2000) (limited promotional pricing could not satisfy recoupment requirement because it "presented no risk of driving Taylor from the market"); Isr. Travel Advisory Serv. v. Isr. Identity Tours, 61 F.3d 1250, 1256 (7th Cir. 1995) (free tours for bar or bat mitzvah celebrants not predatory); A.A. Poultry Farms v. Rose Acre Farms, 881 F.2d 1396, 1400 (7th Cir. 1989) ("[o]ften a price below cost reflects only the sacrifice necessary to establish a presence in a competitive market"); Buffalo Courier-Express v. Buffalo Evening News, 601 F.2d 48, 55 (2d Cir. 1979) (five weeks of free introductory copies of newspaper not predatory). *But see* Multistate Legal Studies v. Harcourt Brace Jovanovich, 63 F.3d 1540, 1551 (10th Cir. 1995) (the evaluation of whether promotional pricing is proper may be different depending upon whether the defendant has monopoly power in the market in which the product is sold).

434. Am. Academic Suppliers v. Beckley-Cardy, Inc., 922 F.2d 1317, 1322 (7th Cir. 1991).

435. *Compare* Gen. Foods Corp., 103 F.T.C. 204, 286-87, 325, 340-41, 364 (1984) (three years may qualify as promotional) *with Buffalo Courier-Express*, 601 F.2d at 55 (ten weeks might be predatory).

*v. linkLine Communications*,[436] the Supreme Court held that a price squeeze does not provide an independent theory of liability under Section 2. Even before the Court's decision in *linkLine*, price squeezes had not been considered necessarily unlawful,[437] and cases recognized that price squeezes may be the result of natural market forces and may even benefit consumers.[438]

Before *linkLine*, the leading case involving the first type of price squeeze was *United States v. Aluminum Co. of America* (*Alcoa*).[439] In *Alcoa*, the Second Circuit held that a Section 2 violation was established where (1) a firm had monopoly power with respect to one product, (2) its price for that product was "higher than a 'fair price,'" (3) that product is required to compete in a second market where the monopolist itself competes, and (4) the monopolist's price in the second market was so low that competitors could not match it and still earn a "living profit."[440] Following *Alcoa*, there were other cases involving a price squeeze between an input and a finished product.[441] However, most price-squeeze cases fell into the second category, in which the defendant sold the same product (usually electric power) at two different levels of the distribution chain.[442]

In *linkLine*,[443] the Supreme Court recognized that "price-squeeze claims have been recognized by Courts of Appeals for many years, beginning with Judge Hand's opinion in [*Alcoa*]," but held that, "[g]iven developments in economic theory and antitrust jurisprudence since *Alcoa*, we find our recent decisions in *Trinko* and *Brooke Group* more pertinent to the question before us."[444] The defendant in *linkLine* was a regulated telephone network provider that, as a condition for a merger, was required by the Federal Communications Commission to sell wholesale transmission service to the plaintiffs, independent service providers, at a price no greater than the price of the defendant's own retail service.[445] The plaintiffs alleged that the defendant "squeezed" their profit margins by setting a high wholesale price and charging a low retail price downstream, thereby effectively precluding the plaintiffs from competing with the defendant.[446] After the Supreme Court's decision in *Verizon Communications v. Law Offices of Curtis V. Trinko, LLP*,[447] regarding refusal to deal claims, the defendant moved for judgment on the pleadings. The defendant argued that it was subject only to a claim of predatory pricing under

436. 555 U.S. 438 (2009).
437. City of Anaheim v. S. Cal. Edison Co., 955 F.2d 1373, 1378 (9th Cir. 1992).
438. *See, e.g.*, Town of Concord v. Boston Edison Co., 915 F.2d 17, 23-25 (1st Cir. 1990) (Breyer, J.).
439. 148 F.2d 416 (2d Cir. 1945).
440. *Id.* at 437-38. Courts grappled with what type of pricing could give rise to an actionable price squeeze. *Alcoa*'s "fair" price test drew criticism because of the difficulties judges and juries face in determining whether a price is fair. *See Town of Concord*, 915 F.2d at 25.
441. *See, e.g.*, Great W. Directories v. Sw. Bell Tel. Co., 63 F.3d 1378, 1386 (5th Cir. 1995); Arthur S. Langenderfer, Inc. v. S.E. Johnson Co., 917 F.2d 1413, 1440 n.26 (6th Cir. 1990); Bonjorno v. Kaiser Aluminum & Chem. Corp., 752 F.2d 802 (3d Cir. 1984).
442. *See, e.g.*, City of Mishawaka v. Am. Elec. Power Co., 616 F.2d 976 (7th Cir. 1980); *City of Anaheim*, 955 F.2d 1373; *Town of Concord*, 915 F.2d 17; Borough of Lansdale v. Phila. Elec. Co., 692 F.2d 307 (3d Cir. 1982); City of Kirkwood v. Union Elec. Co., 671 F.2d 1173 (8th Cir. 1982); City of Groton v. Conn. Light & Power Co., 662 F.2d 921 (2d Cir. 1981).
443. 555 U.S. 438 (2009).
444. *Id.* at 452 n.3 (citing Verizon Commc'ns v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398 (2004), and Brooke Grp. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 222-24 (1993)).
445. *Id.* at 442-43.
446. *Id.* at 443-44.
447. 540 U.S. 398 (2004).

*Brooke Group v. Brown & Williamson Tobacco Corp.*[448] The Ninth Circuit affirmed the district court's denial of the motion, reasoning that "*Trinko* did not involve a price squeeze[] theory," and therefore price squeeze claims should remain viable because they "formed part of the fabric of traditional antitrust law prior to *Trinko*."[449]

The Supreme Court reversed, breaking the price squeeze claim into "wholesale" and "retail" components and analyzing each separately. The Court held that a "straightforward" application of *Trinko* "forecloses any challenge to [defendant's] *wholesale* prices."[450] The Court explained that "*Trinko* . . . makes clear that if a firm has no antitrust duty to deal with its competitors at wholesale, it certainly has no duty to deal under terms and conditions that the rivals find commercially advantageous," whether those terms are nonprice terms and conditions like those in *Trinko* or the price terms in *linkLine*.[451]

As to the retail price allegations, the Court deemed insufficient allegations that the defendant's prices were "too low" for the plaintiffs to make a reasonable profit.[452] The Court applied the *Brooke Group* predatory pricing test, holding that "[r]ecognizing a price-squeeze claim where the defendant's retail price remains above cost would invite the precise harm we sought to avoid in *Brooke Group*: firms might raise their retail prices or refrain from aggressive price competition to avoid antitrust liability."[453] Combining the two strands of its analysis, the Court concluded that an antitrust plaintiff cannot "alchemize" a "meritless claim at the retail level and a meritless claim at the wholesale level" into "a new form of antitrust liability never before recognized by this Court. We decline the invitation to recognize such claims."[454] The Court remanded the case to the district court to assess whether the plaintiff stated a claim under the *Brooke Group* predatory pricing test.[455]

### f. BUYER-SIDE PREDATION

Predatory pricing, or overbuying, by purchasers also can give rise to claims under Section 2. A monopsonist could, in theory, use "predatory bidding" to foreclose competitors by offering to buy inputs at a "high" price that would make it unprofitable for competing firms that rely on the input to manufacture the final product.

The Supreme Court addressed this issue in *Weyerhaeuser Co. v. Ross-Simmons Hardware Lumber Co.*[456] Plaintiff, Ross-Simmons, alleged that Weyerhaeuser had attempted to eliminate competitors by driving up the prices of alder sawlogs and restricting the access of competing manufacturers of hardwood lumber to alder

448. 509 U.S. 209 (1993). The *Brooke Group* test requires a showing that defendant's prices are "below an appropriate measure of its rival's costs" and will result in a "dangerous probability" of recoupment of losses from below-cost pricing. *Id.* at 222-24.

449. *linkLine*, 550 U.S. at 445.

450. *Id.* at 449.

451. *Id.* at 450.

452. *Id.* at 451.

453. *Id.* at 451-52.

454. *Id.* at 457.

455. *Id.* *See also* John Doe 1 v. Abbott Labs., 571 F.3d 930, 933-35 (9th Cir. 2009) (relying on *linkLine* in reversing the district court's denial of a motion to dismiss a claim for monopoly leveraging based on pricing conduct in input and downstream markets).

456. 549 U.S. 312 (2007).

sawlogs through predatory overbidding.[457] In rejecting the plaintiff's allegations, the Court noted that "predatory-bidding mirrors predatory pricing in respects that we deemed significant to our analysis in *Brooke Group*"[458] because such conduct, inter alia, requires a firm "to suffer losses today on the chance that it will reap supracompetitive profits in the future."[459] Adapting the first prong of the *Brooke Group* test, the Court stated that a plaintiff seeking to establish predatory-bidding first must show that the alleged conduct "caused the cost of the relevant output to rise above the revenues generated in the sale of those outputs."[460] The Court further held that to satisfy *Brooke Group*'s second prong, a "predatory-bidding plaintiff . . . must prove that the defendant has a dangerous probability of recouping the losses incurred in bidding up input prices through the exercise of monopsony power."[461]

### 6. *Misuse of Governmental and Standards-Setting Processes*

#### a. MANIPULATION OF PRIVATE AND GOVERNMENT STANDARD SETTING

Standard-setting activities—especially when accomplished by private organizations—have long been subject to antitrust scrutiny.[462] The courts recognize that standard setting is generally procompetitive. The Supreme Court, for instance, has recognized that collaborative standard setting accomplished "through procedures that prevent the standard-setting process from being biased by members with economic interests in stifling product competition . . . can have significant procompetitive advantages."[463] These advantages include providing information that "saves buyers the trouble of investigating products themselves and the risk of trying untested products."[464] They also include ensuring interoperability—"the ability of one manufacturer's product to interface with another manufacturer's product."[465] Standards can foster competition by facilitating comparison of competing products,

---

457. *Id.* at 314-15.
458. *Id.* at 323.
459. *Id.*; *see also* Am. Tobacco Co. v. United States, 328 U.S. 781, 809 (1946) (anticompetitive conduct included overbidding for raw materials as part of a plan "to exclude actual or potential competition").
460. 549 U.S. at 325; *see also In re* Beef Indus. Antitrust Litig., 907 F.2d 510, 514-16 (5th Cir. 1990) (rejecting claim where "prices over the past ten years have remained stable at a depressed level"); Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, 311 F. Supp. 2d 1048, 1108-09 (D. Colo. 2004) (rejecting claim that music promoter bid for artists at a rate above market in order to drive out competitors); Addamax Corp. v. Open Software Found., 888 F. Supp. 274, 280 (D. Mass. 1995) (monopsony claims are not actionable absent proof that the conduct injures consumers by increasing price of the end product).
461. 549 U.S. at 325.
462. *See generally* ABA SECTION OF ANTITRUST LAW, HANDBOOK ON THE ANTITRUST ASPECTS OF STANDARDS SETTING (2d ed. 2011) [hereinafter ABA STANDARDS-SETTING HANDBOOK].
463. Allied Tube & Conduit Corp. v. Indian Head, Inc., 486 U.S. 492, 501 (1988).
464. Consol. Metal Prods. v. Am. Petroleum Inst., 846 F.2d 284, 296 (5th Cir. 1988); *see also* Clamp-All Corp. v. Cast Iron Soil Pipe Inst., 851 F.2d 478, 487 (1st Cir. 1988) (product certification may provide a relatively "cheap and effective" way for manufacturers or consumers to determine whether a product meets certain criteria for acceptability).
465. Rambus, Inc. v. Infineon Techs., 330 F. Supp. 2d 679, 696 & n.26 (E.D. Va. 2004); *see also* ABA STANDARDS-SETTING HANDBOOK, *supra* note 462, at 6-12 (explaining the competitive effects of different types of standards).

facilitating market entry, lowering product development costs, and lowering marketing costs.[466]

The Supreme Court also has recognized, however, that standard setting is "rife with opportunities for anticompetitive activity."[467] Although most challenges to standard-setting conduct have been brought under Section 1,[468] abuse of the standard-setting process has also been condemned as a violation of Section 2 where the other requirements for proving monopolization or attempt are established. As one court noted, "the subversion of an SSO [standard-setting organization] by a single industry player or by a limited subset of SSO members can result in anticompetitive outcomes. Thus, antitrust law historically has been concerned with the risk of one or a small number of participants capturing the economic power of an industry-wide standard and turning the SSO into a source of exclusionary power."[469]

Standards set by either private organizations or by government may be subject to this type of conduct.[470]

### (1) *Private Standard Setting*

Both the antitrust enforcement agencies and the courts have recognized that a single firm may "capture" a privately set standard and monopolize a market through conduct related to intellectual property rights held by the firm. In *Broadcom Corp. v. Qualcomm Inc.*,[471] the Third Circuit held that the plaintiff had stated a claim for monopolization based on allegations that Qualcomm had intentionally deceived a private standard-setting organization when Qualcomm had promised to license its patents essential to the standard on fair, reasonable, and nondiscriminatory (FRAND) terms but failed to do so.[472] Qualcomm's patented technologies were included in the new industry standard in reliance on that promise and, as a result, significantly expanded Qualcomm's market power by eliminating alternatives to its patented technology.[473] In a similar case, *Research in Motion v. Motorola, Inc.*,[474] a district court denied a motion to dismiss a monopolization claim based on the alleged false representation that the defendant would license its patents on FRAND terms. Here the plaintiff alleged that the standard-setting organization relied on this false promise when adopting the defendant's technology and that the defendant subsequently refused to honor its promise. The court held that these allegations were sufficient to allege anticompetitive conduct and antitrust injury.[475]

---

466. *Rambus*, 330 F. Supp. 2d at 696.
467. Am. Soc'y of Mech. Eng'rs v. Hydrolevel Corp., 456 U.S. 556, 571 (1982).
468. *See, e.g.*, *Allied Tube*, 486 U.S. at 497; *Hydrolevel*, 456 U.S. at 65; Radiant Burners, Inc. v. Peoples Gas Light & Coke Co., 364 U.S. 656, 659 (1961).
469. *Rambus*, 330 F. Supp. 2d at 696-97.
470. *See, e.g.*, ABA STANDARDS-SETTING HANDBOOK, *supra* note 462, at 56-64, 107-37.
471. 501 F.3d 297 (3d Cir. 2007).
472. *Id.* at 314.
473. *Id.* at 314, 317.
474. 644 F. Supp. 2d 788 (N.D. Tex. 2008).
475. *Id.* at 793-96. Misrepresenting the existence or scope of intellectual property rights to a standard-setting organization also may be exclusionary. *See* Dell Computer Corp., 121 F.T.C. 616 (1996) (misrepresenting the existence of intellectual property rights to a standard-setting organization may be exclusionary particularly when the standard-setting organization would have adopted a nonproprietary design had it known of the patent).

But courts have held that avoiding a FRAND commitment, alone, cannot constitute exclusionary conduct under Section 2.[476] In *Rambus, Inc.*, the FTC charged Rambus with monopolization and attempted monopolization based upon Rambus's failure to disclose patents and patent applications and its use of information obtained at meetings of JEDEC, the standard-setting organization, to amend patent applications to read on the JEDEC standard.[477] The Commission voted unanimously to reverse and vacate the administrative law judge's decision dismissing the complaint. Although the FTC noted that the JEDEC policy was "not a model of clarity," it held that "whether the SSO requires disclosure should be judged not only by the letter of its rules, but also on how the rules are interpreted by its members, as evidenced by their behavior as well as by their statements of what they understand the rules to be."[478] The Commission found that JEDEC members shared an understanding that the JEDEC rules prohibited Rambus's conduct, held that Rambus's conduct was unlawful because it had anticompetitive effects, and determined that Rambus failed to "carry its burden of establishing that its conduct served procompetitive purposes."[479]

In a subsequent decision, the FTC addressed remedies and held that in a "but for" world absent Rambus's anticompetitive conduct, JEDEC would have incorporated Rambus's technology into the standard with an agreement by Rambus to license the technology on reasonable and nondiscriminatory terms.[480] The FTC's order proscribed maximum royalty rates for Rambus's DDR-SDRAM and SDRAM technologies and enjoined Rambus from engaging in certain conduct.[481] In *Rambus Inc. v. FTC*,[482] the D.C. Circuit vacated the FTC's liability decision and remedy order against Rambus and remanded the case to the FTC for further proceedings. The court held that avoiding a FRAND commitment, alone, could not constitute exclusionary conduct under Section 2, because "an otherwise lawful monopolist's use of deception simply to obtain higher prices normally has no particular tendency to exclude rivals and thus to diminish competition."[483] Recognizing the potential for further proceedings on remand, the court went on to express its "serious concerns about the strength of [the] evidence relied on to support some of the Commission's crucial findings regarding the scope of JEDEC's patent disclosure policies and

476. *See, e.g.,* Vizio, Inc. v. Funai Elec. Co., 2010 U.S. Dist. LEXIS 30850, at *14-17 (C.D. Cal. 2010).

477. 2004 FTC LEXIS 17 (FTC 2004) (initial decision).

478. Rambus Inc., 2006 FTC LEXIS 60, at *119, *78 (FTC 2006).

479. *Id.* at *167.

480. *In re* Rambus, Inc., Dkt. No. 9302 (Feb. 5, 2007) (Opinion of the Commission on Remedy), *available at* http://www.ftc.gov/os/adjpro/d9302/070205opinion.pdf.

481. *Id.* at 28-30 (The Commission's order enjoined Rambus from: (1) collecting royalties relating to the sale, manufacture or use of any JEDEC-compliant DRAM or non-DRAM products that are greater than those prescribed in the Commission's order; (2) enforcing any royalty agreement currently in effect that is barred by the order; and (3) misrepresenting Rambus's patent or patent applications to any standard-setting organization or its member.).

482. 522 F.3d 456 (D.C. Cir. 2008), *cert. denied*, 129 S. Ct. 1318 (2009).

483. *Id.* at 464-66 (distinguishing *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297 (3d Cir. 2007), where the defendant's "deceit lured the SSO away from nonproprietary technology"). The FTC and the D.C. Circuit referred to this as a "RAND" commitment, i.e., licensing on reasonable and nondiscriminatory terms. *Id.* at 461. *See also* Hon Hai Precision Indus. Co. v. Molex Inc., 2009 U.S. Dist. LEXIS 9165, at *7 (N.D. Ill. 2009) (even if defendant had misled the standards-setting body by falsely representing that it would license essential patents on FRAND terms, the conduct does "not constitute predatory or anticompetitive conduct").

Rambus's alleged violation of those policies."[484] The FTC formally dismissed its complaint against Rambus shortly following the Supreme Court's denial of review.[485]

Note that the FTC has used its authority under Section 5 of the FTC Act to reach misconduct in the context of standard setting where "bad faith or deceptive behavior that undermines the [standard setting] process may also undermine competition in the entire industry, raise price to consumers, and reduce choices."[486] The FTC entered into a consent agreement with Negotiated Data Solutions LLC (N-Data) after concluding that N-Data engaged in an unfair method of competition because it was "inherently 'coercive' and 'oppressive' with respect to firms that were locked into a standard" after N-Data repudiated a licensing commitment made to a standard-setting organization.[487]

Allegations of predatory conduct aimed at coercing a private standard-setting body into taking action favorable to an alleged monopolist were held sufficient to state a claim under Section 2 in *Coalition for ICANN Transparency v. VeriSign, Inc.*[488] The plaintiff alleged that VeriSign, which had been the exclusive regulator of the .com domain name market, used its market power to coerce the Internet Corporation for Assigned Names and Numbers (ICANN) to extend its exclusive contract without soliciting competitive bids and on terms favorable to VeriSign.[489]

Where a member of a standard-setting organization discloses both its intellectual property and the terms on which it will license, the subsequent refusal to license on other terms and enforcement of the intellectual property against those who do not take a license is not anticompetitive. In *Townshend v. Rockwell International Corp.*,[490] the district court dismissed a Section 2 claim where the defendant had informed the standard-setting organization of its pending patent, submitted proposed licensing terms to the organization, and (after the technology was standardized) refused to license the technology on different terms, asserting the patent against a firm that refused to take a license.[491] The court also rejected the argument that a "refusal to license on fair terms" was anticompetitive conduct, noting that there was no allegation that the defendants had not offered to license on the terms they presented to the standard-setting group prior to adoption of the standard.[492]

---

484. 522 F.3d at 467.
485. Order Returning Matter to Adjudication and Dismissing the Complaint (May 14, 2009), *available at* http://www.ftc.gov/os/adjpro/d9302/090512orderdismisscomplaint.pdf. In similar private litigation related to *Rambus*, a district court held that, as a matter of law, JEDEC's written policies were too vague to require disclosure of patent applications or the intent to file patent applications. *See* Hynix Semiconductor Inc. v. Rambus Inc., 2008 U.S. Dist. LEXIS 60838, at *15-17 (N.D. Cal. 2008).
486. Negotiated Data Solutions, File No. 051-0094, slip op. at 2 (FTC Jan. 23, 2008) (Statement of the Commission), *available at* http://www.ftc.gov/os/caselist/0510094/080122statement.pdf.
487. Analysis to Aid Public Comment at 5, Negotiated Data Solutions, File No. 051-0094 (FTC Jan. 23, 2008), *available at* http://www.ftc.gov/os/caselist/0510094/080122analysis.pdf.
488. 611 F.3d 495 (9th Cir. 2010).
489. *Id.* at 500-07.
490. 2000 U.S. Dist. LEXIS 5070 (N.D. Cal. 2000).
491. *Id.* at *32-33 (distinguishing Dell Computer Corp., 121 F.T.C. 616 (1996)).
492. *Id.* at *34.

*(2) Government Standard Setting*

Government-imposed standards may also be subject to influence by competitors.[493] Conformance with governmental standards (unlike private standards) is typically required by law.[494] These standards can therefore confer substantial market power. Competitor efforts to influence government standards, by soliciting government adoption of a particular standard or by manipulating a privately set standard to be adopted by the government, may therefore raise antitrust concerns.[495] The cases, however, may involve complex antitrust immunity issues concerning the state action and *Noerr* doctrines.[496]

Even though a plaintiff may not recover for harm caused by governmental adoption of a standard unless *Noerr*'s sham exception applies,[497] the scope of the sham exception to *Noerr* in the governmental standard-setting context is still being defined. Although no court has yet addressed the issue, in *Union Oil of California* (*Unocal*),[498] the FTC concluded that, under certain conditions, deliberate misrepresentations to a government agency promulgating a standard are not protected by *Noerr* from antitrust liability. In *Unocal* the Commission reversed an order dismissing monopolization and attempted monopolization claims based upon Unocal's alleged knowing and willful misrepresentations regarding its patent position to the California Air Resources Board and competing gasoline refiners during regulatory proceedings to promulgate reformulated gasoline regulations.[499]

b. MISUSE OF GOVERNMENT PROCESS

Conduct outside of the standard-setting arena may also amount to a misuse of government process. As in the governmental standard-setting context, the *Noerr*

493. Standards are frequently set by governmental agencies. *See, e.g.*, ABA STANDARDS-SETTING HANDBOOK, *supra* note 462, at 4.

494. *See, e.g.*, *id.* at 4-5.

495. *See, e.g.*, Allied Tube & Conduit Corp. v. Indian Head, Inc., 486 U.S. 492, 495-97 (1988) (collusive action by competitors to stack vote for standard that was adopted by numerous municipalities).

496. The *Noerr* or *Noerr-Pennington* doctrine, based on *Eastern Railroad Presidents Conference v. Noerr Motor Freight*, 365 U.S. 127 (1961), and *United Mine Workers of America v. Pennington*, 381 U.S. 657 (1965), protects good faith government petitioning from serving as the basis for finding antitrust liability; absent a finding that the petitioning was a sham, it is lawful. See Chapter 13.C for a discussion of the *Noerr* doctrine. The state action doctrine, announced in *Parker v. Brown*, 317 U.S. 341 (1943), permits state governments and certain private economic actors to show that the operation of a state regulatory scheme precludes the imposition of antitrust liability. See Chapter 13.B for a discussion of the state action doctrine.

497. For example, in *Massachusetts School of Law v. American Bar Ass'n*, 107 F.3d 1026, 1034-36 (3d Cir. 1997), the court held that the plaintiff's harm flowed not from the ABA's adoption of a standard for law school accreditation, but from states' decisions to require graduation from an accredited school to sit for the bar exam. *See also* Sessions Tank Liners v. Joor Mfg., 17 F.3d 295, 297-98 (9th Cir. 1994) (*Noerr* immunity barred liability for false statements to a standard-setting committee because plaintiff's harm flowed from action of governmental entities adopting the standards); Lawline v. Am. Bar Ass'n, 956 F.2d 1378, 1383-84 (7th Cir. 1992) (bar associations that promulgated disciplinary rules prohibiting partnerships between lawyers and nonlawyers were immune from liability under §§ 1 and 2 because rules had been adopted by Illinois Supreme Court).

498. 138 F.T.C. 1 (2004).

499. *Id.* at 36-45.

doctrine generally protects this type of conduct, but certain abuses of government process may violate Section 2.

*(1) Anticompetitive Litigation*

Under certain limited circumstances, the use of litigation or administrative proceedings against competitors may violate Section 2. First, "sham litigation"—the filing of baseless lawsuits or administrative actions—not in order to prevail in those actions, but to impede a competitor's ability to compete—may be exclusionary conduct outside the protection of *Noerr*.[500] In *Professional Real Estate Investors v. Columbia Pictures Industries*,[501] the Supreme Court clarified the circumstances under which litigation may be a sham and violate Section 2. The claim must be objectively baseless, i.e., no reasonable litigant could have anticipated success on the merits, and the party asserting the claim must have a subjective intent to "interfere directly" with a competitor's business relationships by means of the litigation process, regardless of the outcome of the case.[502]

Second, some courts have held that a series of lawsuits or administrative actions "brought pursuant to a policy of starting legal proceedings without regard to the merits and for the purpose of injuring a market rival" may fall within the sham litigation exception to *Noerr* without regard to the *Professional Real Estate Investors* test.[503] Thus, even if some of the suits "turn out to, just as a matter of chance," have merit, the course of conduct is not protected by *Noerr*.[504] Section 2

500. *See, e.g.*, Covad Commc'ns Co. v. Bell Atl. Corp., 398 F.3d 666, 677 (D.C. Cir. 2005) ("*Noerr-Pennington* immunity, however, does not extend to 'sham' litigation."); T.F.T.F. Capital Corp. v. Marcus Dairy, 312 F.3d 90, 93 (2d Cir. 2002) ("There exists, however, an exception to the *Noerr Pennington* doctrine for 'sham' litigation."); A Fisherman's Best, Inc. v. Recreational Fishing Alliance, 310 F.3d 183, 191 (4th Cir. 2002) ("Under the *Noerr* doctrine filing a lawsuit or seeking other government action can violate antitrust laws when it is a 'sham.'"); Neumann v. Reinforced Earth Co., 786 F.2d 424, 427 (D.C. Cir. 1986); Rickards v. Canine Eye Registration Found., 783 F.2d 1329, 1334 (9th Cir. 1986). In *AMERCO*, 109 F.T.C. 135, 138 (1987), the FTC charged the owner of a U-Haul one-way rental moving equipment business with a "deliberate course of action to abuse the judicial process in order to injure a competitor" by filing claims in the competitor's Chapter 11 bankruptcy reorganization. The FTC contended that the claims were "intended primarily to delay or prevent" reorganization. The FTC action was subsequently settled.

501. 508 U.S. 49 (1993).

502. *Id.* at 60-61 (citing *Noerr*); *see also In re* Indep. Serv. Orgs. Antitrust Litig., 203 F.3d 1322, 1326 (Fed. Cir. 2000) (stating that patent infringement suits may be basis for antitrust liability if suit was "a mere sham to cover what is actually no more than an attempt to interfere directly with the business relationship of a competitor"); Nobelpharma AB v. Implant Innovations, 141 F.3d 1059, 1071 (Fed. Cir. 1998) ("in order to prove a suit was within *Noerr*'s 'sham' exception to immunity, an antitrust plaintiff must prove that the suit was both *objectively* baseless and *subjectively* motivated by a desire to impose collateral, anti-competitive injury rather than to obtain a justifiable legal remedy") (emphasis in original). See Chapter 13.C for a discussion of the *Noerr* doctrine.

503. USS-POSCO Indus. v. Contra Costa Cnty. Bldg. & Constr. Trades Council, 31 F.3d 800, 810-11 (9th Cir. 1994); *see also* PrimeTime 24 Joint Venture v. NBC, 219 F.3d 92, 101 (2d Cir. 2000) (administrative challenges to license). *But see* Christian Mem'l Cultural Ctr. v. Mich. Funeral Dirs. Ass'n, 998 F. Supp. 772, 777 n.2 (E.D. Mich. 1998) (indicating that "courts in this circuit . . . have declined to read *Professional Real Estate* so narrowly" as to be limited only to cases that involve a single lawsuit).

504. *USS-POSCO Indus.*, 31 F.3d at 811 (a record of over 50% success could not support a repetitive litigation claim).

allegations have therefore been premised on allegations of a pattern of baseless claims.[505]

Third, some courts have held that intentional misrepresentations made to a judicial or administrative body may be anticompetitive conduct that falls outside of *Noerr* protection whether or not the *Professional Real Estate Investors* test is met.[506]

Issues involving application of the *Noerr* doctrine arise in a wide variety of other contexts as well. These issues are discussed in Chapter 13.

### *(2) Fraudulently Obtaining Government-Granted Protection from Competition*

Through a variety of means, such as patents, government can grant limited protection from competition to a firm or group of firms. Obtaining this type of protection through fraud may, in limited circumstances, amount to exclusionary conduct under Section 2.

#### (a) The Use of Fraud to Acquire Intellectual Property Rights

Intellectual property rights are the most significant form of government protection from competition. However, protection will not be afforded if the rights were obtained by fraud. In *Walker Process Equipment v. Food Machinery & Chemical Corp.*,[507] the Supreme Court held that enforcing a patent obtained by fraud on the

---

505. *See, e.g.*, ERBE Elektromedizin GmbH v. Canady Tech., 629 F.3d 1278, 1292 (Fed. Cir. 2010) (rejecting sham litigation counterclaim and concluding that the record demonstrated that patent owner had probable cause to file three infringement lawsuits); Kaiser Found. Health Plan v. Abbott Labs., 552 F.3d 1033, 1044 (9th Cir. 2009) (holding there was insufficient evidence to conclude that the 17 suits against generic pharmaceutical companies were a sham because the defendant had prevailed in some and had plausible arguments based on which it could have prevailed in the others); AstraZeneca v. Mylan Labs., 2010 U.S. Dist. LEXIS 50049, at *20 (S.D.N.Y. 2010) (concluding where patentee won eight of eleven infringement suits against generic competitors, patentee did not engage in pattern of baseless lawsuits); *In re* Terazosin Hydrochloride Antitrust Litig., 335 F. Supp. 2d 1336, 1355-56, 1366-67 (S.D. Fla. 2004) (granting summary judgment against monopolization claim based on repetitive litigation because defendant succeeded in seven of the 17 lawsuits it filed and none of the suits was objectively baseless); Twin City Bakery Workers & Welfare Fund v. Astra Aktiebolag, 207 F. Supp. 2d 221, 224 n.2 (S.D.N.Y. 2002) (dismissing monopolization claim and rejecting argument that 12 lawsuits against 10 separate generic drug manufacturers was pattern of baseless litigation).

506. St. Joseph's Hosp. v. Hosp. Corp. of Am., 795 F.2d 948, 955 (11th Cir. 1986); *see also* Kottle v. Nw. Kidney Ctrs., 146 F.3d 1056, 1060 (9th Cir. 1998) ("in the context of a judicial proceeding, if the alleged anticompetitive behavior consists of making intentional misrepresentations to the court, litigation can be deemed a sham if 'a party's knowing fraud upon, or its intentional misrepresentations to, the court deprive the litigation of its legitimacy'") (citation omitted); Liberty Lake Invs. v. Magnuson, 12 F.3d 155, 159 (9th Cir. 1993) (stating that *Professional Real Estate Investors* two-part test for determining sham litigation applies "in the absence of proof that a party's knowing fraud upon, or its intentional misrepresentations to, the court deprive the litigation of its legitimacy"); Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, 690 F.2d 1240, 1260-61 (9th Cir. 1982) ("fraudulent furnishing of false information to an agency in connection with an adjudicatory proceeding" may be the basis of antitrust liability). *But see* Freeman v. Lasky, Haas & Cohler, 410 F.3d 1180, 1185 (9th Cir. 2005) (applying *Professional Real Estate Investors* two-part test to allegations that defense of suit was anticompetitive due to alleged discovery misconduct, subordination of perjury, and witness intimidation).

507. 382 U.S. 172, 176 (1965). See Chapter 11.B.1 for an in-depth discussion of this issue.

Patent and Trademark Office is exclusionary conduct.[508] As the Court explained, proof that a patentee "obtained the patent by knowingly and willfully misrepresenting facts to the Patent Office. . . . would be sufficient to strip [the patentee] of its exemption from the antitrust laws."[509] Courts have extended the reasoning of *Walker Process* to other intellectual property. As with patents, "[f]raudulent procurement of a copyright by means of knowing and willful misrepresentations to the Copyright Office may strip a copyright holder of its exemption from the antitrust laws."[510] The enforcement of a copyright procured through improper means may therefore be exclusionary conduct.[511] The same is true for trademarks.[512]

Antitrust liability for the use of fraud to acquire intellectual property rights is discussed in greater detail in Chapter 11.

(b) The Use of Fraud to Obtain Other Government-Granted Protection from Competition

The courts have also confronted monopolization cases alleging fraud to obtain other government protection from competition. For example, in *In re Buspirone Patent Litigation*,[513] the court held that allegations that a pioneer drug company knowingly submitted false information to the Federal Drug Administration (FDA) in order to obtain a stay of FDA approval for a generic competitor were sufficient to

508. *See id.* at 179 (Harlan, J., concurring) ("We hold today that a treble-damage action for monopolization which, but for the existence of a patent, would be violative of § 2 of the Sherman Act may be maintained under § 4 of the Clayton Act if two conditions are satisfied: (1) the relevant patent is shown to have been procured by knowing and willful fraud practiced by the defendant on the Patent Office or, if the defendant was not the original patent applicant, he had been enforcing the patent with knowledge of the fraudulent manner in which it was obtained; and (2) all the elements otherwise necessary to establish a § 2 monopolization charge are proved.").

509. 328 U.S. at 177. In *Nobelpharma AB v. Implant Innovations*, 141 F.3d 1059 (Fed. Cir. 1998), the Federal Circuit held that *Professional Real Estate Investors* and "*Walker Process* provide alternative legal grounds on which a patentee may be stripped of its immunity from the antitrust laws." *Id.* at 1071. Thus, antitrust liability may be imposed upon proof of *Walker Process* fraud (combined with the other elements of a § 2 violation) "without the additional sham inquiry required under" *Professional Real Estate Investors. Id.* *See also In re* Relafen Antitrust Litig., 360 F. Supp. 2d 166, 184 (D. Mass. 2005) (*Walker Process* "may strip a patentee of immunity independently of or in addition to the sham litigation exception").

510. Knickerbocker Toy Co. v. Winterbrook Corp., 554 F. Supp. 1309, 1321 (D.N.H. 1982).

511. *See, e.g.*, Michael Anthony Jewelers v. Peacock Jewelry, 795 F. Supp. 639, 647-48 (S.D.N.Y. 1992) (allegations of enforcement of fraudulently obtained copyright and other conduct were sufficient to support monopolization claim); *Knickerbocker Toy*, 554 F. Supp. at 1321-22 (recognizing conduct as anticompetitive but dismissing complaint for failure to adequately allege market and monopoly power); Vogue Ring Creations, Inc. v. Hardman, 410 F. Supp. 609, 616-17 (D.R.I. 1976) (recognizing enforcement of fraudulently procured copyright to be exclusionary).

512. *See, e.g.*, Nw. Corp. v. Gabriel Mfg. Co., 1996 U.S. Dist. LEXIS 19275, at *19 (N.D. Ill. 1996) ("Trademark monopolization or attempted monopolization claims often fall into one of two general categories. The first involves the use of an illegally obtained trademark and focuses on the power of the trademarked product to monopolize a relevant economic market solely as a consequence of its illegal registration."); Caplan v. Am. Baby, Inc., 582 F. Supp. 869, 871 (S.D.N.Y. 1984) (denying motion to dismiss attempted monopolization counterclaim challenging an attempt to register an unenforceable trademark and to enjoin others from its use despite its cancellation).

513. 185 F. Supp. 2d 363 (S.D.N.Y. 2002).

support a claim for monopolization.[514] As another example, in *Guimerfe, Inc. v. Perez-Perdomo*,[515] the court rejected the defendant's argument that *Noerr-Pennington* barred the plaintiff's claim that the defendant blocked its entry into the home health care market in Puerto Rico. The court found the allegations that the defendant engaged in a collusive scheme to oppose every application by the plaintiff to enter the market "with an expensive, time-consuming web of unwarranted, governmental processing" were sufficient to plead that the defendant engaged in sham petitioning activity.[516]

Exclusionary conduct, however, does not include seeking government-granted protection from competition where there is a reasonable basis to do so. In *Organon Inc. v. Mylan Pharmaceuticals*,[517] the antitrust plaintiffs alleged that defendants had engaged in monopolization by improperly listing a patent in the FDA's Orange Book to delay generic competition. The court, however, found (based on the language of the FDA regulation) that the defendants had a reasonable basis for the filing, holding that "given the statutory and regulatory language at the time it submitted the . . . patent for listing in the Orange Book, [the defendants had] a reasonable basis for the submission, and therefore, [the defendants'] listing was not improper."[518] The court therefore dismissed the claim.[519]

### 7. *Improper Coordination with Competitors*

The courts have held that certain types of coordination with competitors may satisfy the conduct element of the monopolization offense.

#### a. MONOPOLIZATION BY ACQUIRING CONTROL OF COMPETITORS

Coordination with competitors can take many forms, of which the most complete is the acquisition of control of competitors. Although these acquisitions are typically challenged under Section 7 of the Clayton Act,[520] the Supreme Court long ago made

514. *Id.* at 369-76, 380 (holding (alternatively) that *Noerr* did not apply because (1) listing in the Orange Book was not petitioning activity; (2) the alleged misrepresentations fell within an exception to the *Noerr* doctrine under the reasoning of *Walker Process* because defendant allegedly submitted false information; and (3) the allegations were sufficient to invoke the sham exception); *see also* Xechem, Inc. v. Bristol-Myers Squibb Co., 372 F.3d 899, 902 (7th Cir. 2004) (reversing dismissal of complaint based on statute of limitations grounds and explaining that the allegation of improper listing of patent in Orange Book was a "new exclusionary act" within the limitations period). In *In re Remeron Antitrust Litig.*, 335 F. Supp. 2d 522 (D.N.J. 2004), the court refused to dismiss a complaint alleging that a pioneer drug company engaged in exclusionary conduct by filing of a patent in the Orange Book 13 months later than the date required by the Hatch-Waxman Act (30 days after approval of the application). The court stated that "[w]ithin the maze of Hatch-Waxman, if a patent holder's actions unlawfully maintain otherwise lawful monopoly power or use a lawful patent to manipulate the ANDA process, such action could lead to anticompetitive effects in the relevant market." *Id.* at 531. Antitrust issues arising out of the Hatch-Waxman Act amendments are addressed in more detail in part F.8 of Chapter 14.
515. 2009 U.S. Dist. LEXIS 28758 (D.P.R. 2009).
516. *Id.* at *11.
517. 293 F. Supp. 2d 453 (D.N.J. 2003).
518. *Id.* at 460.
519. *Id.* at 462.
520. 15 U.S.C. § 18.

it clear that the acquisition of control of competitors may satisfy the conduct element of Section 2 as well.

In *Standard Oil Co. v. United States*,[521] for instance, the Supreme Court held that the Standard Oil Company of New Jersey had monopolized the petroleum industry in violation of Section 2 by acquiring controlling interests in a multiple competitors.[522] The Court concluded that these stock transfers evidenced a purpose to maintain monopoly power "not as a result of normal methods of industrial development" but by "new means of combination . . . , the whole with the purpose of excluding others from the trade."[523] Similarly, in *United States v. Grinnell Corp.*,[524] the Court held that the defendant had engaged in monopolization by, among other things, acquiring control over three companies, which combined held 87 percent of the relevant market.[525] Thus, "'merger to monopoly,' benign as to the merged competitors, is a feasible section 2 claim . . . even if it is more often challenged under Clayton Act section 7, which requires much less."[526]

### b. MONOPOLIZATION THROUGH AGREEMENTS WITH COMPETITORS

Though most often addressed under Section 1, certain agreements with competitors (though short of the acquisition of control) may also constitute anticompetitive conduct under Section 2.[527] For instance, agreements with competitors that limit competition between the parties may satisfy the Section 2 conduct element.[528] Similarly, agreements with potential competitors by which the

---

521. 221 U.S. 1 (1911).
522. *Id.* at 72-75.
523. *Id.* at 75; *see also* United States v. Am. Tobacco Co., 221 U.S. 106, 181-83 (1911) (defendant violated § 2 by (1) acquiring controlling interests of competitors following ruinous price wars; (2) creating entry barriers by acquiring control over necessary inputs; (3) buying out competitors' plants to shut those plants down; and (4) requiring numerous persons to enter into long-term covenants not to compete); *cf.* United States v. Syufy Enters., 903 F.2d 659, 673 (9th Cir. 1990) (government failed to prove monopolization where market had low entry barriers and explaining that, "in a competitive market, buying out competitors is not merely permissible, it contributes to market stability and promotes the efficient allocation of resources").
524. 384 U.S. 563 (1966).
525. *Id.* at 567, 576 ("By those acquisitions [the defendant] perfected the monopoly power to exclude competitors and fix prices.").
526. Fraser v. Major League Soccer, 284 F.3d 47, 61 (1st Cir. 2002) (citation omitted); *see also* Arthur S. Langenderfer, Inc. v. S.E. Johnson Co., 917 F.2d 1413, 1443-44 (6th Cir. 1990) (affirming jury verdict that jointly owned defendants had monopolized market through acquisitions of competitors); Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council, 857 F.2d 55, 73 (2d Cir. 1988) (tennis association's merger with competitor, among other conduct, sufficient to state a claim for monopolization). *But see* Lektro-Vend Corp. v. Vendo Co., 660 F.2d 255, 271 (7th Cir. 1981) ("It is true that acquisitions can sometimes provide evidence of predatory conduct . . . . Such actions alone, however, are not generally considered predatory and are therefore rarely condemned unless they occur within an overall context of unfair monopolistic practices."); Corsearch, Inc. v. Thomson & Thomson, 792 F. Supp. 305, 325 (S.D.N.Y. 1992) (finding that defendant's acquisitions of competitors did not violate § 2 because there was no evidence that the acquisitions were undertaken to "acquire or maintain a monopoly position and prevent competition").
527. As described later in this chapter in Part F, § 2 also prohibits conspiracies to monopolize, which is a distinct offense.
528. *See, e.g.*, *Grinnell*, 384 U.S. at 576 (market division agreements were an "unlawful and exclusionary" practice under § 2); *Fraser*, 384 F.3d at 61 (if league owners were viewed as competitors, "it is not difficult to see how an agreement not to compete—a mirror image of the

potential entrant agrees to stay out of the market also may amount to monopolization.[529]

In addition, agreements that exclude competitors of the parties to the agreement can also be the basis for a monopolization claim. In *Biovail Corp. v. Hoechst AG*,[530] the court held that an alleged agreement between a branded drug manufacturer and a generic drug manufacturer that operated to keep generic competitors out of the market could be the basis for a monopolization claim. [531] The court held that such conduct could be a violation of Section 1 or "a willful attempt to maintain or obtain a monopoly" in violation of Section 2.[532]

### 8. *Other Tortious or Illegal Conduct*

Some claims under Section 2 are asserted based upon conduct that is independently prohibited as tortious or otherwise illegal.[533] Defining the parameters of antitrust liability under Section 2 in this respect can be difficult. The tests that courts have articulated to define the scope of Section 2 liability generally presuppose that the challenged conduct is of the type that, at least in theory, can be supported by some valid business justification.[534] The tests do not apply easily when conduct is independently illegal.

In *Conwood Co. v. United States Tobacco Co.*,[535] the Sixth Circuit upheld a jury verdict and an award of trebled damages in excess of $1 billion. The plaintiff

---

players' section 1 claim—might create a monopsony and eliminate competition"; § 2 claim dismissed on other grounds); Fair Isaac Corp. v. Equifax Inc., 2008 U.S. Dist. LEXIS 16664, at *22-23 (D. Minn. 2008) (allegation that defendants could use their dominant position in the market for aggregating consumer credit data to gain a monopoly in the credit scoring market through a joint venture could state § 2 claim); *In re* NCAA I-A Walk-On Football Players Litig., 398 F. Supp. 2d 1144, 1151 (W.D. Wash. 2005) (allegation that defendants conspired to form monopsony to limit football scholarships sufficient to state § 2 claim); Columbia River Pilots, 126 F.T.C. 255, 257-58 (1999) (association allegedly maintained monopoly through agreement between association and former members that restricted competition from former members).

529. *See, e.g.*, Schine Chain Theaters v. United States, 334 U.S. 110, 119 (1948) (covenants not to compete were "additional weapons in [the defendant's] arsenal of power through the use of which its monopoly was sought to be extended"); Marnell v. UPS, 1971 U.S. Dist. LEXIS 11030, at *40 (N.D. Cal. 1971) (finding that covenants not to compete, along with other conduct, were done for the purpose of monopolizing market). *But see Lektro-Vend Corp.*, 660 F.2d at 371 (stating that covenants not to compete are not generally considered predatory).

530. 49 F. Supp. 2d 750 (D.N.J. 1999).

531. *Id.* at 767.

532. *Id.*; *see also* SmithKline Beecham Corp. v. Apotex Corp., 383 F. Supp. 2d 686, 702 (E.D. Pa. 2004) (generic exclusivity agreement could be part of alleged larger scheme to monopolize market in violation of § 2); Bristol-Myers Squibb Co., 135 F.T.C. 444, 453-54 (2003) (alleging monopolization in violation of § 5 of the FTC Act through agreement not to challenge validity of the patent and to take actions to enhance apparent validity to discourage other competitors from entry); Abbott Labs., 2000 FTC LEXIS 65, at *26-27 (FTC 2000) (alleging monopolization in violation of § 5 of the FTC Act through agreement between branded drug manufacturer and generic that had effect of precluding entry by all generics).

533. In addition to tortious conduct, the violation of regulatory requirements has been held to satisfy the conduct element of a monopolization claim. *See, e.g.*, W. Concrete Structures Co. v. Mitsui & Co. (U.S.A.), 760 F.2d 1013, 1018 (9th Cir. 1985) (import violations).

534. Verizon Commc'ns v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 409 (2004); *see, e.g.*, Stearns Airport Equip. Co. v. FMC Corp., 170 F.3d 518, 522 (5th Cir. 1999) (efforts to influence bid specifications is an expected part of municipal bidding and not anticompetitive).

535. 290 F.3d 768 (6th Cir. 2002).

established that a rival had removed its retail display racks without retailers' permission, provided misleading information to retailers about competing products, and entered into exclusive agreements with retailers to exclude rival products. The court held that "[b]ecause of restrictions on advertising in the tobacco industry, and the critical nature of POS [point of sale] advertising in the relevant market, efforts by USTC [United States Tobacco Co.], a conceded monopolist, to exclude Conwood's racks and POS advertising from retail locations through any means other than legitimate competition could certainly support Conwood's § 2 Sherman Act claim."[536] USTC argued that "none of the practices Conwood complain[ed] of amount to antitrust violations, but are no more than isolated sporadic torts."[537] The court acknowledged that "[i]solated tortious activity alone does not constitute exclusionary conduct for purposes of a § 2 violation, absent a significant and more than a temporary effect on competition," but stated that "merely because a particular practice might be actionable under tort law does not preclude an action under the antitrust laws as well. 'Anticompetitive conduct' can come in too many different forms, and is too dependent upon context, for any court or commentator ever to have enumerated all the varieties."[538]

In *Dooley v. Crab Boat Owners Ass'n*,[539] the court held that evidence of coercion of competitors through cutting crab lines and beating up crew members sufficed to create a disputed issue of material fact on the question of whether the defendant's conduct was anticompetitive. The court concluded that this conduct "would have harmed competition by preventing crab from reaching market at a competitive price."[540]

Courts generally have rejected antitrust claims based upon "predatory hiring"[541] and intentional mismanagement of a firm.[542]

### 9. *Product Disparagement*

A monopolist has wide latitude to advertise new products truthfully and aggressively. In *Berkey Photo, Inc. v. Eastman Kodak Co.*,[543] the court stated:

536. *Id.* at 784.
537. *Id.* at 783.
538. *Id.* at 784 (citation omitted).
539. 2004 U.S. Dist. LEXIS 7117 (N.D. Cal. 2004).
540. *Id.* at *42.
541. *See, e.g.*, Quality Measurement Co. v. IPSOS S.A., 56 F. App'x 639, 646-47 (6th Cir. 2003) (hiring of a single employee cannot support a § 2 claim); Am. Prof'l Testing Serv. v. Harcourt Brace Jovanovich, 108 F.3d 1147, 1151 (9th Cir. 1997) (hiring a rival's employee not significant enough to warrant recognition under § 2 of the Sherman Act); *cf.* Natsource LLC v. GFI Group, 332 F. Supp. 2d 626, 631 (S.D.N.Y. 2004) ("While the hiring of employees alone generally cannot give rise to antitrust liability, the hiring of a competitor's employees in conjunction with other wrongful acts . . . can constitute anticompetitive conduct in violation of the Sherman Act."). *But see* McCabe Hamilton & Renny, Co. v. Matson Terminals, 2008 U.S. Dist. LEXIS 47428, at *17-18 (D. Haw. 2008) (plaintiff could prove predatory hiring by showing hiring was made with intent to harm competition without helping the monopolist or by showing the monopolist did not use the employees it hired).
542. *See* Six W. Retail Acquisition v. Sony Theatre Mgmt. Corp., 2004 U.S. Dist. LEXIS 5411, at *35 (S.D.N.Y. 2004) ("Mismanaging theatres in which Loews itself had an interest is not a typical predatory or anticompetitive activity."), *aff'd*, 124 F. App'x 73 (2d Cir. 2005).
543. 603 F.2d 263 (2d Cir. 1979).

> A monopolist is not forbidden to publicize its product unless the extent of this activity is so unwarranted by competitive exigencies as to constitute an entry barrier. And in its advertising, a producer is ordinarily permitted, much like an advocate at law, to bathe his cause in the best light possible. Advertising that emphasizes a product's strengths and minimizes its weaknesses does not, at least unless it amounts to deception, constitute anticompetitive conduct violative of § 2.[544]

However, some courts have held that a Section 2 claim may be based on false or misleading advertising or other disparaging statements.[545] The plaintiff must, however, overcome a presumption that the effect of such statements is de minimis. Courts have held that overcoming the presumption requires cumulative proof that the representations were (1) clearly false, (2) clearly material, (3) clearly likely to induce reasonable reliance, (4) made to buyers without knowledge of the subject matter, (5) continued for prolonged periods of time, and (6) not readily susceptible to neutralization or other offset by rivals.[546] Courts may require a plaintiff to satisfy all six elements to overcome the de minimis presumption.[547]

---

544. *Id.* at 287-88 (footnote and citations omitted).

545. *See, e.g.*, Conwood Co. v. U.S. Tobacco Co., 290 F.3d 768, 786-88 (6th Cir. 2002) (deceptive statements made in role of "category manager" were anticompetitive); Nat'l Ass'n of Pharm. Mfrs. v. Ayerst Labs., 850 F.2d 904, 916 (2d Cir. 1988) (false advertising); Int'l Travel Arrangers v. W. Airlines, 623 F.2d 1255, 1268, 1270 (8th Cir. 1980) (misleading advertising); Brownlee v. Applied Biosystems, 1989 U.S. Dist. LEXIS 5960, at *10-13 (N.D. Cal. 1989) (sham litigation, product disparagement). *But cf.* Abcor Corp. v. AM Int'l, 916 F.2d 924, 930 (4th Cir. 1990) (two isolated cases of lies or misinformation intended to suggest that plaintiff was going out of business were by themselves insufficient to avoid summary judgment); Military Servs. Realty v. Realty Consultants, 823 F.2d 829, 832 n.4 (4th Cir. 1987) (quoting Merkle Press v. Merkle, 519 F. Supp. 50, 54 (D. Md. 1981)) ("[C]ourts should be circumspect in converting ordinary business torts into violations of antitrust laws. To do so would be to 'create a federal common law of unfair competition' which was not the intent of the antitrust laws."); Picker Int'l v. Leavitt, 865 F. Supp. 951, 964-65 (D. Mass. 1994) (disparaging statement to a single customer insufficient to support § 2 claim). *See generally* U.S. Football League v. NFL, 634 F. Supp. 1155, 1183 (S.D.N.Y. 1986) (disparagement by a firm with monopoly power may violate § 2, although true but unflattering statements do not).

546. *See Am. Prof'l Testing Serv.*, 108 F.3d at 1152; Apple iPod iTunes Antitrust Litig., 2011 U.S. Dist. LEXIS 77155, at *20 (N.D. Cal. 2011) (citing *Am. Prof'l Testing*); Alternative Electrodes, LLC v. Empi, Inc., 597 F. Supp. 2d 322, 331-32 (E.D.N.Y. 2009) (while truthful comparisons of products do not constitute anticompetitive conduct, "false and misleading statements may provide a basis for antitrust claims"); L-3 Commc'ns Integrated Sys. v. Lockheed Martin Corp., 2008 U.S. Dist. LEXIS 74907, at *21-23 (N.D. Tex. 2008) (defendant's actions could constitute exclusionary conduct after applying the six-factor test or by applying the general principles for determining exclusionary conduct); Applera Corp. v. MJ Research, 349 F. Supp. 2d 338, 344-45 (D. Conn. 2004); Eon Labs Mfg. v. Watson Pharms., 164 F. Supp. 2d 350, 361 (S.D.N.Y. 2001) (inclusion of branded product inserts in alleged monopolist's generic "fighting brand" had only de minimis effect where purchaser only saw material after opening package); Avery Dennison v. ACCO Brands, 2000 U.S. Dist. LEXIS 3938, at *60-61 (C.D. Cal. 2000); David L. Aldridge Co. v. Microsoft Corp., 995 F. Supp. 728, 749 (S.D. Tex. 1998) (court rejected predatory disparagement claim by manufacturer of software designed to enhance operating systems). *But see* Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, 323 F.3d 366, 371 (6th Cir. 2003) (refusing to require plaintiff to meet all six tests, but requiring at least a showing that the advertising was clearly false and that it would be difficult or costly for plaintiff to counter it).

547. *Am. Prof'l Testing Serv.*, 108 F.3d at 1152; *see also* TYR Sport v. Warnaco Swimwear, Inc., 709 F. Supp. 2d 821, 832 (C.D. Cal. 2010) (holding that by failing to demonstrate that the statements had a significant and enduring impact on competition, the plaintiff failed to meet all of the elements of the six-factor test required by the Ninth Circuit); MultiVideo Labs v. Intel Corp., 2000 U.S. Dist. LEXIS 110, at *42 (S.D.N.Y. 2000).

The Seventh Circuit, however, suggested in *Sanderson v. Culligan International Co.*[548] that complaints of false and disparaging statements are not sufficient to state a claim under Section 2 where they do not actually prevent the rival from competing because "[a]ntitrust law condemns practices that drive up prices by curtailing output. False statements about a rival's goods do not curtail output in either the short or long run. They just set the stage for competition in a different venue: the advertising market."[549]

## *10. Valid Business Justification*

As noted above, most articulations of the standard against which conduct is measured under Section 2 ask whether the challenged conduct advances a legitimate business goal—e.g., maximizing short-run profits, preventing free riding, or aligning the incentives of distributors. Courts have not, however, uniformly defined the role, if any, that purported business justifications for challenged conduct play in the Section 2 inquiry.

Some courts apply a burden-shifting regime, requiring defendants to provide a legitimate business justification for their conduct after the plaintiff establishes an anticompetitive effect.[550] For example, in *United States v. Microsoft Corp.*[551] the D.C. Circuit placed the issue of justification at the center of a four-part framework for analyzing whether conduct is considered exclusionary. Under *Microsoft*, the plaintiff bears the burden of establishing that "the monopolist's conduct . . . has the requisite anticompetitive effect."[552] Upon proof of anticompetitive effect, the burden shifts to the defendant to "proffer a 'procompetitive justification' for its conduct."[553] The plaintiff then has the opportunity to rebut the defendant's justification. If the plaintiff fails to undermine the defendant's justification, in order to prevail it "must demonstrate that the anticompetitive harm of the conduct outweighs the procompetitive benefit."[554]

This approach is similar to the balancing required under the rule of reason in Section 1 cases.[555] As in Section 1 cases, rather than literally balancing the costs and

548. 415 F.3d 620 (7th Cir. 2005) (Easterbrook, J.).

549. *Id.* at 623 (citations omitted). As the court explained: "Some other law may require judicial intervention in order to increase the portion of truth in advertising; the Sherman Act does not." *Id.* at 624. *Accord* Briggs & Stratton Corp. v. Kohler Co., 405 F. Supp. 2d 986, 990 (W.D. Wis. 2005) (citing *Sanderson* and striking allegation that defendant misrepresented the power of its engines where there was no showing that "claims regarding the power of its engines reduce the availability of [the counterclaimant's] products or otherwise exclude [the counterclaimant] from the market").

550. *See, e.g.*, Racing Tires Am. v. Hoosier Racing Tire Corp., 614 F.3d 57, 75 (3d Cir. 2010) ("Once the plaintiff demonstrates harm to competition, the defendant then has to show that it is actually promoting a pro-competitive or legitimate business objective."); United States v. Dentsply Int'l, 399 F.3d 181, 196 (3d Cir. 2005) ("[E]ven if a company exerts monopoly power, it may defend its practices by establishing a business justification."); Morris Commc'ns Corp. v. PGA Tour, 364 F.3d 1288, 1295 (11th Cir. 2004); United States v. Microsoft Corp., 253 F.3d 34, 58-59 (D.C. Cir. 2001).

551. 253 F.3d 34 (D.C. Cir. 2001).

552. *Id.* at 58-59.

553. *Id.* at 59.

554. *Id.*

555. *See, e.g., id.*; Mid-Texas Commc'ns Sys. v. AT&T, 615 F.2d 1372, 1389 n.13 (5th Cir. 1980); Byars v. Bluff City News. Co., 609 F.2d 843, 860 (6th Cir. 1979). See Chapter 1.B.3.b(1)(c) for a discussion of the balancing under § 1.

benefits of conduct, courts more typically ask whether the conduct, even if supported by a justification, hinders competition "in an unnecessarily restrictive way."[556]

A business justification will not be accepted where it is pretextual.[557] Nor is the fact that the challenged conduct is designed to enhance profitability in itself a sufficient business justification.[558] Instead, "a business justification is valid if it relates directly or indirectly to the enhancement of consumer welfare."[559] Justifications that have been accepted include the prevention of free riding,[560] reducing or avoiding costs,[561] ensuring consumer safety,[562] and providing superior products to customers.[563]

The burden-shifting approach does not apply in all cases. In cases involving refusals to deal with rivals, for example, some courts have held that the mere existence of a nonpretextual justification will suffice and that a jury is not permitted to "weigh the sufficiency of a legitimate business justification against the anticompetitive effects" of a monopolist's conduct.[564]

## D. Extension of Monopoly from One Market to Another

The Supreme Court's 2004 decision in *Verizon Communications v. Law Offices of Curtis V. Trinko, LLP*[565] clarified the circumstances under which a monopolist may be held liable for extending, or attempting to extend, monopoly power from one market to another. Using monopoly power in one market to monopolize or attempt

---

556. Aspen Highlands Skiing Corp. v. Aspen Skiing Co., 472 U.S. 585, 605 n.32 (1985); *see also* Multistate Legal Studies v. Harcourt Brace Jovanovich, 63 F.3d 1540, 1550 (10th Cir. 1995) (conduct unlawful if "more restrictive than reasonably necessary" for "competition on the merits").

557. *See, e.g.*, Eastman Kodak Co. v. Image Technical Servs., 504 U.S. 451, 484 (1992); United States v. Dentsply Int'l, 399 F.3d 181, 197 (3d Cir. 2005) (evidence supported district court's determination that justification for exclusive dealing policy was pretextual where grandfathered dealers not subject to the policy were no less efficient than exclusive dealers); Image Technical Servs. v. Eastman Kodak Co., 125 F.3d 1195, 1219 (9th Cir. 1997) (justification pretextual where executive responsible for challenged policy testified that purported justification "never crossed his mind").

558. *See, e.g.*, LePage's Inc. v. 3M Co., 324 F.3d 141, 163 (3d Cir. 2003) (en banc) ("[D]efendant's assertion that it acted in furtherance of its economic interests does not constitute the type of business justification that is an acceptable defense to § 2 monopolization."); Del. & Hudson Ry. v. Consol. Rail Corp., 902 F.2d 174, 178 (2d Cir. 1990) ("A monopolist cannot escape liability for conduct that is otherwise actionable simply because that conduct also provides short-term profits.").

559. Data Gen. Corp. v. Grumman Sys. Support Corp., 36 F.3d 1147, 1183 (1st Cir. 1994).

560. *See, e.g.*, Morris Commc'ns Corp. v. PGA Tour, 364 F.3d 1288, 1295 (11th Cir. 2004).

561. *See, e.g.*, Ill. *ex rel.* Burris v. Panhandle E. Pipe Line Co., 935 F.2d 1469, 1485 (7th Cir. 1991) (legitimate for monopolist to refuse to release customers from contracts where the monopolist would itself face enormous costs under take or pay contracts if it did so); Ocean State Physicians Health Plan v. Blue Cross & Blue Shield, 883 F.2d 1101, 1110 (1st Cir. 1989); Bell v. Dow Chem. Co., 847 F.2d 1179, 1186 (5th Cir. 1988); Digene Corp. v. Third Wave Techs., 536 F. Supp. 2d 996, 1005 (W.D. Wis. 2008).

562. HDC Med. v. Minntech Corp., 474 F.3d 543, 550 (8th Cir. 2007) (change in medical device was made "to ensure patient safety").

563. *See, e.g.*, Aspen Highlands Skiing Corp. v. Aspen Skiing Co., 472 U.S. 585, 608-11 (1985); United States v. Microsoft Corp., 253 F.3d 34, 59 (D.C. Cir. 2001).

564. *Bell*, 847 F.2d at 1186; *see also Morris Commc'ns*, 364 F.3d at 1295; Oahu Gas Serv. v. Pac. Res., 838 F.2d 360, 369 (9th Cir. 1988).

565. 540 U.S. 398 (2004).